ARTIANO SHINOFF
Daniel R. Shinoff, Esq. (SBN 99129)
dshinoff@as7law.com
Jack M. Sleeth, Jr., Esq. (SBN 108638)
jsleeth@as7law.com
Michelle M. Pacis, Esq. (SBN 306549)
mpacis@as7law.com
2488 Historic Decatur Road, Suite 200
San Diego, California 92106
Telephone: 619-232-3122
Facsimile: 619-232-3264

Attorneys for Defendants MICHELLE
O'CONNOR-RATCLIFF; T.J. ZANE

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER GARNIER; and KIMBERLY GARNIER, | Case No.: 3:17-CV-02215-W-JLB |
| | Judge: Hon. Thomas J. Whelan |
| | Dept.: 3C |
| Plaintiffs, | Magistrate: Jill L. Burkhardt |
| | Dept.: 5th Floor |
| v. | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| POWAY UNIFIED SCHOOL DISTRICT; MICHELLE O'CONNOR-RATCLIFF; T.J. ZANE and DOES 1 through 1000, | **[Fed. Rule Civ. Proc,, Rule 56]** |
| | **NO ORAL ARGUMENT PURSUANT TO LOCAL RULE 7.1d.1.** |
| Defendants. | Date: March 25, 2019 |
| | Action Date: October 30, 2017 |
| | Trial date: Not Set |

ARTIANO SHINOFF

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................ 5

II.    FACTS ............................................................................... 6

       A.    Facts Relevant to "Standing" ........................................ 6

             1.    Restraining Order ................................................ 6

             2.    State Discrimination Case .................................... 7

             3.    First Federal District case .................................. 7

       B.    Defendants' Social Media Pages ................................... 8

             1.    T.J. Zane ............................................................ 8

             2.    Michelle O'Connor-Ratcliff ............................ 10

III.   LEGAL STANDARDS ...................................................... 11

IV.    LEGAL ANALYSIS .......................................................... 12

       A.    Plaintiffs Do Not Have an Injury to Provide Standing to Sue ........ 12

             1.    Plaintiffs' Benefit from Being Sued ......................... 12

             2.    Plaintiffs Have Multiple Avenues to Speak .............. 13

       B.    The Plaintiffs Cannot Bring a Claim Under 42 U.S.C. § 1983, Because There Is No Government Control or State Action ........... 14

       C.    Forum Analysis ............................................................ 18

             1.    The Social Media Pages Are Not Traditional Public Forums ........... 19

             2.    The Social Media Pages Are Not Designated Public Forums ........... 20

             3.    Even If The Social Media Pages Are Considered Designated Public Forums, Defendants' Conduct of Blocking The Plaintiffs Were Reasonable Time, Place, and Manner Regulations ........... 20

             4.    The Social Media Pages Are Not Limited Public Forums ........... 21

             5.    Even If The Social Media Pages Are Considered Limited Public Forums, The Blocking Of The Plaintiffs Was Viewpoint neutral and reasonable ........... 22

             6.    The Social Media Pages Are Non-Public Forums and The Blocking Of The Plaintiffs Was Reasonable ........... 22

ARTIANO SHINOFF

1

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

1          **D.      The Defendants Enjoy Qualified Immunity** ......................................23

2    **V.     CONCLUSION** ..........................................................................................24

3    _____

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARTIANO SHINOFF

2

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Barlow v. Superior Court of California, Cty. of San Diego*
2008 WL 4079285, at 12 ...................................................................................22

4

5

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*
531 U.S. 288, 295-96 (2001) ............................................................................16

6

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*
473 U.S. 788, 801 (1985) ..................................................................................18

7

8

*Council of Ins. Agents & Brokers v. Molasky–Arman*
522 F.3d 925, 932 (9th Cir. 2008) ....................................................................12

9

*Davison v. Loudon County Board of Supervisors*
267, F.Supp.3d 702 (E.D. VA 2017)................................................................15

10

11

*Devereaux v. Abbey*
263 F.3d 1070, 1076 (9th Cir. 2001) ................................................................11

12

*Edmonson v. Leesville Concrete Co.*
500 U.S. 614, 620 (1991) ..................................................................................15

13

14

*Flagg  Bros., Inc. v. Brooks*
436 U.S. 149, 155-156 (1978) ..........................................................................14

15

*Golden Gateway Center v. Golden Gateway Tenants Assn.*
26 Cal.4th 1013 (Cal. 2001) .............................................................................14

16

17

*Gonzalez v. Superior Court*
180 Cal.App.3d 1116, 1122 (1986) ..................................................................21

18

*High Tech Gays v. Defense Indus. Sec. Clearance Office*
895 F.2d 563, 574 (9th Cir. 1990) ....................................................................11

19

20

*Hope v. Pelzer*
536 U.S. 730 (2002)..........................................................................................23

21

*Hopper v. City of Pasco*
241 F.3d 1067, 1074–75 (9th Cir. 2001) ..........................................................22

22

23

*Hudgens v. N. L. R. B.*
424 U.S. 507 (1976)..........................................................................................14

24

*Jackson v. Metropolitan Edison Co.*
419 U.S. 345, 351 (1974) ..................................................................................15

25

26

*Jacobsen v. Bonine*
(1997) 123 F.3d 1272, 1274 ............................................................................20

27

*Knight First Amendment Institute at Columbia University et al. v. Trump et al.*
1:17-cv-05205 (2018) .......................................................................................15

28

ARTIANO SHINOFF

3

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

*Lehman v. City of Shaker Heights*
  418 U.S. 298, (1974)..................................................................22

*Lujan v. Defenders of Wildlife*
  504 U.S. 555, 560–61 (1992) ..................................................12

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*
  210 F.3d 1099, 1102 (9th Cir. 2000) ........................................11

*Pearson v. Callahan*
  555 U.S. 223 (2009)..................................................................23

*Perry Ed. Assn. v. Perry Local Educator's Assn*
  460 U.S. 37, 45 (1983) .............................................................19

*Pleasant Grove City, Utah, v. Summum*
  555 U.S. 460, 469 (2009) .........................................................19

*Public Utilities Comm'n v. Pollack*
  343 U.S. 451 (1952)..................................................................15

*Saucier v. Katz*
  533 U.S. 194, 195 (2001) .........................................................23

*United States v. Students Challenging Regulatory Agency Procedures
(SCRAP)*
  412 U.S. 669, 689 n. 14, (1973) ..............................................12

*White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ................21

**Statutes**

*Jacobson v. Bonine*
  123 Ca.3d 1272, 1274 (9th Cir. 1997 .......................................18

**Other Authorities**

Cal. Gov. Code § 54952.6..........................................................17

Cal. Gov. Code, § 54950 et seq. ...............................................16

Cal. Gov. Code, § 54952.2.........................................................16

Ralph M. Brown Act...................................................................16

Us. Const., Art. III, § 2, cl. 1. .....................................................12

ARTIANO SHINOFF

4

**Case No. 3:17-CV-02215-W-JLB**

# I.     <u>INTRODUCTION</u>

Plaintiffs, husband and wife, CHRISTOPHER GARNIER and KIMBERLY GARNIER, sued the Defendants, MICHELLE O'CONNOR-RATCLIFF ("MOR") and T.J. ZANE ("Zane"), two elected school board members, under the First Amendment, pursuant to 42 U.S.C. section 1983, and the California Constitution, because the board members blocked the couple from posting on their social media accounts. There is a significant "standing" issue, because the Plaintiffs are not "harmed" by being blocked. Instead, being blocked gave the Plaintiffs an opportunity to continue harassing the Poway Unified School District ("District"). This is a continuation of a long series of lawsuits between the Plaintiffs and the District.

The District obtained a restraining order against Mr. Garnier after he threatened parents and staff of a school. He appealed but lost. He filed other state suits, which he also lost and was ordered to pay attorney's fees. He then filed a federal discrimination suit and lost.   This lawsuit offers him the opportunity to counter-balance the prior sanctions by seeking attorney's fees.  Moreover, Plaintiffs admit that there is no message that they are not able to convey to these Defendants through other media, including regular mail, email, personal discussion, or an appearance before the governing board. Consequently, they are not "harmed" by being blocked; being blocked merely presented a benefit in the form of a new opportunity to continue their dispute with the District.

Moreover, and importantly, Plaintiffs cannot show "state action" or that the Defendants acted "under color of law," because the Defendants social media accounts are not government operated. Rather, the accounts are maintained by the Defendants to promote their individual political campaigns.

Notwithstanding, if it were found that there is state action, the board members did not block the couple because of the content of their posts. The couple repeatedly posted the same messages, over and over, as many as 44 times, to the point that repetitious posts disrupted the accounts and interfered with the intended purpose of the accounts. The
///

ARTIANO SHINOFF

5

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

1   board members blocked the Plaintiff's to stop them from disrupting the board members'

2   intended messages, not because of the subject matter or viewpoint of the individual posts.

3   <div align="center">

**II.   FACTS**
</div>

4         Mr. Garnier is a former part-time employee of the District. He worked for the

5   District from approximately 2011 to 2013. Joint Statement of Disputed and Undisputed

6   Facts ("JS"), No. 1. The Plaintiffs have children who attend Painted Rock Elementary

7   School ("Painted Rock"), a school within the District. JS, No. 2.

8   **A. Facts Relevant to "Standing"**

9       **1. Restraining Order**

10         From the time Mr. Garnier began working for the District, he engaged in erratic

11   and, at times, threatening behavior. JS, No. 3. In 2014, the District filed a Petition for

12   Workplace Violence Restraining Order ("Petition") to protect the Painted Rock staff and

13   community. JS, No. 4. The Petition was supported by the sworn declarations of four

14   District staff and one community member. *Id.* All of these individuals expressed concern

15   for their safety and the safety of students and employees of Painted Rock due to Mr.

16   Garnier's statements and actions. *Id.*

17         In response to the District's request for a restraining order, Mr. Garnier attempted

18   to dismiss the lawsuit, arguing that he was merely exercising his First Amendment right

19   to free speech by being critical of District policies and personnel. JS, No. 5. To that end,

20   he filed a Special Motion to Strike the District's Petition (aka Anti-SLAPP motion). *Id.*

21   The Trial Court completely disagreed with Mr. Garnier's arguments and denied the Anti-

22   SLAPP motion in full. JS, No. 6. Then, on February 6, 2015, the Court granted the

23   District's Petition and issued an injunction ordering Mr. Garnier to stay away from the

24   school's principal. JS, No. 7. This Restraining Order was in effect for three years. *Id.*

25         On April 10, 2015, the Court awarded the District attorney's fees in connection

26   with opposing Mr. Garnier's Anti-SLAPP motion. JS, No. 8.

27         Mr. Garnier appealed the order denying the Anti-SLAPP motion as well as the

28   judgment granting the restraining order. JS, No. 9. On October 26, 2016, the Court of

<div align="left" style="writing-mode: vertical-rl">ARTIANO SHINOFF</div>

<div align="center">6</div>

Appeal affirmed the trial court's rulings in all respects. *Id*. After the appeal, the Court awarded the District additional attorney's fees and costs and entered judgment against Mr. Garnier. JS, No. 10. He has not paid this judgment award to the District. JS, No. 11. However, the money judgment is effective for ten years and it can be renewed at the end of the ten-year period. JS, No. 12.

**2. State Discrimination Case**

On December 2, 2014, Mr. Garnier filed a state lawsuit against the District. Mr. Garnier claimed racial discrimination and defamation stemming from his previous employment with the District. JS, No. 13. This lawsuit surrounded Mr. Garnier's interactions with the District's Director of Student Services and Director of Human Resources during a student expulsion hearing. *Id*. Mr. Garnier claimed he was subject to racial discrimination during the expulsion hearing by the District's administrators, claiming that they prohibited him from testifying on behalf of the student. *Id*. Mr. Garnier further alleged that he was defamed when one of the administrators stated that Mr. Garnier was fired as a football coach at a school within the District's boundaries. *Id*.

In his "statement of damages" served at the beginning of the case, Mr. Garnier identified $1.5 million in damages. JS, No. 14. Ultimately, Mr. Garnier filed a Request for Dismissal and the court awarded $4,804.00 in costs against Mr. Garnier. JS, No. 15.

**3. First Federal District case**

On October 21, 2016, Mr. Garnier filed a federal lawsuit against the District for violations of his free speech and due process rights. JS, No. 16. Mr. Garnier alleged facts related to the Restraining Order matter and his discrimination lawsuit against the District. *Id*. He also alleged that when he ran for a Painted Rock School Site Council position in 2014, the Principal discriminated against him by changing the voting process. *Id*. Further, Mr. Garnier claimed that in 2015, the District officially requested Mr. Garnier and his wife stop attending any District-related events due to allegations of sexual harassment and a hostile working environment against Mr. Garnier. *Id*.

///

1  The District Court eventually dismissed the case, due to Mr. Garnier's failure to

2  litigate. JS, No. 17. On May 11, 2017, Mr. Garnier's newly retained attorney, Cory

3  Briggs, filed a Motion to Set Aside the Dismissal.  JS, No.  18. On August 7, 2017, the

4  Court denied Mr. Garnier's motion, because Mr. Garnier failed to meet his burden to

5  reopen the case. *Id.* The case was formally dismissed by the Court in a Judgment dated

6  August 7, 2017. *Id.*

7  **B. Defendants' Social Media Pages**

8  **1.  T.J. Zane**

9  In or around June 2014, Zane decided to run for a seat on the District's Board of

10  Education. JS, Nos. 26, 59. He then created a Facebook page[1] to help promote his

11  campaign and political activities. JS, Nos. 27, 60, 108. The Facebook page is titled, "Zane

12  for School Board." JS, Nos. 28, 61, 109. Within the "about" section of the Facebook page,

13  Zane has a link to his campaign website. JS, Nos. 29, 62, 110. In addition, Zane included

14  his ballot statement in the "story" section of his Facebook page when he initially created

15  it. JS, Nos. 30, 63, 111. Zane intended to use his Facebook page to portray him "in the

16  most positive light." JS, Nos. 31, 64, 112. He did not intend to use, and does not use, his

17  Facebook page "to solicit comments or input" or as "a public forum." JS, Nos. 32, 65,

18  113.

19  Zane is the only administrator of his Facebook page. JS, Nos. 33, 66. No one at the

20  District has any control over his page and no District employee has ever posted original

21  content on his Facebook page. JS, Nos. 34, 67. Further, the District does not, and has not,

22  spent any money to maintain his Facebook page. JS, Nos. 35, 68.

23  Zane was initially sworn in to the District's Board of Education in December of

24  2014. JS, Nos. 36, 69, 114. He was recently reelected to another four-year term. JS, Nos.

25

26

27  [1] When referencing either Zane or MOR's "Facebook page," the individual Defendants only refer to
their political Facebook page. The Plaintiffs have not indicated that they take issue with being blocked

28  from the individual Defendant's personal or business Facebook pages.

ARTIANO SHINOFF

8

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

37, 70, 115. Zane considered himself "running for [re-election] the day after [he] was sworn in." JS, Nos. 38, 71, 116. Indeed, Zane continued using his Facebook page to further his campaign efforts. JS, Nos. 39, 72, 117. However, Zane shared the same information regarding his political activities during open Board meetings as he did on any Facebook post. JS, Nos. 40, 73.

The Garniers began posting repetitive and unrelated comments to Zane's Facebook posts in or around 2015. JS, Nos. 95, 127, 140. The nature of the Garniers' comments caused Zane's original posts to be buried under the Garniers' posts. JS, Nos. 101, 133, 146. The Garniers also posted the same repetitive comments on Zane's friends' personal and business Facebook pages. JS, No. 100, 132, 145. Because the Garniers' comments effectively muted Zane's original posts, Zane began deleting all of the Garniers' comments from his posts. JS Nos. 102, 134, 147. Eventually, Zane blocked the Garniers from posting comments on his personal Facebook page. JS Nos. 103, 135, 148. However, unlike his personal page, Zane was unable to "block" the Garniers from his campaign page; therefore, instead of blocking the Garniers, Zane disabled the ability for any Facebook user to create original posts on his campaign page. JS Nos. 104, 136, 149. Notwithstanding being blocked from commenting, the Garniers are able to see other posts and comments on Zane's Facebook page. JS Nos. 106, 138, 151.

The entire time that Zane has been an elected official, he has provided the public, including the Garniers, the opportunity to publicly speak to him and criticize him or the District's operations at open Board meetings. JS, No. 19. Beginning in 2014, the Garniers have attended many of these open Board meetings and shared their concerns with the Districts' operations. JS, No. 21. Moreover, the public, including the Garniers, can share their concerns and criticisms of Zane's political activities via his District-provided email, U.S. Mail, in person, and on other social media platforms, including Zane's Twitter page. JS, No. 22. Further, Ms. Garnier created other Facebook pages in order to post additional criticism about Zane. JS, No. 25.

///

9

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

ARTIANO SHINOFF

Zane was never told by the District that he could not or should not blocked constituents from his Facebook page. JS, No. 41, 74, 155.

### 2. Michelle O'Connor-Ratcliff

MOR decided to run for the District's Board of Educators in 2014. JS, Nos. 44, 77, 118. MOR created her Facebook and Twitter pages to support her political campaign for election to the District's Board of Education in 2014. JS, Nos. 45, 78, 119. She believes that she is "always running for public office," even after being elected as a public official. JS, Nos. 46, 79, 120. She uses her social media accounts to "try to win support" for the next election cycle. JS, Nos. 47, 80, 121.

MOR did not intend to use, and does not use, her social media accounts as "feedback forums;" rather, she uses her social media accounts as more of a "bulletin board." JS, Nos. 48, 81, 122. MOR posts "campaign material" to her social media accounts. JS, Nos. 49, 82, 123. This information also tends to include information about the operations of the District. (*Id.*)

MOR was initially sworn in to the District's Board of Education in November of 2014. JS, Nos. 50, 83, 124. She was recently reelected to another four-year term. JS, Nos. 51, 84, 125.

The Garniers began posting repetitive and unrelated comments to MOR's Facebook posts in or around 2015. JS, Nos. 95, 127, 140. In fact, Mr. Garnier posted the same 10-paragraph comment to MOR's Facebook posts on 44 different occasions. JS, Nos. 97, 129, 142. The Garniers also posted comments such as a YouTube link to a video about their family. JS Nos. 96, 128, 141. In total, Mr. Garnier posted to MOR's Facebook page 201 times and Ms. Garnier posted to MOR's Facebook page 33 times. JS, Nos. 131, 144. The nature of the Garniers' comments caused MOR's original posts to be buried under the Garniers' posts. JS, Nos. 101, 133, 146. Because the Garniers' comments effectively muted MOR's original posts, MOR blocked the Garniers from her Facebook page in or around June 2016 and Mr. Garnier from her Twitter page soon thereafter. JS, ///

10

ARTIANO SHINOFF

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

Nos. 105, 137, 150. Notwithstanding being blocked from commenting, the Garniers are able to see other posts and comments on MOR's Facebook page. JS, No. 138, 151.

The entire time that MOR has been an elected official, she has provided the public, including the Garniers, the opportunity to publicly speak to her and criticize her and the District's operations at open Board meetings. JS, No. 20. Beginning in 2014, the Garniers have attended many of these open Board meetings and shared their concerns with the Districts' operations. JS, No. 21. Moreover, the public, including the Garniers, can share their concerns and/criticisms of her political activities via MOR's District-provided email, U.S. Mail, in person, and on other social media platforms. JS, No. 23. Further, K. Garnier created other Facebook pages in order to post additional criticism about MOR. JS, No. 25.

The District was not involved in any way in the creation or maintenance of MOR's Facebook or Twitter pages. JS, Nos. 52, 85. MOR is the only administrator of both her Facebook and Twitter pages. JS, Nos. 53, 86. No one at the District has any control over her social media page and no District employee has ever posted original content on her social media pages. JS, Nos. 54, 87. Further, the District does not and has not spent any money to maintain her social media pages. JS, Nos. 55, 88.

MOR did not talk to anyone at the District about blocking the Garniers before she blocked them. JS, Nos. 56, 89. She was never told by the District that she could not or should not block the Plaintiffs from her social media pages. JS, No. 155.

## III. <u>LEGAL STANDARDS</u>

To carry its burden, a party moving for summary judgment must produce evidence negating an essential element of the nonmoving party's claim or show that the nonmoving party cannot carry its burden at trial. See *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000), citing *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). The moving party may demonstrate a lack of evidence by argument alone. See *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (When nonmoving party has the burden of proof at

11

ARTIANO SHINOFF

1  trial, the moving party need only point out "that there is an absence of evidence to support

2  the nonmoving party's case.").

3                  **IV.**   **LEGAL ANALYSIS**

4  **A. Plaintiffs Do Not Have an Injury to Provide Standing to Sue**

5        Federal jurisdiction extends only to cases or controversies. (Us. Const., Art. III, §

6  2, cl. 1.)    The "irreducible constitutional minimum of standing" consists of three

7  elements: (1) injury in fact, (2) causation, and (3) likelihood that a favorable decision will

8  redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs

9  bear the burden of establishing standing. *Id*. at 561. "An 'injury in fact' is "an invasion

10  of a legally protected interest" that is (a) "concrete and particularized"; and (b) "actual or

11  imminent," not "conjectural" or "hypothetical."    *Id*. at 560. "Injury in fact" is

12  particularized if it has affected the plaintiff in a "personal and individualized way." *Id*. at

13  561 n. 1. The injury may be minimal. See *Council of Ins. Agents & Brokers v. Molasky–*

14  *Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (holding that "'an identifiable trifle'" is

15  sufficient to establish standing (quoting *United States v. Students Challenging Regulatory*

16  *Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, (1973).   "In response to a

17  summary judgment motion…the plaintiff must 'set forth' by affidavit or other evidence

18  'specific facts'" to prove standing. *Lujan*, *supra*, at 561; FRCP 56(e).

19        On these facts, there is no "injury-in-fact." Plaintiffs were the focus of the blockage

20  and they were blocked, but there is a deeper issue to address to find an actual injury.

21  Plaintiffs are pleased, rather than being harmed, because there is a long history between

22  these parties.

23      **1. Plaintiffs' Benefit from Being Sued**

24        By filing this lawsuit, Plaintiffs were seeking another dispute, again, after a series

25  of failed physical disputes, electronic harassments, and legal disputes in the past. JS Nos.,

26  4-18. Mr. Garnier has been in conflict with the staff of the District for the past four years.

27  This is just the latest in a series of attempts he has made to get back at the District for

28  perceived slights and prior judicial awards against him.

ARTIANO SHINOFF

12

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

The Plaintiffs contend the District discriminates against African-American parents and students. They have been vociferous in their claims. Mr. Garnier makes his statements in person, in print, and electronically. JS Nos., 21-23. He became embroiled in litigation with the District when he accosted parents in the parking lot of a District school and threatened school staff.  The District obtained a Restraining Order against him in 2014.  JS No. 7. He appealed that decision and lost. JS No. 9. He quit a teaching job with the District because of alleged racism and the District terminated the coaching position associated with that teaching job.  He filed a racial discrimination lawsuit in state court. JS No. 13. He voluntarily dismissed that action.  JS No. 15. He then filed a federal First Amendment claim, which was dismissed by the District Court.  JS Nos 16-18.

Plaintiff Kimberly Garnier frequently joined her husband in his assertions against the District. JS Nos. 24-25. They both regularly appear at school board meetings and speak to the board on their perceived issues. JS No. 21. For both Plaintiffs, this case is just another effort to get publicity. Neither of them are harmed by being blocked from these social media accounts. Instead, they gain benefits in their campaign against the District by this opportunity to assert another legal issue.

## 2.  Plaintiffs Have Multiple Avenues to Speak

There is another reason the Plaintiffs are not harmed. They are blocked from the Defendants' personal campaign accounts, but are not blocked from communicating any idea they wish to assert to the District, other staff, other board members or the Defendants, through several different methods. The Plaintiffs can communicate their messages through email. JS, Nos. 22, 23. They are able to speak in person to both defendants, and other board members, at board meetings. JS, Nos. 21-23. They may send letters through the U.S. Mail. JS, Nos. 22, 23. And, they can meet with the Defendants in person. JS, Nos. 22, 23. They have repeatedly voiced their ideas using these various methods, since at least 2014.  JS, Nos. 21-23.

Mr. Garnier admitted under oath in a hearing that he posted the same message 49 times on October 2, 2014, with a message similar to the messages he was sending to the

13

ARTIANO SHINOFF

social medial accounts at issue here. JS No. 7. That particular message was, "Boys and Niggers are still being treated like boys and niggers." *Id*. He has been communicating a similar message like that for years. JS Nos. 7. Plaintiffs have not been prevented from communicating their message (JS Nos. 19-25) and they are not harmed by being blocked from the Defendants' social media pages, because they are suing the District and its staff at every opportunity. JS Nos. 4-18. Therefore, the Plaintiffs do not have standing to sue the Defendants.

**B. The Plaintiffs Cannot Bring a Claim Under 42 U.S.C. § 1983, Because There Is No Government Control or State Action**

In order to prove a claim under section 1983, Plaintiffs must prove two elements. First, they must show that they have "been deprived of a right 'secured by the Constitution and the laws' of the United States"; second, they must show that the Defendants "deprived them of this right acting 'under color of any statute' of the State of [California]. It is clear that these two elements denote two separate areas of inquiry." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-156 (1978).

Plaintiffs claim that they have been deprived of their free speech rights under the First Amendment of the United States Constitution and article 1, section 2(a) of the California Constitution. Therefore, they must show governmental action. *Flagg Bros., Inc*., at 156. This is because free speech rights are protected only against infringement by governments. *Hudgens v. N. L. R. B.*, 424 U.S. 507 (1976) [relating to First Amendment rights; *Golden Gateway Center v. Golden Gateway Tenants Assn*., 26 Cal.4th 1013 (Cal. 2001) [relating to California State Constitutional free speech rights]. "Civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual…is simply a private wrong…" (*Civil Rights Cases*, 109 U.S. 3, 17 (1883).)

To determine whether there was state action or merely conduct on the part of an individual, "the inquiry must be whether there is a sufficiently close nexus between the

ARTIANO SHINOFF

14

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

State and the challenged action of the [private person] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co*., 419 U.S. 345, 351 (1974); See, e.g., *Edmonson v. Leesville Concrete Co*., 500 U.S. 614, 620 (1991) ["Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints"]. A sufficiently close nexus may be found where there is high governmental regulation of an activity or where the government orders an activity. *Id.*, at 356, analyzing *Public Utilities Comm'n v. Pollack*, 343 U.S. 451 (1952) [examining State action in First Amendment case].

Although not binding, several recent Federal Court decisions provide helpful guidance on this issue.

For example, in *Knight First Amendment Institute at Columbia University et al. v. Trump et al.*, a recent case involving First Amendment rights and social media, citizens sued President Trump for blocking them from his Twitter account. *Knight First Amendment Institute at Columbia University et al. v. Trump et al*., 1:17-cv-05205 (2018) ("*Trump*"). The Court found that the President and his aid's "control over the [Twitter] account is…governmental for three reasons: (1) the account is presented as being "registered to Donald J. Trump '45th President of the United States of America, Washington D.C.;'" (2) the tweets from the account are "official records that must be preserved under the Presidential Records Act;" and (3) the account has been used to conduct squarely executive functions." (*Trump*, at 43-44.) The Court explained, "[b]ecause the President and [his aid] use the @realDonaldTrump account for governmental functions, the control they exercise over it is accordingly governmental in nature. (*Id*., at 49-50.)

In *Davison v. Loudon County Board of Supervisors*, 267, F.Supp.3d 702 (E.D. VA 2017), a citizen sued an elected official for the violation of his free speech rights after the elected official blocked the citizen from her Facebook page. The Court considered several

15

ARTIANO SHINOFF

factors to determine whether there was state action, including whether the public official categorized her social media page as that of a "Government Official," whether the elected official invited the public to state-sanctioned events on her social media page, whether the government employer intertwined itself with the elected official's use of the social media page, and whether the blocked stemmed from official conduct by the elected official. *Id*., at 712-714. The Court answered all of the questions affirmatively. Notably, the Court found that the government employer used its resources to support the elected official's Facebook page by paying the salary of one of the administrators of the social media page and the government employer's official newsletters included links promoting the social media page. *Id*., at 713.

In other cases, determining whether there is state action may be a finer line. In *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96 (2001), the Court analyzed whether an interscholastic athletic association's regulatory activity was "state action" for purposes of a 42 U.S.C. § 1983 claim. The Court set forth three factors to determine whether there was state action present: (1) whether the private actor was acting pursuant to the state's coercive power, (2) whether the state provides "significant encouragement, either overt or covert," and (3) whether the private actor "operates as a willful participant in joint activity with the state or its agents." (*Brentwood*, at 296.) After analyzing these factors, the Court found that because public officials and public institutions were "pervasively entwined" in the association's compositions and workings, the association's regulatory activity was "state action." (*Id*., at 298.)

Here, the Defendants' social media pages are not "governmental in nature." While the social media pages may have stated the Defendants' position as District Board members, the social media pages are not considered "official records." For example, the Ralph M. Brown Act ("Brown Act") (Cal. Gov. Code, § 54950 et seq.) does not require that the Defendants' posts be available to the public for review. In contrast, the Brown Act requires that communications between members of a legislative body regarding actions by that body be held during public meetings. *See* Cal. Gov. Code, § 54952.2.

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

1   Additionally, the legislative branch of government is different from the executive

2   branch. A legislator cannot take official action alone. These two Defendants cannot take

3   any official or legislative actions using their social media accounts. Instead, the five-

4   member Board needs a majority vote to take any action on behalf of the District. *See* Cal.

5   Gov. Code § 54952.6.

6   Moreover, the elements provided by the *Brentwood* and *Davison* cases also show

7   that the Defendants' blocking of the Plaintiff's was not "state action."  The District did

8   not assert any "coercive power" over the Defendants when they created their social media

9   pages, nor did the District "intertwine" itself with the Defendants' use of their pages. JS

10   Nos. 33-35, 41, 43, 52-56, 58. Indeed, the Defendants testified that they created their

11   social media pages when they decided to run for office as a District Board member. JS

12   Nos. 26-30, 44-45. Thus, they created their pages even before the state had any authority

13   over them. Additionally, throughout their tenure as Board members, the District has never

14   asked the Defendants to post, or not post, certain messages on their social media accounts.

15   JS Nos. 33-35, 41, 43, 52-56, 58. Instead, the Defendants maintained their own pages and

16   posted content to advance their individual political campaigns for the next election. JS

17   Nos. 31-33, 38-40, 46-49, 53.

18   Lastly, although the District also has several social media pages, these pages are

19   administered by different people – the individual Defendants operate their social media

20   pages and the District's Communication Department operates the Districts' social media

21   pages. JS Nos. 34, 54, 67, 87. The District has a "District-Sponsored Social Media"

22   policy, which states that each social media platform shall prominently display:

23   (3) A statement that the site is regularly monitored, and any
24   inappropriate comments will be promptly removed.
   Inappropriate comments include those that: (a) Are obscene,
25   libelous, or so incite students as to create a clear and present
   danger of the commission of unlawful acts, violation of school
26   rules, or substantial disruption of the school's orderly operation;
27   (b) Are not related to the stated purpose of the site, including, but
   not limited to, comments of a commercial nature, political
28

17

**Case No. 3:17-CV-02215-W-JLB**

ARTIANO SHINOFF

1
2

> activity, and comments that constitute discrimination or harassment.

3  JS, Nos. 42, 57.

4  The Defendants have never posted the District's social media policy on their social
5  media accounts and have never purported to act pursuant to that policy. JS, Nos. 43, 58.
6  Instead, the Defendants acted on their own volition when they blocked the Plaintiffs from
7  their social media pages.

8  Based on the above, Plaintiffs cannot prove the "state action" element of their
9  Section 1983 or California Constitution claims and both claims fail as a matter of law.

10  **C. Forum Analysis[2]**

11  Defendants have not found binding authority on the issue of the application of the
12  First Amendment to internet social media; this appears to be a first impression.  The
13  *Trump* case is not binding and is distinguishable.

14  Generally, to determine whether a person's free speech rights have been violated
15  by the government, the court must first determine the forum in which the Plaintiffs wish
16  to speak. "It is the 'location and purpose' of the property and the government's subjective
17  intent in having the property built and maintained, that is crucial to determining the nature
18  of the property for forum analysis." *Jacobson v. Bonine*, 123 Ca.3d 1272, 1274 (9th Cir.
19  1997). "[F]or a space to be susceptible to forum analysis, it must be owned or controlled
20  by the government." *Trump*, at p. 39; citing *Cornelius v. NAACP Legal Defense and
21  Educational Fund, Inc.*, 473 U.S. 788, 801 (1985) ["a speaker must seek access to public
22  property or to private property dedicated to public use to evoke First Amendment
23  concerns". "A space may be a forum based on government control even absent legal
24  ownership. *Trump*, at p. 41.

25
26
27
28

---

[2] The Defendants do not believe the Plaintiffs can meet the "state action" element of their Free Speech claims; however, the Defendants will assume that the Plaintiffs can meet this element solely for the sake of presenting a "forum analysis" argument.

18

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

ARTIANO SHINOFF

This analysis is similar to the "state action" analysis. As discussed above, the District did not "own" the Defendants' social media pages. JS Nos. 66-68, 74, 76, 85-89, 91. Moreover, the District did not control the social media pages; rather, the Defendants, individually, determined what content would be posted to their pages and what users would have access to their pages. JS Nos. 60-64, 66-68, 78, 85-88. Additionally, the Defendants' "subjective intent" in creating their social media pages was to put themselves in a favorable light for the upcoming school Board elections. JS No. 64, 72, 78, 80, 82. Once they were elected to office, the Defendants continued to use their social media pages to promote their platform and work within the District. *Id*. Therefore, the nature of the social media pages is not to allow any and all political speech or debate, but to promote the Defendants' political agendas. The Plaintiffs cannot prove that the Facebook pages were "public property or private property dedicated to public use." As such, their free speech claims fail as a matter of law.

However, if this Court is inclined to find that the social media pages are controlled by the government, then Plaintiffs still cannot show that the blocking is unlawful.

### 1.  The Social Media Pages Are Not Traditional Public Forums

Traditional public fora are those such as public streets and parks, "which have immemorially been held in trust for the use of public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Ed. Assn. v. Perry Local Educator's Assn*, 460 U.S. 37, 45 (1983). "Reasonable time, place, and manner restrictions are allowed…but any restriction on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest…and restrictions based on viewpoint are prohibited. *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 469 (2009).

Social media is not a forum which has historically been used for public comment. JS No. 92. Therefore, the Defendants' social media pages are not public forums.

///

ARTIANO SHINOFF

**2.  The Social Media Pages Are Not Designated Public Forums**

A designated public forum is "a place the state has opened for use by the public as a place for expressive activity." *Perry, supra*, at 46. These forums are "intentionally" opened for public discourse. *Jacobsen v. Bonine* (1997) 123 F.3d 1272, 1274 [Finding that interstate rest areas are not designated public fora, because "the government did not dedicate the property for First Amendment activity"]. "The government does not create a public forum by…permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, *supra*, 473 U.S. at 802 [Designated forum not found when the nature of the property is inconsistent with expressive activity]. "In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum." *Cornelius*, at 805.

Here, the Defendants' social media pages are not designated public forums, because the Defendants did not "dedicate the property for First Amendment activity." On the contrary, the "principal function" of the pages is to promote the Defendants' individual campaigns and show the Defendants in the best light possible. JS No. 93. Expressive activity to the contrary would disrupt that principal purpose. (*See Cornelius, supra*, at 805.) Indeed, the Plaintiffs' posts on the Defendants' social media pages disrupted the Defendants' messages to their followers, which was the catalyst for blocking the Plaintiffs. JS, Nos. 95, 102, 105, 127, 134, 137, 140, 147, 150.

**3.  Even If The Social Media Pages Are Considered Designated Public Forums, The Defendants' Conduct of Blocking The Plaintiffs Were Reasonable Time, Place, and Manner Regulations**

In designated public fora, "reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry*, *supra*, at 46. Reasonable time, place, and manner restrictions are permitted as long as the regulations are (1) content-neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leave open ample alternative

ARTIANO SHINOFF

20

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

channels of communications. *Gonzalez v. Superior Court*, 180 Cal.App.3d 1116, 1122 (1986).

For example, "[w]hile a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious." *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990). "A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner." *Id* . at 1426.

Here, the blocking was narrowly tailored to serve the significant interest in spreading the Defendants' message to potential voters. The Plaintiffs were blocked, because they inundated the Defendants social media pages with hundreds of comments unrelated to the original post by the Defendant. JS, Nos. 95-99, 127-131, 140-143, This caused the original post to be buried by the Plaintiffs' comments. JS, Nos. 101, 133, 146. Thus, the Plaintiff's posts prevented the Defendants' from accomplishing their business – showing potential voters their involvement in the District.

Notwithstanding their inability to post on the Defendants' social media pages, the Plaintiffs are still able to see other users' posts and comments on the Defendants' social media pages. JS No. 106. Moreover, the Plaintiffs can still privately email the Defendants using the Defendants' District-provided emails, and/or write to the Defendants via regular mail, and/or attend open Board meetings and speak to the Defendants directly. JS Nos. 19-25.  Thus, even if the social media pages are considered designated public forums, the blocking was a reasonable time, place, and manner restriction.

### 4.  The Social Media Pages Are Not Limited Public Forums

California differentiates between designated public forums and limited public forums. A limited public forum is a sub-category of a designated public forum that "refer[s] to a type of nonpublic forum that the government has intentionally opened to

///

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

1   certain groups or to certain topics…but reserves access to it for only certain groups or

2   categories of speech." *Hopper v. City of Pasco,* 241 F.3d 1067, 1074–75 (9th Cir. 2001).

3       Here, the Defendants have not "opened" up their social media pages to certain

4   groups or categories of speech. The Defendants maintained their social media pages to

5   promote themselves for the next upcoming election. JS Nos. 107-125. They did not intend

6   their social media pages to be used as a place of expression for any certain group or

7   category of speech. *Id.* Therefore, the social media pages are not limited public forums.

8   **5.  Even If The Social Media Pages Are Considered Limited Public Forums,**

9       **The Blocking Of The Plaintiffs Was Viewpoint neutral and reasonable**

10      "Expressive activity in a limited public forum accordingly may be restricted

11  without violating the Constitution as long as the restrictions are viewpoint neutral and

12  reasonable in light of the purpose served by the forum." (*Barlow v. Superior Court of*

13  *California, Cty. of San Diego*, 2008 WL 4079285, at 12 (S.D. Cal. Aug. 28, 2008).)

14      If the pages are considered limited public forums, then the blocking was proper,

15  because the Plaintiffs were not blocked due to their viewpoint, but, instead, they were

16  blocked due to excessive and unrelated comments. JS, Nos. 127-137. Moreover, the

17  stated purpose for the social media pages is to promote the Defendants' political agendas.

18  JS No. 126. Therefore, blocking the Plaintiff's excessive and comments unrelated to the

19  original post is reasonable in light of the purpose of the forum.

20  **6.  The Social Media Pages Are Non-Public Forums and The Blocking Of The**

21      **Plaintiffs Was Reasonable**

22      "[A] non-public forum by definition is not dedicated to general debate or the free

23  exchange of ideas." *Cornelius*, *supra*, 473 U.S. at 811. The Government's decision to

24  restrict access to a nonpublic forum need only be reasonable; it need not be the most

25  reasonable or the only reasonable limitation. *Cornelius*, at 808. Although a speaker may

26  be excluded from a nonpublic forum if he wishes to address a topic not encompassed

27  within the purpose of the forum, (*see Lehman v. City of Shaker Heights*, 418 U.S. 298,

28  (1974)), or if he is not a member of the class of speakers for whose especial benefit the

ARTIANO SHINOFF

22

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

forum was created, (s*ee Perry Education Assn*., *supra*) the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.

The Defendants' social media pages are non-public forums. The Defendants created their social media pages for one purpose – to promote themselves for the next election cycle. JS NO. 139. While expressive activity may take place on their social media pages, this is not their stated purpose.

The Defendants blocked the Plaintiffs, because they posted excessive messages to the Defendants' social media pages which drowned out the Defendants' original post, not because of the content or viewpoint of the posts. JS, Nos. 140-150. This is analogous to a candidate for public office holding a campaign fundraiser and removing an audience member for disrupting the candidate's speech.

Because the Defendants reasonably blocked the Plaintiffs blocking was proper.

**D. The Defendants Enjoy Qualified Immunity**

Qualified immunity seeks to guarantee that public officials who are subjected to suit are on notice that their actions were unlawful. *Hope v. Pelzer*, 536 U.S. 730 (2002). In order to make a determination regarding qualified immunity, a court may first determine that, given the facts alleged and, in the light most favorable to the plaintiff, the official's conduct violated the plaintiff's constitutional right. *Saucier v. Katz*, 533 U.S. 194, 195 (2001). If a constitutional right was violated, then it must be determined that the right was clearly established. This determination rests upon the specific context of the case, and not a broad general proposition. *Id*. Moreover, the court must inquire as to whether it would be clear to a reasonable official that his or her conduct was unlawful in the given situation. *Id*. In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court held that a court may determine which prong of the analysis should be addressed first in light of the circumstances.

Here, it is indisputable that the Plaintiff's "right" to free speech on the Defendants' social media pages was anything but clear. Moreover, it was not clear that the Defendants'

ARTIANO SHINOFF

23

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX

blocking of the Plaintiffs was unlawful. This is because: (1) social media is a new phenomenon (JS No. 152); (2) the right to "speak" on social media is not a clearly established right; (3) the Defendants believed their social media pages were not Government-owned, because the Defendants created their social media pages by themselves and without needing the approval of the District (JS No. 153); and (4) blocking people on social media does not remove all available forms of communication (JS No. 19-25).

Therefore, the Defendants have qualified immunity, and they should not be held liable for their blocking of the Plaintiffs.

## V.   <u>CONCLUSION</u>

The Plaintiffs were not harmed when the Defendants blocked them from their social media pages. Instead, they relished being blocked, because it gave them another shot at suing the District. Therefore, the Plaintiffs cannot prove standing. Moreover, Defendants created and maintained their social media pages individually, without any involvement or encouragement from the District. Thus, Plaintiffs cannot prove the "state action" element of their free speech claims. Additionally, even if the Defendants' social media pages are found to be government-run, the blocking passes judicial scrutiny, because the conduct was reasonable and not Plaintiffs were not blocked based on the content or viewpoint of their messages but, rather, based on their disruptive nature. Lastly, because the phenomenon of social media is so new, Defendants did not know that blocking the Plaintiffs from their campaign pages could violate any constitutional rights. Therefore, the Defendants should benefit from qualified immunity.

///

///

///

///

///

///

24

Based on the above, the Plaintiffs' claims fail as a matter of law and their lawsuit against the Defendants should be dismissed, with prejudice.

Dated: February 15, 2019                    ARTIANO SHINOFF


By:   _s/ Michelle M. Pacis_
      Daniel R. Shinoff
      dshinoff@as7law.com
      Jack M. Sleeth, Jr.
      jsleeth@as7law.com
      Michelle M. Pacis
      mpasic@as7law.com
      Attorneys for Defendants MICHELLE
      O'CONNOR-RATCLIFF: T.J. ZANE

ARTIANO SHINOFF

AS7 Law San Diego/001350/000086/PL/S0421463.DOCX