# EXHIBIT "R"

T.J. Zane, 11/26/2018

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4    CHRISTOPHER GARNIER; and KIMBERLY      )
      GARNIER,                               )
 5                                           )
                   Plaintiffs,               )
 6                                           )
           vs.                               )Case No.:
 7                                           )3:17-CV-2215-W-JLB
      POWAY UNIFIED SCHOOL DISTRICT et       )
 8    al.,                                   )
                                             )
 9                 Defendants.               )
      _____)
10

11

12              DEPOSITION OF T. J. ZANE,

13    taken by the attorney for the Plaintiffs, commencing at

14    the hour of 9:15 a.m. on Monday, November 26, 2018, at

15    4891 Pacific Highway, Suite 104, San Diego, California

16    92110, before Amanda Noel Marcos, Certified Shorthand

17    Reporter, No. 13965, in and for the State of California.

18

19

20

21

22

23

24

25
```

2

T.J. Zane, 11/26/2018

1     A     Correct.  Is correct okay as an answer?

2     **Q     Yes.  Correct.  In the deposition of your**

3  **colleague, we referred to Poway Unified School District**

4  **either as PUSD or Poway Unified.  Is it okay if we do**

5  **that today?**

6     A     Sure.  Yes.

7     **Q     How long have you been on the governing board?**

8     A     I was sworn in in December of 2014.

9     **Q     And you were recently reelected, correct?**

10    A     Yes.

11    **Q     Okay.  Congratulations.**

12    A     Thank you.

13    **Q     You're sworn in next month?**

14    A     Yes.

15    **Q     Do you know who Chris Garnier is?**

16    A     Yes.

17    **Q     Do you know who Kim Garnier is?**

18    A     Yes.

19    **Q     Okay.  They are residents of Poway Unified?**

20    A     (Witness nods head.)

21    **Q     Yes?**

22    A     I believe so.  I assume so.

23    **Q     Okay.  Do you understand that their children**

24  **attend Poway Unified Schools?**

25    A     That's my understanding.  Although, I don't

13

T.J. Zane, 11/26/2018

1    A    Okay.  Sure.

2    Q    **Why do you have the Facebook page?**

3    A    Again, referring only to the political page,

4    correct?

5    Q    **Yeah.  Yeah.**

6    A    Well, I think my clarifying question is part of

7    the answer in and of itself is because it's created as a

8    political page, my campaign page.  So it was created

9    around the time when I decided to run in 2014 to help

10   promote my campaign and my political activities.

11   Q    **Okay.  Did you ever use it for anything other**

12   **than your candidate activities?**

13   A    No.  You mean as far as -- what do you mean by

14   that?

15   Q    **Well, you were sworn in in December of 2014,**

16   **right?**

17   A    Right.

18   Q    **So you were no longer a candidate once you were**

19   **sworn in, correct?**

20   A    Well, I just ran for reelection.

21   Q    **I realize that, but you weren't running for**

22   **reelection on, let's say, Christmas of 2014, right?  You**

23   **just got reelected.**

24   A    Well, as a political guy, I consider myself

25   running for election the day after I was sworn in.

17

T.J. Zane, 11/26/2018

1       Q       Okay.  Did you identify yourself on your

2   Facebook page as a political candidate or as a

3   government official?

4       A       Originally as a candidate.  After getting sworn

5   in, the moniker was changed to reflect government

6   official.  But the description of the page remained the

7   same inasmuch as it described the page as promoting my

8   political activities and the going on of the district.

9       Q       But your political activities dealt with Poway

10   Unified, correct?

11       A       Yes, inasmuch as I was running for reelection,

12   yes.  They were limited to that, yeah.

13       Q       Is your answer the same for your Twitter

14   account?  Why do you have a Twitter account?

15       A       I had a -- shoot.  I don't know.  I had a

16   Twitter account much longer, created much earlier than

17   2014.  I don't know the year I established it.  But I

18   think I was trying to get savvy to the technology maybe

19   and wanted to secure the handle before somebody else

20   did.  So I just grabbed it.

21       Q       You wanted to be the real T.J. Zane?

22       A       Exactly.  Right.  Right.  Right.

23       Q       Okay.  Do you communicate with the public

24   through your Facebook page?

25       A       What do you mean by communicate?

18

T.J. Zane, 11/26/2018

1    **Q    Why do you post things on your Facebook page?**

2    A    So people can see what I'm doing.

3    **Q    The public is your audience?**

4    A    The public or I guess anybody who is

5    actually -- I don't know the technical workings of it,

6    if it's everybody or just the people who like the page

7    see it.

8    **Q    Got you.**

9    A    I assume both can.  I don't know.

10    **Q    You put the information on your Facebook page**

11    **for public consumption; fair to say?**

12    A    Sure.  Sure.

13    **Q    Do people ever respond to your posts on the**

14    **Facebook page?**

15    A    They do occasionally.

16    **Q    Okay.  Do you read those responses?**

17    A    Not all the time.

18    **Q    But sometimes?**

19    A    Sometimes.

20    **Q    Do you ever respond to people who post comments**

21    **to you?**

22    A    Hardly ever.  I'd have a hard time trying to

23    remember instances in which I did.  I don't use the page

24    to solicit comments or input.

25    **Q    Yeah.  But you understand that people have**

19

T.J. Zane, 11/26/2018

1   discuss political issues and policy issues as opposed to

2   not being able to discuss them?

3        A      Without specificity to my own Facebook page,

4   sure, I would agree with that statement.

5        Q      In general it's better for members of the

6   public to talk than not talk, correct?

7        A      Sure.

8        Q      And in general it's better for members of the

9   public to interact and share views as opposed to living

10  in silos and keeping everything to themselves?

11       A      (Witness nods head.)

12       Q      Yes?

13       A      Generally speaking, yeah.

14       Q      Does that apply equally to your Facebook page?

15       A      No.

16       Q      Why not?

17       A      Because my Facebook page is a political, for

18  lack of better word, tool.   It's a promotional vehicle

19  for me as a candidate.   And as such, I believe I ought

20  to be able to manage how my page is promoted.

21       Q      And you allow people who are not your

22  quote-unquote friends on Facebook to post comments on

23  your Facebook page, right?

24       A      I actually had the setting on my Facebook page,

25  I don't recall the date upon which I did this, but it

22

1    precludes anyone from being able to post anything in a

2    separate individualized post.

3         Q    Right.  But they can --

4         A    But whenever I post something, people can still

5    go on and post something.  Yes.  Correct.

6         Q    Right.  And so is there -- you understand that

7    members of the public can see what comments people have

8    posted in response to your original posts, correct?

9         A    Sure.  Yes.

10        Q    And you think that's a good thing?

11        A    It could be good.  It could be bad.  I mean, I

12   don't know.

13        Q    You don't have a problem with members of the

14   public seeing how other members of the public react to

15   your posts, do you?

16        A    Well, if some reactions or posts are overly

17   negative and perhaps veer off of anything having to do

18   with actual -- you know, my activity as a school board

19   member, then I guess you can say I would have a problem

20   with it, to use your terms.

21             If things are just because of the very fact

22   that I mentioned it's a promotional page, it's intended

23   to -- it's a political campaign page intended to portray

24   me in the most positive light for reelection as

25   possible, then I am more likely to -- you know, I'd like

                                                        23

T.J. Zane, 11/26/2018

1   to see if somebody said something nice, right, and if it

2   was germane to the school board.  So I don't know if

3   that kind of goes to your --

4       **Q**    **Wouldn't you also want to know if somebody had**

5   **something bad to say about you?**

6       A    Well, there is plenty of places and

7   opportunities for someone to do so.  It doesn't

8   necessarily have to be on my political Facebook page.

9       **Q**    **There is no harm to you in knowing that you**

10  **have a critic or two?**

11      A    Right.

12      **Q**    **Correct?**

13      A    And I can -- I often learn that through either

14  public comment at the dais or e-mails, district e-mails.

15      **Q**    **Or your Facebook page, right?**

16      A    Sure.  But I also can see critics of mine on

17  pages other than mine.

18      **Q**    **Sure.  I'm not limiting criticism to Facebook.**

19  **I'm just saying -- I'm asking you whether your**

20  **understanding and view of Facebook is that it is similar**

21  **to other public forums where the good and the bad is**

22  **aired by the public?**

23      A    I don't entirely see the similarity inasmuch as

24  I view a political campaign Facebook page created by

25  myself to promote my activities as a political tool, not

24

T.J. Zane, 11/26/2018

1   a public forum.

2          MR. BRIGGS:  Okay.  I'm going to show you an

3   exhibit we'll mark as No. 1.  Exhibit No. 1 is your

4   deposition notice for today.

5          (Exhibit 1 was marked.)

6   BY MR. BRIGGS:

7      Q    Have you seen Exhibit 1 before today?

8      A    Yes, other than the proof of service.

9      Q    Did you read it when you got it?

10     A    Generally.  I read the date and time I needed

11  to appear.

12     Q    Unlike yours truly, who didn't read the time

13  that you needed to appear and was late to the depo.

14     A    I did read the time.  Yeah.  Yeah.

15     Q    Okay.  Did you notice on the second page of the

16  notice that there are three categories of documents that

17  you were asked to bring with you?

18     A    Okay.  Yeah.  I see them here.

19     Q    Did you bring any of those documents with you

20  today?

21     A    I didn't bring any documents with me today.  I

22  believe I provided some documentation as part of

23  discovery earlier.  So I thought that whatever was

24  listed here was already provided.  If it wasn't, I'm

25  happy to --

25

T.J. Zane, 11/26/2018

1    page some pictures that I shared of me visiting a local

2    middle school.

3    BY MR. BRIGGS:

4        Q    So there are things that you do as a member of

5    the Poway Unified governing board that are made public

6    via your Facebook page, but aren't necessarily made

7    public at governing board meetings, correct?

8        A    No.  I share that as part of my board report

9    with the monthly board meetings.

10       Q    Everything that you post on your Facebook page

11   you would have shared at your monthly board meeting?

12       A    Without the benefit of doing an inventory of

13   all my posts, maybe with a few exceptions, there are

14   some things that I might post that aren't necessarily

15   commented on or referenced at a board meeting.

16       Q    Do you understand that when people comment on

17   your Facebook page, that other members of the public can

18   see those comments?

19       A    Yes.

20       Q    And do you understand that sometimes a

21   subsequent commenter will be responding to an earlier

22   commenter in posting a comment on your Facebook page?

23       A    Yes.

24       Q    And as a political person, do you think it's

25   generally better that members of the public be able to

21

T.J. Zane, 11/26/2018

1    you're the only one who can post original content?

2         A    That's correct, with one minor exception.   In

3    '14 when I created the page, I gave my web master access

4    to my Facebook page, but he hasn't used it since 2014.

5         Q    And you control your web master?

6         A    Right.   Right.

7         Q    Nobody other than you or somebody under your

8    control --

9         A    Correct.

10        Q    -- can post original content on your Facebook

11   page?

12        A    Correct.

13        Q    Okay.   Have you blocked anybody or otherwise

14   restricted anybody's ability to comment in response to

15   your original posts?

16        A    Well, like I said, I can't -- Facebook doesn't

17   give you the ability to block anybody from commenting on

18   Facebook posts that you generate.   You're limited to

19   either -- I mean, you just ignore it, you just leave it

20   there or you can hide it or you can delete it.

21        Q    Okay.   Have you blocked Chris Garnier from

22   commenting on your Facebook page?

23        A    Again, not blocked.   Have any of his comments

24   been deleted?   Yes.

25        Q    Okay.   Is he at this moment in time able to go

28

T.J. Zane, 11/26/2018

1    correct?

2        A    Correct.

3        Q    When someone searches Facebook, as I did on

4    June 5, 2018, I got two results.  I got a T.J. Zane as a

5    people and a T.J. Zane as a pages.  Do those look like

6    your Facebook pages there in the search results?

7        A    Yes.  Am I allowed to mark this?

8        Q    Don't mark on it.  If you want to mark on mine,

9    you can.  But that one is going to be an exhibit to the

10   deposition transcript.

11       A    Okay.

12       Q    Does Exhibit 4 look like an accurate reflection

13   of search results if someone were to put your name in

14   the search field?

15       A    At that time, probably, yes.

16       Q    Okay.  And in June of this year, were you --

17   you were running for reelection, correct?

18       A    Always running for reelection.

19       Q    So that answer is yes?

20       A    Yes.

21       Q    And you describe yourself on your -- well, let

22   me back up.  Where it says T.J. Zane under the people

23   heading, and then it says Poway Unified School District,

24   is that your personal page?

25       A    That's my personal page.

38

T.J. Zane, 11/26/2018

1    Q    Okay.  So under people, the result T.J. Zane,

2    that's the web page that only you and friends -- your

3    most intimate friends and family members can see,

4    correct?

5    A    Correct.

6    Q    Under pages where it says T.J. Zane and 610

7    like this government official, that's your official T.J.

8    Zane page as a board member, correct?

9    A    As a candidate, yes.

10   Q    Okay.

11   A    There is something that's worth pointing out.

12   Q    Yeah.  Go ahead.

13   A    So even though it says Poway Unified School

14   District here, this is like some sort of Facebook

15   algorithm that populates this as a quote-unquote

16   employer based upon when you build out your resume in

17   your personal page.  So they put that in because that

18   was the most recent thing at the time based upon the

19   dates that were entered for when I started here as

20   opposed to when I started in my business.

21        So when I -- earlier this year, I don't

22   remember the date, but presumably after June or whenever

23   you ran the search, I went in to adjust the dates

24   accordingly, so that if you were probably to rerun this,

25   you would see something other than Poway Unified School

39

T.J. Zane, 11/26/2018

1    settings for the political page.

2         Q    But you understand that they're screen shots

3    from different sections of your Facebook page, right?

4         A    Right.  The one ending in 000003 is from my

5    personal settings.  And 000004 is for the Zane for

6    School Board page.

7         Q    Yes.  But you don't have -- the one ending in 3

8    actually has a link for blocking in the left-hand side?

9         A    That's correct.

10        Q    And the one on Page 4, you've not provided a

11   comparable screen shot?

12        A    The settings pages for your personal page and

13   your page --

14        Q    Political page, let's call it.

15        A    The layout is different.  The look it

16   different.

17        Q    Is your personal page the administrator for

18   your political page?

19        A    I'm the administrator for the political page.

20   I don't know what that means as far as --

21        Q    Do you understand that you couldn't have the

22   political page without having a personal page?

23        A    I don't know for sure, but that's probably

24   correct.  I don't know.

25        Q    I'm not asking you to believe me.  I'm asking

48

T.J. Zane, 11/26/2018

1    unblock the Garniers so that they could post on your

2    Facebook page?

3         A    Political page?

4         Q    Yeah.

5         A    If there was a restriction on posting on my

6    personal.

7         Q    Yeah.  I'm not talking about your personal.

8    But if the blocking that you've done through your

9    personal account somehow carries forward and precludes

10   them from posting comments on your political page, would

11   you unblock them so that they could post on your

12   political page?

13        A    Yes, provided they weren't able to still post

14   on my personal page.

15        Q    Understood.  And just to be clear, no part of

16   this lawsuit is directed at what you post on your

17   personal page, you know, for your family and friends to

18   see.

19        A    Sure.

20        Q    You knew that before today, correct?

21        A    What's that?

22        Q    You knew that before today, right?

23        A    Generally, yes.  But I understood there was

24   always the potential for confusion between all the

25   different pages.

50

Peterson Reporting Video & Litigation Services

T.J. Zane, 11/26/2018

1   Q      Have those messages in 000007 and 000008 been
2   deleted?

3   A      I believe so.

4   Q      Take a look at 000009.  What is that?

5   A      This looks like a screen shot or capture of a
6   post on a Facebook page for San Diego Leaders 2020.

7   Q      Okay.  It looks to me as though it's only one
8   page because the following pages doesn't look like a
9   continuation.

10  A      Looks like a cutoff, right.

11  Q      Would you agree that 000009 is not complete?

12  A      It's not complete in its content, but it
13  illustrates the point of where it was posted.

14  Q      Okay.  Do you know who posted it?

15  A      This would be -- this is the same exact message
16  posted by Mr. Garnier and a number of other -- my
17  assumption is that this was Mr. Garnier as well without
18  the benefit of the completed portions of the screen shot
19  here.

20  Q      Do you have the complete portion of the screen
21  shot somewhere?

22  A      I don't know.  I'm happy to go look.

23  Q      Okay.  Can we put a blank in the transcript
24  here?  And if you can find it, write yes and provide it
25  to your attorney to give to us.  And if you can't find

52

Peterson Reporting Video & Litigation Services

T.J. Zane, 11/26/2018

1    it, write no.   Is that okay?

2        A    Sure.

3        Q    Okay.

4          (Information Requested: _____.)

5              MR. SLEETH:   What page is that?

6              MR. BRIGGS:   000009.

7    BY MR. BRIGGS:

8        Q    Then on Page 000010, we have some -- couple

9    posts -- three posts, one by Mrs. Garnier and a third by

10   Mr. Garnier.  Do you know where those were posted?

11       A    I don't know.

12       Q    It appears, if you look at Dadian & Associates,

13   in his post he writes, "I don't know Christopher Garnier

14   and I resent his posting on my page."

15              Do you believe --

16       A    Right.  Right.

17       Q    Do you believe this was somebody else's

18   Facebook page?

19       A    Yeah.  That is more likely than not from

20   Mr. Dadian's Facebook page.

21       Q    More likely than not?

22       A    More likely than not that is where it's from.

23       Q    It doesn't appear to be a post on your Facebook

24   page, correct?

25       A    Correct.

T.J. Zane, 11/26/2018

1     Q     -- in September of 2017?

2     A     Yes.

3     Q     Okay.  Is there anything on this page that

4  indicates you were a candidate for public or political

5  office?

6     A     Other than the About section that reads -- or

7  ends in "to promote public and political information."

8     Q     Other than that, there is nothing on this page

9  in your mind?

10     A     And the -- I don't even know what the right

11  term is.  The sign -- the call sign, if you will, for

12  the page is entitled Zane for School Board.

13     Q     Okay.

14     A     The website that's linked is not a district

15  website that's linked.  It's my campaign website that's

16  linked.  Underneath my picture, underneath my name, it

17  reads @ZaneforSchoolBoard.

18     Q     Okay.  None of the information that you typed

19  in describing your story or the About section -- well,

20  let me withdraw that question.

21         In the section that says About, you chose the

22  words there, correct?

23     A     Correct.

24     Q     Sorry.  And when I say in the About section, I

25  mean under the More Info heading of the About section,

58

T.J. Zane, 11/26/2018

1    there are two icons.  And next to those icons, you

2    provided the text that is in there, correct?

3        A    That's correct.

4        Q    And then on the right side of Exhibit 8, under

5    the Story heading, you typed in the information that

6    appears there, correct?

7        A    That's correct.

8        Q    Okay.

9        A    Which I believe is a cut and paste from my

10   ballot statement in 2014.

11           MR. BRIGGS:  Okay.  I'm going to show you an

12   exhibit we'll mark as No. 9.  Exhibit 9 is 21 pages from

13   your Facebook home page on June 5 of 2018.  It goes

14   through January 26 of 2018.

15           (Exhibit 9 was marked.)

16   BY MR. BRIGGS:

17       Q    Do you recognize those 21 pages as being an

18   accurate representation of that time period, that time

19   period's posts on your Facebook page?

20       A    Yes, I do.

21       Q    Okay.  Would you agree in looking at Exhibit 7

22   and Exhibit 9, that the predominant subject matter is

23   the business of Poway Unified School District?

24       A    I would agree that it is predominantly Poway

25   Unified School District related.

59

T.J. Zane, 11/26/2018

1          MR. BRIGGS:  Okay.  I'll show you a one-page

2     document we'll mark as No. 10.  Exhibit 10 is the About

3     portion of your Facebook page on June 5 of 2018.

4               (Exhibit 10 was marked.)

5     BY MR. BRIGGS:

6          Q     Do you recognize Exhibit 10?

7          A     I do, yeah.

8          Q     Do you --

9          A     I don't know why it's different from 8.

10         Q     That's my question.  Do you know why the Story

11    section of your About page is gone?

12         A     I do not.

13         Q     Did you make any changes to the About section

14    of your Facebook page between September 8 of 2017 and

15    June 5 of 2018?

16         A     I must have, but I don't recall how that was,

17    whatever I did affected this change.

18         Q     Your Facebook account has never been hacked,

19    correct?

20         A     No.

21         Q     No, that's not correct?

22         A     That's correct.  It has not been hacked.

23         Q     Okay.

24         A     It's more likely than not that I was preparing

25    for the pending election, so I started to prepare the

                                                          60

T.J. Zane, 11/26/2018

1    Q    Okay.  Any idea why she -- in October of last

2    year, she had a comment field on this Facebook page, but

3    Mr. Garnier didn't?

4         MR. SLEETH:  Objection.  Compound.

5    BY MR. BRIGGS:

6    Q    You can answer.

7    A    I do not.

8    Q    Okay.  Does anybody at Poway Unified have any

9    control whatsoever over your political Facebook page?

10   A    No.

11   Q    Has anybody at Poway Unified other than you

12   ever posted any original content on your political

13   Facebook page?

14   A    No.

15   Q    Does Poway Unified spend any money whatsoever

16   on your political Facebook page?

17   A    No.

18   Q    Other than comments by the Garniers, have you

19   ever deleted anybody else's comments on your Facebook

20   page?  And I'm going back to saying Facebook page.  I

21   mean, the political.

22   A    Sure.  I understand.

23   Q    Have you ever deleted anybody else's comments?

24   A    Probably.  Possibly.

25   Q    Do you recall whose comments you deleted?

62

T.J. Zane, 11/26/2018

1    A    No.

2    Q    I'm going to ask you a question.  We sort of

3    covered it.  But there is a nuance that's important.

4    The documents you provided and your testimony establish

5    that you have blocked the Garniers from your personal

6    Facebook page?

7    A    Correct.

8    Q    It's your belief that you have not done

9    anything to block them on your political Facebook page,

10    correct?

11    A    Correct.

12    Q    Was there anything that either of them did that

13    prompted you to block them from your personal page or is

14    it simply a matter that they're not in your close circle

15    of friends and they're not family members, and just like

16    Cory Briggs, they're not to be included in that personal

17    page?

18    A    I don't believe I blocked Cory Briggs from my

19    personal page.

20    Q    I don't think you did.  That's why I compared

21    them to me.  I'm trying to figure out if there is some

22    reason why they are affirmatively blocked from your

23    personal page and I'm not.

24    A    I think it was simply a function of not wanting

25    to have the same sort of repetitive posts that were

63

T.J. Zane, 11/26/2018

1    originally put on my political page and subsequently

2    deleted from being repetitively posted on my personal

3    page, as they were repetitively posted on friends'

4    pages, friends' business pages, etcetera, evidenced by

5    the material we reviewed.

6         Q    **So other than repetitive posts, there is no**

7    **reason that you blocked them from your personal page,**

8    **correct?**

9         A    Well, yeah, repetitive posts and they weren't

10   considered close personal friends that I would have

11   wanted to have the ability to --

12        **Q    You don't consider me a close personal friend**

13   **who you want to see your personal page, correct?**

14        A    You haven't demonstrated a history of excessive

15   repetitive posts that would lead me to want to delete

16   you from my -- or block you from my personal Facebook

17   page.

18        **Q    So this is what I'm getting at.  Are they**

19   **blocked from your personal page because they're not**

20   **family or immediate friends or is it because they posted**

21   **repetitively?**

22        A    Both.

23        **Q    Okay.  I'm not a close friend or family member.**

24   **I suppose if we do the DNA far back enough, we're**

25   **related.  But barring that, I'm not in the circle of**

64

T.J. Zane, 11/26/2018

1    friends or family members and I'm not blocked to my

2    knowledge or to yours.  So why wouldn't you block me?

3    Is it because I haven't posted anything repetitive?

4        A    You're not in my world, so to speak.  I mean

5    that politely.

6        Q    I didn't take offense.  We don't fish in the

7    same pond?

8        A    Right.

9        Q    But I'm trying to understand.  So is your

10   answer that they're blocked from your personal page

11   because of repetitive postings and they are interested

12   in the same subject matter as you?  Is that a fair way

13   of putting it?

14       A    Because there was demonstrated repetitive

15   postings on a whole host of pages other than my

16   political Facebook page that I also did not want to have

17   included on my personal page.

18       Q    So you blocked them on the personal as a

19   preemptive measure?

20       A    Correct.

21       Q    Okay.  When did you block them from your

22   personal page?

23       A    I don't know.  And I don't know if I have the

24   ability to tell that.

25       Q    Okay.  Was it after December of 2014?

65

T.J. Zane, 11/26/2018

1    A    More likely, yes, because I would not have

2    really --

3    Q    You weren't a public official before then?

4    A    We weren't traveling in the same circle, so to

5    speak, prior to that.

6    Q    And you would have blocked them from your

7    political Facebook page before this lawsuit was filed in

8    October of 2017, correct?

9    A    No, because I didn't block them from my

10   political Facebook page.

11   Q    You blocked them from your personal Facebook

12   page sometime before this lawsuit was filed in October

13   of 2017, correct?

14   A    Yes.

15   Q    So between December 2014 and October 2017, you

16   blocked both of them from your personal Facebook page,

17   correct?

18   A    Yes, I believe so.

19   Q    Okay.  Is there a reason that you blocked them

20   to limit their access altogether as opposed to deleting

21   their comments on a comment by comment basis?

22   A    Now you're referring to my personal page?

23   Q    Yes.

24   A    Probably just so I wouldn't have to deal with

25   that.

66

T.J. Zane, 11/26/2018

1        A      I believe it's the director of information

2    technology, Jennifer Burks, Dr. Burks, I believe.  I

3    don't know for sure.

4        **Q      Does the governing board have any involvement**

5    **whatsoever in the administration of the district's**

6    **Facebook page?**

7        A      Thankfully, no.

8        **Q      While you've been on the board, has the board**

9    **ever been consulted about the content of what goes on**

10   **the district's Facebook page?**

11       A      Never to my recollection.

12       **Q      While you've been on the board, has the board**

13   **ever been consulted about whether anybody should be**

14   **blocked from posting comments on the district's Facebook**

15   **page?**

16       A      No.

17       **Q      Do you know whether either of my clients has**

18   **ever been blocked from the district's Facebook page?**

19       A      No.

20       **Q      By blocked, I mean unable to comment in**

21   **response to original posts.  You're not aware of that?**

22       A      No.

23       **Q      Okay.  Has the board ever been advised that**

24   **constituents should not be blocked from accessing a**

25   **board member's social media account?**

Peterson Reporting Video & Litigation Services

T.J. Zane, 11/26/2018

 1      A       I don't believe so.

 2              MR. BRIGGS:  Okay.  Off the record.

 3              (Off the record.)

 4              MR. BRIGGS:  Back on.

 5          I don't have any more questions at this time.

 6  I'm not going to end the depo because there is a slight

 7  need that we may need to revisit some issues subject to

 8  those for other documents and some unanswered questions.

 9  I'm going to suspend the deposition and propose that we

10  incorporate the stipulation from your colleague's

11  deposition last week.  Is that okay?

12              THE WITNESS:  Yes.

13              MR. BRIGGS:  Is that okay?

14              MR. SLEETH:  So stipulated.

15              MR. BRIGGS:  Great.  Thank you.

16              (Whereupon, all parties agreed to the

17              following stipulation:

18              MR. BRIGGS:  I propose the following
                stipulation:  Since there may be some
19              straggling issues that require another
                session that we all hope not, I'm not
20              going to end the depo.  I'm going to
                suspend it with the understanding if we
21              need to come back, I'll work with
                counsel.  Hopefully we don't.
22              Anyways, we should relieve the court
                reporter of her duty under the Code.
23              The original will be sent to the
                witness's attorney.  The witness will
24              review the transcript, provide the
                answers in the blanks that we talked
25              about, make any changes, sign it under

                                                      69

T.J. Zane, 11/26/2018

```
 1              C E R T I F I C A T E

 2

 3   I, AMANDA NOEL MARCOS, Certified Shorthand Reporter for

 4   the State of California, do hereby certify:

 5

 6   That the witness in the foregoing deposition was by me

 7   first duly sworn to testify to the truth, the whole

 8   truth and nothing but the truth in the foregoing cause;

 9   that the deposition was then reported by me in machine

10   shorthand and transcribed, through computer-aided

11   transcription, under my direction; and that the above

12   and foregoing transcript is a true record of the

13   testimony elicited and proceedings had at said

14   deposition.

15   Further, that if the foregoing pertains to the original

16   transcript of deposition in a Federal case, before

17   completion of the proceedings, review of the transcript

18   [] was [] was not requested.

19   I do further certify I am neither financially interested

20   in the action nor a relative or employee of any attorney

21   or party to this action.

22   In witness whereof, I have hereunto set my hand this

23   day of            ,      .

24                     _____

25                          AMANDA NOEL MARCOS
```

72