1
2
3
4
5
6
7
8
9
10            **UNITED STATES DISTRICT COURT**

11            **SOUTHERN DISTRICT OF CALIFORNIA**

12

13   CHRISTOPHER GARNIER, et al.,          Case No.:  17-cv-2215-W (JLB)

14                            Plaintiffs,   **ORDER GRANTING IN PART AND
                                            DENIES IN PART DEFENDANTS'**
15   v.                                     **MOTION FOR SUMMARY
                                            JUDGMENT [DOC. 34]**
16   POWAY UNIFIED SCHOOL
     DISTRICT, et al.,
17
                             Defendants.
18

19

20          Pending before the Court is Defendants Michelle O'Connor-Ratcliff and T.J.

21   Zane's summary-judgment motion.  Plaintiffs Christopher Garnier and Kimberly Garnier

22   oppose.

23          The Court decides the matter on the papers submitted and without oral argument.

24   See Civ. L.R. 7.1(d.1).  For the following reasons, the Court **GRANTS IN PART** and

25   **DENIES IN PART** Defendants' summary-judgment motion [Doc. 34].

26   //

27   //

28

## I. BACKGROUND[1]

Defendants Michelle O'Connor-Ratcliff ("MOR") and T.J. Zane are members of the Poway Unified School District's ("PUSD") Board. (*MOR Decl.* [Doc. 34-6] ¶ 1; *Zane Decl.* [Doc. 34-5] ¶ 1.) Before being elected in late 2014, MOR and Zane created public Facebook pages, and in 2016 MOR also created a public Twitter page, to help promote their PUSD Board campaigns and political activities. (*MOR Decl.* ¶ 2; *Zane Decl.* ¶ 2; *Sleeth Decl.* [Doc. 34-2] ¶¶ 35, 36, *Ex. R* [Doc. 34-26] 4:6–10, *Ex. S* [Doc. 34-27] 5:3–13.[2]) MOR and Zane also have personal Facebook pages for communicating with close friends and family. (*Briggs Decl.* [34-4] ¶ 4, *Ex. 4* [Doc. 35-8] at 2; *Sep. Statement* [Doc. 36-1] 92:21–22, 99:28–100:3.)

After MOR and Zane were elected, each changed their public Facebook pages to reflect their Board positions. MOR added a "Political Info" section that listed her "Current Office" as "Board of Education President, Poway Unified School District," and her "About" section identified her as a "Government Official" and included her official PUSD email address under her "Contact Info." (*Briggs Decl.* ¶ 8, Ex. 8 [Doc. 35-12] at 2.) Zane changed his Facebook page to identify his position as a "Poway Unified School District Trustee," he added a picture of a PUSD sign, and in the "About" section he also identified himself as a "Government Official." (*Briggs Decl.* ¶ 11, *Ex. 11* [Doc. 35-15] at 2; *Sleeth Decl.* ¶ 35, *Ex. R* 5:4–6.) Additionally, MOR and Zane used their Facebook pages to provide information about their participation in PUSD activities, as well as other PUSD and Board information. (*See, e.g.*, *Vaughn Decl.* [Doc. 34-3] ¶¶ 11–12, *Ex. T* [Doc. 34-28] at 2, 3, *Ex. U* [Doc. 34-29] at 2, 6, 8, 10, 12, 14, 16, 28, 32; *see also Briggs Decl.* ¶ 9, *Ex. 9* [Doc. 35-13] at 2, 11–15, 20–22, *Ex. 10* [Doc. 35-14] at 9, 11, 15, 24–

---

[1] Generally, parties and witnesses are referred to by their last name. The exceptions are Defendant Michelle O'Connor-Ratcliff, who refers to herself as "MOR" (*see P&A* [Doc. 34-1] 5:3), and Plaintiffs, who will be referred to as Mr. Garnier and Ms. Garnier to avoid any confusion.

[2] Page references for exhibits are to the CM/ECF page stamp, not the individual exhibit's page number.

25.)  Besides MOR and Zane, no PUSD employee regulated, controlled, or spent money maintaining any of their social media pages.  (*Paik Decl.* [Doc. 34-4] ¶¶ 6–7.)

Plaintiffs Christopher Garnier and Kimberly Garnier reside within PUSD boundaries, and their children attend public schools within the district.  (*C. Garnier Decl.* [Doc. 35-1] ¶ 2; *K. Garnier Decl.* [Doc. 35-2] ¶ 2.)  Mr. Garnier was also a part-time PUSD employee from approximately 2011 to 2013.  Both have attended many PUSD Board meetings where they frequently voice their concerns on issues.  (*Sleeth Decl.* ¶¶ 33–34, *Ex. P* [Doc. 34-24] 6:5–22, *Ex. Q* [Doc. 34-25] 5:8–13.)

After MOR and Zane were elected to the PUSD Board, the Garniers began posting comments on their Facebook page.  MOR contends the comments were "repetitive and unrelated" to her Facebook and Twitter posts, which "caused [her] original posts to be buried under the Garniers' posts."  (*MOR Decl.* ¶ 5.)  In approximately July 2016, she "blocked the Garniers from posting on [her] Facebook campaign page . . . , and [she] blocked Mr. Garnier from [her] Twitter campaign page soon thereafter."  (*Id.* ¶ 6.)

Zane also contends the Garniers posted "repetitive and unrelated" comments that "caused [his] original posts to be buried under the Garniers' posts."  (*Zane Decl.* ¶ 5.)  Zane also eventually effectively blocked Mr. Garnier's ability to comment on his page.  (*Id.* ¶ 9.)

The Garniers eventually realized they were blocked from MOR's Facebook page, and Mr. Garnier realized he was blocked from MOR's Twitter page and Zane's Facebook page.  (*C. Garnier Decl.* ¶¶ 8, 10; *K. Garnier Decl.* ¶ 9.)  The Garniers dispute they posted repetitive and unrelated comments, and instead assert they were blocked in retaliation for criticizing MOR and Zane regarding PUSD matters.  (*Compl.* [Doc. 1] ¶ 10F; *Opp'n* [Doc. 35] 9:21–22.)

On October 30, 2017, the Garniers filed this lawsuit against MOR and Zane in their individual capacities, alleging they violated the Garniers' federal and state constitutional rights by blocking them from exercising their free-speech and/or government-petitioning rights in a public forum, namely on their public social-media

pages.[3] MOR and Zane now seek summary judgment on the following grounds: (1) the Garniers lack standing because they have not suffered an "injury in fact"; (2) MOR and Zane are entitled to qualified immunity; (3) MOR and Zane are not liable under 42 U.S.C. § 1983 because they did not act under color of state law; (4) MOR and Zane's social media pages are not public forums; and (5) even if MOR and Zane's social media pages are public forums, blocking the Garniers constitutes a reasonable time, place and manner regulation.

## II.  LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322–23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary

---

[3] Zane also blocked the Garniers from posting on his personal Facebook page.  (*Zane Decl.* ¶ 8.) However, the Garniers' First Amendment claims are based on being blocked only from MOR and Zane's public Facebook pages, not their personal or business pages.  (*Compl.* ¶¶ 10–16; *P&A* at 8 n. 1.)

judgment." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." <u>In re Citric Acid Litig.</u>, 191 F.3d 1090, 1094 (9th Cir. 1999) (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing <u>Anderson</u>, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Ford Motor Credit Co. v. Daugherty</u>, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing <u>Celotex</u>, 477 U.S. at 324). Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. <u>See Matsushita</u>, 475 U.S. at 587.


### III.    EVIDENTIARY OBJECTION

As a preliminary matter, MOR and Zane object to Nara Pasin's declaration, which was filed in support of the Garniers' opposition. (*See Defs' Obj.* [Doc. 36-2].) MOR and Zane contend the declaration is improper expert opinion because the information contained therein is based on technical and specialized knowledge. (*Id.* 5:25–6:10.)

According to her declaration, Pasin has been a Facebook user for over 10 years. (*Pasin Decl.* [Doc. 35-3] ¶¶ 1, 20.) Pasin describes how Facebook is structured for the typical user, and the different ways Facebook pages may be customized. (*Id.* ¶¶ 3–6, 8–16.) She has not "received any outside tutorials or assistance in relation to utilizing

Facebook." (*Id.* ¶ 1.) All the information she provides is based on her experience as a "Facebook user and reading Facebook's Settings." (*Id.* ¶ 18.)

Pasin is also an active Twitter user, and she discusses how Twitter accounts are structured and typically used. (*Id.* ¶¶ 20–26.) She has not "received any outside tutorials or assistance in relation to utilizing Twitter," but instead obtained all of the information discussed in her declaration "by acting as a Twitter user and reading Twitter's Settings." (*Id.* ¶¶ 20, 28.)

Contrary to MOR and Zane's argument, the information discussed in Pasin's declaration does not require technical or specialized knowledge, but instead involves information known to the typical user. Because Pasin has been using Facebook for over 10 years and is an active Twitter user, her testimony is proper. Accordingly, MOR and Zane's objection is overruled.

The parties also assert a number of other objections. (*See Defs' Obj.*; *Plts' Obj.* [Doc. 35-30].) All remaining objections to evidence cited in this order are overruled. To the extent the parties object to evidence not cited in this order, the Court declines to rule on the objections.

## IV.  DISCUSSION

### A.  The Garniers have standing.

MOR and Zane argue the Garniers do not have standing to pursue a First Amendment claim because they have not been "injured in fact." (*P&A* [Doc. 34-1] 12: 19–20.) According to MOR and Zane, the Garniers have not been harmed because they have other avenues to voice their concerns and opinions outside of MOR and Zane's public Facebook and Twitter pages. (*Id.* 13:17–14:7.)

To establish standing, a plaintiff must show (1) injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). An "injury in fact" is an "invasion of a legally protected

interest" that is both (a) "concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical." Id. at 560. To meet the imminence requirement, the injury must be "certainly impending." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013). To be particularized, an injury "must affect the plaintiff in a personal and individual way." Spokeo, Inc. v. Robins, 578 U.S. —, —, 136 S. Ct. 1540, 1548 (2016). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." Id. However, an injury need not be tangible to satisfy the concreteness requirement, and "intangible injuries can nevertheless be concrete." Id. at 1549.

In Knight First Amendment Institute at Columbia University v. Trump, 302 F. Supp. 3d 541 (S.D.N.Y. 2018)[4], the plaintiffs were blocked from President Trump's public Twitter account after each of them tweeted a message criticizing him or his policies. The plaintiffs then sued President Trump, among others, for violating their First Amendment rights. The district court evaluated whether plaintiffs satisfied the "injury-in-fact" element of standing despite having "alternative means" of viewing and responding to the President's tweets.

The court began by recognizing plaintiffs had a "number of limitations" on their use of Twitter that encumbered their ability to communicate using the social media platform. Id. at 557. The court found the limitations constituted past harms that were "virtually certain" to continue because the individual plaintiffs continued to be blocked. Id. at 557–58. Furthermore, although plaintiffs' injuries were not tangible, they were nevertheless concrete, as the limitations on plaintiffs' ability to communicate were

---

[4] The Second Circuit affirmed the district court's decision on July 9, 2019. See Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226 (2d Cir. 2019).

7

"squarely within the 'intangible injuries' previously determined to be concrete." <u>Id.</u> at 558. The injuries were also particularized because each plaintiff was affected in a "personal and individual way," because each personally owned a Twitter account that was blocked. <u>Id.</u> The court, therefore, held plaintiffs established an injury in fact. <u>Id.</u>

Here, the Garniers injuries are actual and imminent. Although they can communicate their opinions and concerns to MOR and Zane through "alternative means," such as email, regular mail, and at Board meetings, it is undisputed that MOR and Zane have blocked the Garniers from communicating on Twitter and Facebook. (*MOR Decl.* ¶ 6; *Zane Decl.* ¶ 7.) As a result, the Garniers can no longer comment on or react to any of MOR or Zane's posts. (*C. Garnier Decl.* ¶ 8, *K. Garnier Decl.* ¶ 9.) Similarly, Mr. Garnier cannot view any of MOR's Twitter posts or participate in the interactive portions of her Twitter conversations. (*C. Garnier Decl.* ¶ 10.) Thus, as in <u>Knight</u>, the Garniers have been injured because their ability to communicate using social media has been limited, and their injuries are "virtually certain" to continue because the Garniers remain blocked. The Garniers' injuries are also concrete and particularized because, like the Twitter users in <u>Knight</u>, Mr. and Mrs. Garnier personally own the accounts that were blocked and are each affected in a "personal and individual way." The Court, therefore, finds the Garniers have been injured in fact and have standing to sue MOR and Zane. [5]

//

//

//

---

[5] MOR and Zane assert an additional reason the Garniers lack standing. In their moving papers, MOR and Zane describe several lawsuits between the Garniers and PUSD. (*See P&A* 6:9–8:6.) Based on that litigation, MOR and Zane contend the Garniers benefitted from being blocked because it allowed them to file more litigation and to continue to harass PUSD. (*Id.* 12:24–13:16.) Not surprisingly, MOR and Zane provide no legal support for this argument, and they appear to abandon the theory in their Reply. (*See Reply* [Doc. 36] 2:24–3:23.) To the extent, MOR and Zane did not abandon the argument, the Court finds it meritless and, simply put, silly.

17-cv-2215-W (JLB)

**B.** **MOR and Zane are entitled to qualified immunity for damage claims.**

MOR and Zane argue they are entitled to qualified immunity because the Garniers' right to free speech on MOR and Zane's social media pages was not clearly established when they were blocked. (*P&A* 23:27–28.)

Public officials are entitled to qualified immunity from liability for monetary damages unless the plaintiff establishes (1) the conduct violated a constitutional right, and (2) the right was "clearly established" when the alleged violation occurred. <u>Saucier v. Katz</u>, 533 U.S. 194 (2001). In evaluating this two-step inquiry, district courts have discretion in deciding which prong to address first depending on the facts of the particular case. <u>Pearson v. Callahan</u>, 555 U.S. 223, 232, 236–42 (2009).

The second prong requires the plaintiff to show the right a government official is alleged to have violated was "'clearly established' in a more particularized, and hence more relevant, sense." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). While it is not necessary for the exact action in question to have been previously held unlawful, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> In obvious cases, a right can be clearly established "even without a body of relevant case law." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002) (because the Eighth Amendment violation was "obvious," the right was clearly established even without a materially similar case). Thus, in evaluating whether a right is clearly established, it is necessary to consider the particular circumstances involving the alleged violation. <u>See</u> <u>Anderson</u>, 483 U.S. at 641 (considering the circumstances surrounding an FBI agent's decision to conduct a warrantless search in evaluating qualified immunity).

Here, the Garniers contend that when they were blocked from MOR and Zane's social media accounts, it was already clearly established "that retaliation for the exercise of one's First Amendment rights amounts to a constitutional violation." (*Opp'n* 11:2–3.) Although correct, what was not yet established was the First Amendment right to post comments on a public official's Facebook or Twitter page. That right was first

17-cv-2215-W (JLB)

established in May 2018 in <u>Knight</u>, 302 F. Supp. 3d 541. Because MOR and Zane blocked the Garniers approximately two years before <u>Knight</u> (*see MOR Decl.* ¶ 6; *Zane Decl.* ¶ 9), the Garniers' constitutional right was not yet clearly established.

The Garniers also argue qualified immunity does not apply to this case because the doctrine only bars damages and not claims for declaratory or injunctive relief. While qualified immunity does not bar claims for declaratory and injunctive relief, the Garniers are also seeking monetary damages.[6] (*See Compl.*) Thus, MOR and Zane are entitled to summary adjudication of the damages claim. <u>See</u> <u>Greene v. Terhune</u>, 2 Fed. Appx. 750, 752 (9th Cir. 2001) (finding that qualified immunity did not apply to the plaintiff's declaratory and injunctive relief claim, but nevertheless barred the damages claim).

### C. MOR and Zane acted under color of state law.

MOR and Zane contend the Garniers cannot bring a claim under 42 U.S.C. § 1983 because MOR and Zane did not act under color of state law when they blocked the Garniers from their social media pages. (*P&A* 14:8–18:9.)

"To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49–50 (1999). Traditionally, "acting under color of state law requires that the defendant in a § 1983 action has exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988) (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326, (1941)). "In general, section 1983 is not

---

[6] Although the Garniers' opposition contends they are seeking declaratory and injunctive relief, only the Complaint's caption mentions that relief. (*See Compl.* 1:11–13.) MOR and Zane's reply, however, simply points out that the Complaint's prayer does not request declaratory or injunctive relief. (*Reply* 7:21–23.) They do not then argue or cite any authority for the proposition that the Garniers cannot seek declaratory or injunctive relief.

17-cv-2215-W (JLB)

implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for the authority of his office." <u>Martinez v. Colon</u>, 54 F.3d 980, 986 (1st Cir. 1995). The Supreme Court has held that if a defendant's conduct meets the state-action requirement under the Fourteenth Amendment, "then that conduct [is] also action under color of state law and will support a suit under § 1983." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 935 (1982). Both require "the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." <u>Id.</u> at 937. There must be a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 351 (1974).

There is no single formula for determining state action. <u>Melara v. Kennedy</u>, 541 F.2d 802, 805 (9th Cir.1976). Rather, the analysis "is a matter of normative judgment, and the criteria lack rigid simplicity." <u>Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001). When determining whether an individual or entity's conduct amounts to state action, courts look at the totality of circumstances. <u>Skinner v. Ry. Labor Executives' Assoc.</u>, 489 U.S. 602, 614–15 (1989) (whether a private party's conduct amounts to state action is "resolved 'in light of all the circumstances'"); <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 n. 1 (4th Cir. 2003) (explaining the Supreme Court "look[s] at that totality of circumstances that might bear on the question of the nexus between the challenged action and the state"); <u>Howerton v. Gabica</u>, 708 F.2d 380, 384 (9th Cir.1983) (in order to determine whether defendant acted under color of state law, "the circumstances surrounding the [conduct] must be examined in their totality").

While there is no Ninth Circuit authority addressing state action in the context of a government official blocking someone from a social media platform, the Fourth Circuit has dealt with the issue. In <u>Davison v. Randall</u>, 912 F.3d 666 (4th Cir. 2019), a county resident brought a section 1983 action against the Chair of the County Board of

Supervisors after the Chair blocked the resident from her public Facebook page. The Fourth Circuit affirmed the district court's finding that the defendant acted under color of state law in blocking the plaintiff. Id. at 681. The court focused on the Chair's use of her Facebook page "as a tool of governance," noting that the defendant used the page to inform the public about her and the county board's official activities, as well as public safety events and the county's response to such events. Id. at 680. The court also found persuasive that the defendant "swathe[d] the [Chair's Facebook Page] in the trappings of her office." Id. at 680–81 (brackets in original). This included categorizing her page as belonging to a government official, including her official title on the page, adding her county email address and the county office's phone number to the page's contact information section, including the official county website on the page, and posting content with a "strong tendency toward matters related to [the defendant]'s office." Id. The court reasoned that "a private citizen could not have created and used the Chair's Facebook Page in such a manner." Id. at 681. The court also reasoned that because the Chair's challenged actions were "linked to events which arose out of h[er] official status," her "purportedly private actions b[ore] a 'sufficiently close nexus' with the State to satisfy Section 1983's color-of-law requirement." See id. at 680, 681 (quoting Rossignol 316 F.3d at 524).

Here, like Davison, MOR and Zane's Facebook pages were used "as a tool of governance" because they were used to inform the public about MOR and Zane's official activities, as well as information related to PUSD and the Board. For example, in a Facebook post from March 12, 2015, MOR provided a link to the Pomerado News' online synopsis of a PUSD meeting. (Vaughn Decl. ¶ 12, Ex. U at 2.) On April 1, 2015, MOR informed readers about the "FINAL community forum where you can share your priorities for the school district and participate in creating next year's Local Control Accountability Plan." (Id. at 6.) On June 22, 2015, MOR again provided notice about the "Board meeting tonight" and stated that the "big items up for approval are next year's Local Control Accountability Plan (LCAP), General Fund budget, and Special Education

17-cv-2215-W (JLB)

budget." (*Id.* at 14.)  The post also provides a link to the "[f]ull agenda packet for tonight." (*Id.*)  On June 26, 2015, MOR's post reported that "the Board adopted the district's 2015–2016 Local Control Accountability Plan" and provided readers with a link to a "quick primer on the LCAP and LCFF." (*Id.* at 16.)  In August 2015, MOR shared that she was honored to have received an award from the local Girl Scouts chapter for PUSD's support of the organization's mission. (*Id.* at 28.)  In another post from March 2016, MOR shared about being invited to a PUSD elementary school to speak to students and their parents about women working in public service and government. (*Id.* at 132.)  On her Twitter page in August 2017, MOR posted a picture from the orientation for new teachers with a caption that included: "Welcome to #TeamPUSD!" (*Briggs Decl.* ¶ 9, *Ex. 9* at 22.)  In September 2017, she tweeted a picture of her, Zane, another PUSD Board member, and a school principal at the "Salute to Teachers" event. (*Id.* at 11.)  MOR also shared posts from PUSD's official Facebook and Twitter pages. (*See, e.g.*, *Vaughn Decl.* ¶ 12, *Ex. U* at 8; *Briggs Decl.* ¶ 9, *Ex. 9* at 11–14, 20, 21.)

Similarly, in March 2015, Zane posted about his visit to a PUSD high school to see how students were doing after a threat of violence. (*Vaughn Decl.* ¶ 11, *Ex. T* at 2.)  On January 5, 2017, Zane posted about serving as "Emcee for the third year in a row" at the Character and Ethics Film Festival where "[s]tudents are invited to create and submit a video showing good character." (*Briggs Decl.* ¶ 10, *Ex. 10* at 24–25.)  On January 11, 2017, Zane posted about "need[ing] your input for PUSD's LCAP (Local Control Accountability Plan)" and explained "[t]his is how District budget priorities are set for our schools . . . ." (*Id.* at 24.)  In March 2017, Zane provided a link for information about the PUSD Board's passage of a "safe haven" resolution, and the next month Zane provided information about "RB High's Fight Against Hunger Club." (*Id.* at 11, 15.)  In May 2017, Zane notified and kept constituents up to date on a lockdown at a PUSD high school through a series of three posts. (*Id.* at 9.)  And like MOR, Zane also shared posts from PUSD's Facebook page. (*See, e.g., Vaughn Decl.* ¶ 11, *Ex. T* at 3.)

Just as in <u>Davison</u>, MOR and Zane's posts were linked to events which arose out of their official status as PUSD Board members. The content of their posts, considered in totality, went beyond their policy preferences or information about their campaigns for reelection. Instead, the content of many of their posts was possible because they were "clothed with the authority of state law." <u>Davison</u>, 912 F.3d at 679. Their ability to post about district events they attended and share Board information was due to their positions as public officials within PUSD. Thus, MOR and Zane's actions on their social media pages bore a sufficiently close nexus with the state.

Furthermore, similar to the defendants in <u>Davison</u>, both MOR and Zane "swathed [their social media pages] in the trappings of [their] office." <u>Id.</u> at 680. MOR's Facebook page lists her "Current Office" as "Board of Education President, Poway Unified School District," and the "About" section identifies her as a "Government Official" and includes her official PUSD email address under "Contact Info." (*Briggs Decl.* ¶ 8, *Ex. 8* at 2.) MOR's Twitter page also identifies her as "President, Poway Unified School District Board of Education," and lists her Twitter handle as @MOR4PUSD. (*Id.* ¶ 9, *Ex. 9* at 2.) Zane's Facebook page lists his position as a "Poway Unified School District Trustee," includes a picture of a PUSD sign, and identifies Zane as a "Government Official." (*Briggs Decl.* ¶ 11, *Ex.* 11 at 2.)

Because MOR and Zane could not have used their social media pages in the way they did but for their positions on PUSD's Board, their blocking of the Garniers satisfies the state-action requirement for a section 1983 claim.

### D. <u>MOR and Zane created public forums.</u>

MOR and Zane argue that even if they did act under color of state law, their social media pages are not public forums. In support of this contention, MOR and Zane emphasize that their social media pages were intended to promote their campaigns, "not to allow any and all political speech and debate." (*P&A* 19:6–11.)

In deciding whether a space is a public forum, courts look at "the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity" to determine the government's intent. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985); see also Davison, 912 F.3d at 682 (finding public official's Facebook page had "the hallmarks of a public forum" because of the page's "compatib[ility] with expressive activity"). "We will not find that a public forum has been created in the face of clear evidence of a contrary intent . . . nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." Cornelius, 473 U.S. at 803. However, "[o]pening an instrumentality of communication 'for indiscriminate use by the general public' creates a public forum." Id. (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47 (1983)); see also Davison, 912 F.3d at 682 (finding public official's Facebook page a public forum where official "placed no restrictions on the public's access to the page or use of the interactive component"). Additionally, a public forum need not be "spatial or geographic," rather "the same principles are applicable" to a "metaphysical forum." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 830 (1995).

In Knight First Amendment Institute at Columbia University v. Trump, 928 F.3d 226 (2d Cir. 2019), President Trump appealed the district court's finding that his Twitter account was a public forum. The Second Circuit affirmed the decision reasoning that the "Account was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation." Id. at 237. This conclusion was based on the following: (1) Trump and the White House staff presented the account "as belonging to, and operated by the President"; (2) the White House official Twitter account directed users to follow Trump's account for updates about his administration; (3) his tweets were considered official public records; and (4) Trump regularly used the account to communicate and interact with the public regarding his

administration, including announcing "matters related to official government business," such as national policy and executive staff changes. Id. at 235–36. According to the Second Circuit, these facts demonstrated Trump "consistently used the Account as an important tool of governance and executive outreach," and were "overwhelming" evidence of the "public, non-private nature of the Account." Id. at 236. These facts also established "substantial and pervasive government involvement with, and control over, the Account." Id. at 235.

Here, as demonstrated in the previous sections, MOR and Zane kept constituents updated on PUSD events through their social media pages. As in Knight, where Trump's tweets regularly notified the public about his administration and announced matters related to official government business, MOR and Zane's posts provided notice about issues before the PUSD Board, and provided information relevant to their positions and duties as Board members. (See, e.g., Vaughn Decl. ¶¶ 11–12, Ex. T at 2, 3, Ex. U at 2, 6, 8, 10, 12, 14, 16, 28, 32; see also Briggs Decl. ¶ 9, Ex. 9 at 2, 11–15, 20–22, Ex. 10 at 9, 11, 15, 24–25.) Also similar to Trump, MOR and Zane highlighted their positions as government officials on their social media pages. By listing their official titles, providing district contact information, and identifying themselves as "Government Officials," MOR and Zane established a government presence on their public pages. (Briggs Decl. ¶¶ 8–9, 11, Ex. 8, Ex. 9 at 2, Ex. 11.)

Moreover, MOR and Zane do not argue that they set any general limitations on who could follow or comment on their pages, nor on the language the public could use when commenting. Thus, MOR and Zane opened their pages "for indiscriminate use by the general public," and as a result created public forums. Knight, 928 F.3d at 237.

MOR and Zane nevertheless argue their social media pages are not public forums because PUSD did not own or control their accounts. "[T]hat the government does not 'own' the property in the sense that it holds title to the property, is not determinative of whether the property is, in fact, sufficiently controlled by the government to make it a forum for First Amendment purposes." Knight, 928 F.3d at 235 (citing Se. Promotions,

Ltd. v. Conrad, 420 U.S. 546, 547–52 (1975)).  Although neither PUSD nor any other PUSD employee besides MOR and Zane managed or funded their social media pages, MOR and Zane are themselves government officials who decided what to post and who could access their pages.  (*MOR Decl.* ¶¶ 7–8; *Zane Decl.* ¶¶ 10–11.)  Thus, although PUSD did not control MOR and Zane's pages, they, as government officials, did.

MOR and Zane also contend their social media pages are not public forums because they created them before becoming Board members and used them solely to promote their campaigns.  However, it is undisputed that since their election to the Board, MOR and Zane's posts have related to their governmental duties and positions as Board members.  (*MOR Decl.* ¶ 2; *Zane Decl.* ¶ 2.)  As noted in Knight, "[the] litigation concerns what the Account is now," not how the account was used prior to litigation or how it will be used when MOR and Zane are no longer Board members.  Knight, 928 F.3d at 231.  Because MOR and Zane were posting content related to their positions as public officials and had opened their pages to the public without limitation when they blocked the Garniers, the Court finds the interactive portion of their social media pages are public forums.


### E.     The category of forum created by MOR and Zane.

Having determined that MOR and Zane created public forums, the Court must determine the category of forum they created.

The Supreme Court has recognized three categories of public fora: "traditional public forums," "designated public forums," and "limited public forums."  Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 (2010).  A traditional public forum is a place which "by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a public street or park.  Perry Educ. Ass'n, 460 U.S. at 45.  The government creates a designated public forum when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose."  Pleasant Grove City, Utah v.

Summum, 555 U.S. 460, 469 (2009). "[T]he Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802. Limited public forums are spaces "limited to use by certain groups or dedicated solely to the discussion of certain subjects." Pleasant Grove, 555 U.S. at 470.

MOR and Zane argue that their social media pages are neither traditional public forums nor designated public forums. Although their pages do not constitute traditional public forums, for the reasons that follow the Court finds they are designated public forums.

### 1. __MOR and Zane's social media pages are designated public forums.__

MOR and Zane argue that their social media pages are not designated public forums because they "did not 'dedicate the property for First Amendment activity'" and the "'principal function' of the pages is to promote the Defendants' individual campaigns and show the Defendants in the best light possible." (*P&A* 20:14–16.)

In Knight, the district court found President Trump's Twitter account was a designated public forum. Id. 302 F.Supp.3d at 574. While the court acknowledged that "government intent" is "the touchstone for determining whether" the space is a designated public forum, it explained that "intent is not merely a matter of stated purpose." Id. Rather, intent must be inferred from objective factors, including the government's policy and practice, the nature of the property, and its compatibility with expressive activity. Id. Because Trump's Twitter account was "generally accessible to the public at large" and Twitter itself is designed to allow users to interact with each other, the court held that the interactive space of Trump's account was a designated public forum. Id.

Just as in Knight, MOR and Zane opened their social media pages to the general public for comments without setting any limiting criteria. Any member of the public

could access their social media pages and use the platforms to interact with MOR and Zane through their posts, unless they were blocked.  Indeed, although MOR and Zane contend they intended to use their social media pages solely to promote their campaigns and not to interact with constituents, this contention is contradicted by their Facebook pages.  MOR and Zane's posts frequently invite readers to "write a comment."  (*See, e.g., Briggs Decl.* ¶ 10, *Ex. 10* at 3, 4, 6–11; *Vaughn Decl.* ¶ 12, *Ex. U* at 2, 5–10.)  Their Facebook pages also ask followers to "Invite your friends to like this Page" and, next to a "Send Message" link, followers are informed that MOR and Zane "Typically repl[y] within an hour." (*Pasin Decl.* ¶ 19, *Ex. 21* [Doc. 35-25] at 2–4; *Briggs Decl.* ¶ 10, *Ex. 10* at 2.)  MOR's page also encourages followers to "Ask [MOR]" a question.  (*Pasin Decl.* ¶ 19, *Ex. 21* at 2.)  Moreover, aside from encouraging interaction, there is evidence in the record of MOR and Zane interacting with users.  (*See, e.g., Vaughn Decl.* ¶ 12, *Ex. U* at 152–53; *Briggs Decl.* ¶ 10, *Ex. 10* at 7, 65.)

Additionally, the interactive nature of Facebook and Twitter is one of their defining characteristics.  On its own Facebook page, Facebook describes its mission as to: "Give people the power to build community and bring the world closer together." (*Briggs Decl.* ¶ 12, *Ex. 12* [Doc. 35-16].)  Similarly, in addressing its values, Twitter states, "We believe in free expression and think everyone has the power to impact the world." (*Id.* ¶ 17, *Ex. 22* [Doc. 35-26] at 2.)  Although some expressive activity might disrupt MOR and Zane's purpose for using the pages, the nature of Facebook and Twitter is consistent with expressive activity.  Social media users can use Facebook and Twitter to comment on, react to/like, mention another user, or share another user's posts.  (*Pasin Decl.* ¶¶ 6, 22–24.)  In fact, there are many comments, posts, and likes on MOR and Zane's pages from various users.  (*See, e.g.*, *Vaughn Decl.* ¶¶ 11–12, *Ex. T* at 2–3, *Ex. U* at 3–5, 25.)  Therefore, Facebook and Twitter's interactive nature demonstrates the pages' compatibility with expressive activity.

For these reasons, the Court finds the interactive portion of MOR and Zane's social media pages constitute designated public forums.

**2. MOR and Zane's social media pages are not limited public forums.**

MOR and Zane alternatively contend their social media pages constitute limited public forums, to which a more lenient standard of review applies. (*P&A* 22:8–19.)

"[A] limited public forum is a sub-category of a designated public forum that 'refers to a type of nonpublic forum that government has intentionally opened to certain groups or to certain topics." Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir. 2001) (citing DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ., 196 F.3d 958, 965 (9th Cir. 1999)). Restrictions in a limited public forum are permissible as long as they are "viewpoint neutral and reasonable in light of the purpose served by the forum." Arizona Life Coalition Inc. v. Stanton, 515 F.3d 956, 971 (9th Cir. 2008).

In evaluating whether a forum is a limited public forum or designated public forum, courts "must examine the terms on which the forum operates . . . ." Hopper, 241 F.3d at 1075. Government intent is critical in this determination, which in turn is evaluated by looking at the government's policy and practice. Id. (quoting Cornelius, 473 U.S. at 802). "The 'policy' and 'practice' inquiries are intimately linked in the sense that an abstract policy statement purporting to restrict access to a forum is not enough. What matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted." Id.

Here, MOR and Zane contend that their social media pages are limited public forums because they "have not 'opened' up their social media pages to certain groups or categories of speech" and instead maintain "their social media pages to promote themselves for the next upcoming election." (*P&A* 22:3–5.) The Court is not persuaded for at least two reasons.

First, MOR and Zane have failed to identify any policies or restrictions limiting the groups or categories of speech. While they emphasize that their original reason for creating the social media pages was to campaign for office (*see MOR Decl.* ¶ 2; *Zane Decl.* ¶ 2), there is no limit on who could "speak" or what topics could be addressed

17-cv-2215-W (JLB)

implicit in their reasoning.  In contrast, where courts have found a limited public forum, the government had explicit policies or restrictions governing the groups that could "speak" or topics that could be discussed.  See Arizona Life Coalition Inc., 515 F.3d 956 (finding Arizona specialty license plate program constituted limited public forum); Seattle Mideast Awareness Campaign v. King Cnty., 781 F.3d 489 (9th Cir. 2008) (finding County's Metro bus advertising program a limited public forum); Flint v. Dennison, 488 F.3d 816 (9th Cir. 2007) (finding election to university's student senate a limited public forum); Faith Ctr Church Evangelistic Ministries v. Glover, 480 F.3d 891 (9th Cir. 2007) (finding library meeting room a limited public forum); Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044 (9th Cir. 2003) (finding school's distribution of advertisements a limited public forum); DiLoreto, 196 F.3d 958 (finding school's baseball fence a limited public forum).  For this reason alone, MOR and Zane's social media pages are not limited public forums.

Second, assuming MOR and Zane meant to limit "speech" on their social media pages to issues involving their campaigns, the evidence establishes that MOR and Zane failed to consistently apply that restriction.  As demonstrated in the previous sections, MOR and Zane's posts frequently provided information on a wide array of topics involving the Board and PUSD in general, and their pages encouraged all users to interact with MOR and Zane.  Because the evidence indicates MOR and Zane failed to consistently enforce their purported restrictions, their social media pages are not limited public forums.

**3.** **A disputed issue of material fact exists regarding whether MOR and Zane's blocking of the Garniers was content neutral.**

MOR and Zane argue that even if their social media pages are designated public forums, blocking the Garniers represents reasonable time, place and manner regulations. (*P&A* 20:21–23:21.)

"In a designated public forum, speakers cannot be excluded unless it is 'necessary to serve a compelling state interest' and the exclusion is 'narrowly drawn to achieve that interest.'" <u>Arizona Life Coalition Inc.</u>, 515 F.3d at 968 (citing <u>Sammartano v. First Judicial District Court</u>, 303 F.3d 959, 965 (9th Cir. 2002)). The Supreme Court follows a three-part test for evaluating the constitutionality of government regulations of the time, place or manner of protected speech: the regulations must (1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication of the information. <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989); <u>see also</u> <u>Kindt v. Santa Monica Rent Control Bd.</u>, 67 F.3d 266, 271 (9th Cir. 1995) (finding rent control board's time restrictions on public commentary during meetings were "reasonable time, place, and manner restrictions that preserve a board's legitimate interest in conducting efficient, orderly meetings").

Regulations are "content-neutral" if they are "justified without reference to the content of the regulated speech." <u>Ward</u>, 491 U.S. at 791. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Id.</u> A regulation "need not be the least restrictive or least intrusive means" of serving a government's content-neutral interest, in order to be "narrowly tailored." <u>Id.</u> at 798. Instead, a regulation is "narrowly tailored" "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." <u>Id.</u> at 799 (quoting <u>United States v. Albertini</u>, 472 U.S. 675, 689 (1985)). The "ample alternative channels for communication" requirement is met when a regulation "does not attempt to ban any particular manner or type of expression at a given place or time." <u>Id.</u> at 802. Regulations that meet this requirement "continue[ ] to permit expressive activity." <u>Id.</u>

MOR and Zane contend the Garniers were blocked because they "inundated the Defendants' social media pages with hundreds of comments unrelated to the original post" causing "the original post to be buried by the Plaintiffs' comments." (*P&A* 21:11–14.) As a result, MOR and Zane argue "Plaintiffs' posts prevented the Defendants' from

accomplishing their business—showing potential voters their involvement in the District." (*Id.* 21:15–16.)

The Garniers dispute that they disrupted MOR and Zane's social media pages and instead contend MOR and Zane engaged in viewpoint discrimination. (*Opp'n* 9:21–22.) In support of this argument, the Garniers point out that they did not post repetitive comments within the same "dialogue as Defendants suggest," but instead posted "[c]omments of a similar nature . . . underneath different Posts to reach audiences within different interactive portions of the Facebook page . . . ." (*Id.* 9:25–27.) The Garniers also assert that all of their "comments dealt with PUSD and Defendants' roles in PUSD-related matters." (*Id.* 10:1–2.)

The evidence currently before the Court confirms that although the Garniers posted repetitive comments, they did not post repetitive comments within the same post. (*See e.g. Briggs Decl.* ¶ 1, *Ex. 1* [Doc. 35-5] 9:7–14; *C. Garnier Decl.* ¶ 7.) The evidence also indicates that Facebook automatically edits the display of lengthy comments to only display the first few lines. (*Pasin Decl.* ¶ 9.) Users may then choose to enlarge the comment to display the entire comment. (*Id.*) Additionally, Facebook also sorts and displays comments by the "most relevant." (*Id.* ¶ 8.) Based on these undisputed facts, there exists a disputed issue of material fact regarding whether the Garniers' comments actually disrupted MOR and Zane's original posts. This is important because if the Garniers' comments did not disrupt the original posts, it is reasonable to infer that MOR and Zane's claimed justification for blocking the Garniers was a pretext and that they actually blocked the Garniers because of the content of their comments. Accordingly, the Court finds summary judgment is not appropriate because a disputed issue of material facts exists regarding whether MOR and Zane's conduct was content neutral. See Norse v. City of Santa Cruz, 629 F.3d 966, 976 (9th Cir. 2010) (explaining that in order to find plaintiff's ejection from city council meetings did not violate the First Amendment, plaintiff's conduct had to actually disrupt or disturb the meetings) (citing White v. City of Norwalk, 900 F.2d 1421, 1424–26 (9th Cir. 1990)).

# V.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** MOR and Zane's motion [Doc. 34] as follows:

1.   Defendants MOR and Zane are entitled to summary adjudication of Plaintiffs' damages claim because Defendants MOR and Zane are entitled to qualified immunity.

2.   Defendants MOR and Zane are not entitled to summary adjudication of Plaintiffs' claims for injunctive and declaratory relief because disputed issues of fact exist regarding whether Plaintiffs were blocked because of the content of their messages.

Dated:  September 26, 2019

Hon. Thomas J. Whelan
United States District Judge

17-cv-2215-W (JLB)