UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable ROGER T. BENITEZ, District Court Judge

| | |
|---|---|
| CHRISTOPHER GARNIER, et al., ) | |
| ) | |
| Plaintiff, ) | CASE NO. |
| VS. ) | 3:17-cv-2215-BEN-JLB |
| ) | |
| POWAY UNIFIED SCHOOL DISTRICT,) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Diego, California
Monday, September 21, 2020

BENCH TRIAL - DAY 1

APPEARANCES:

For Plaintiffs:        BRIGGS LAW CORPORATION
                       99 East C Street, Suite 111
                       Upland, California 91786
                       BY: CORY J. BRIGGS, ESQ.
                           NORA PASIN, ESQ.


For Defendants:        ARTIANO SHINOFF
                       2488 Historic Decatur Road, Suite 200
                       San Diego, California  92106
                       BY: DANIEL R. SHINOFF, ESQ.
                           JACK M. SLEETH, JR., ESQ.
                           JESSE B. BASEL, ESQ.




Reported by:           Ellen L. Simone, RMR, CRR, CSR No. 14261
                       Official Court Reporter

1                    EXHIBIT TO WITNESSES

2    FOR THE PLAINTIFFS:

3    CHRISTOPHER GARNIER
     Direct By Mr. Briggs . . . . . . . . . . . . .17
4    Cross By Mr. Shinoff . . . . . . . . . . . . .51
     Redirect By Mr. Briggs . . . . . . . . . . . .74
5    Recross By Mr. Shinoff . . . . . . . . . . . .86

6    KIMBERLY GARNIER
     Direct By Mr. Briggs . . . . . . . . . . . . .87
7    Cross By Mr. Shinoff . . . . . . . . . . . . .96
     Redirect By Mr. Briggs . . . . . . . . . . . 103
8    Recross By Mr. Shinoff . . . . . . . . . . . 109

9    THOMAS JOSEPH ZANE
     Direct By Mr. Briggs . . . . . . . . . . . . 112
10   Cross By Mr. Shinoff . . . . . . . . . . . . 124
     Redirect By Mr. Briggs . . . . . . . . . . . 142
11
     MICHELLE O'CONNOR-RATCLIFF
12   Direct By Mr. Briggs . . . . . . . . . . . . 152
     Cross By Mr. Shinoff . . . . . . . . . . . . 169
13   Redirect By Mr. Briggs . . . . . . . . . . . 185

14

15                   INDEX TO EXHIBITS

16   FOR THE PLAINTIFFS:

17   3    . . . . . . . . . . . . . . . . . . .30
     5    . . . . . . . . . . . . . . . . . . .34
18   4    . . . . . . . . . . . . . . . . . . .34
     6    . . . . . . . . . . . . . . . . . . .35
19   7    . . . . . . . . . . . . . . . . . . .35
     14   . . . . . . . . . . . . . . . . . . .46
20   13, 15, and 16  . . . . . . . . . . . . . .50
     19   . . . . . . . . . . . . . . . . . . 185
21
     FOR THE DEFENDANTS:
22
     U, pages 25 through 130   . . . . . . . . . . .64
23   V, pages 1 through 11   . . . . . . . . . . .70

24

25

1    SAN DIEGO, CALIFORNIA; SEPTEMBER 21, 2020; 9:37 A.M.

2                              -o0o-

3          THE CLERK:  Number 1 on calendar.  17-cv-2215.

4    Garnier, et al. v. Poway Unified School District, et al.

5          Bench trial, Day 1.

6          THE COURT:  Counsel, if you would do me a favor and

7    please register your appearances for the record.  Please spell

8    your name slowly, make sure that both my court reporter and I

9    have it down, starting with the plaintiff.

10         MR. BRIGGS:  Good morning, Your Honor.  I'm Cory

11   Briggs.  C-o-r-y, B-r-i-g-g-s.

12         MS. PASIN:  Nora Pasin.  N-o-r-a, P-a-s-i-n.

13         THE COURT:  You're a lawyer?

14         MS. PASIN:  Yes, Your Honor.

15         THE COURT:  And you represent?

16         MS. PASIN:  For plaintiffs.

17         THE COURT:  For plaintiff.  I thought I saw you on the

18   witness list.  Did I -- no?

19         MR. BRIGGS:  You did, Your Honor.

20         THE COURT:  Okay.  So, all right.

21         Turning our attention to the defense.

22         MR. SHINOFF:  Good morning, Your Honor.

23         My name is Daniel Shinoff, S-h-i-n-o-f-f, and I

24   represent Ms. Michelle O'Connor-Ratcliff, as well as T.J. Zane.

25         THE COURT:  I'm sorry.  As well as?

1      MR. SHINOFF:  T.J. Zane.

2      THE COURT:  Okay.  Ratcliff and Zane.

3      MR. BASEL:  Good morning, Your Honor.  Jesse Basel,

4  J-e-s-s-e, B-a-s-e-l, and counsel for defense, as well, Your

5  Honor.

6      THE COURT:  All right.  And we have someone on Zoom.

7  How are you?

8      MR. SLEETH:  I'm very good, Your Honor.  Thank you

9  very much for taking the extra trouble to let me appear

10  virtually.

11      THE COURT:  No problem.  No problem.

12      MR. SLEETH:  My name is Jack Sleeth, S-l-e-e-t-h.

13  First name is ordinary, Jack, J-a-c-k.

14      THE COURT:  Ordinary Jack?

15      MR. SLEETH:  Yup.  I represent the defendants.

16      THE COURT:  Ordinary Jack Sleeth.  Do I have that

17  right?

18      MR. SLEETH:  The spelling is the ordinary J-a-c-k,

19  yes.

20      THE COURT:  All right.  You can smile, Mr. Sleeth.

21  It's okay.

22      MR. SLEETH:  Thank you.

23      THE COURT:  Good.  All right.  Everybody be seated.

24      MR. SHINOFF:  Your Honor, just one housekeeping

25  matter, and I think the Court touched upon it.

1    We do have a lawyer who is also a witness.  I would

2  ask that she be excluded until she testifies as a nonparty

3  witness.

4         THE COURT:  No, I don't think we're going to do that.

5         As you know, this case was originally Judge Whelan's

6  case.  He presided over this case for a considerable period of

7  time.  I believe he ruled on the summary judgment motions that

8  were made.

9         And then the case was transferred to Judge Sabraw, and

10  then subsequently, Judge Sabraw transferred the case to me.

11        I have done my best to try to bring myself up to speed

12  to both the history and the legal issues involved in the case.

13  You will forgive me if I stumble and fall from time to time.  I

14  expect that you will assist me in getting through any issues

15  that I may not have quite figured out or that I may need some

16  help on.

17        Now, my understanding, frankly, after reading this --

18  and I spent a considerable amount of time over the weekend

19  looking at the material in this case -- Judge Whelan ruled on

20  summary judgment motions.

21        And by the way, I know that the defense wants me to go

22  back and reinvent the wheel on some of these issues.  I'm not

23  going to do that.  Judge Whelan issued his order.  Whatever his

24  order is is the way I intend to proceed with the case.

25        And the way I read the case -- or I should say Judge

1   Whelan's order -- there's really one issue to be tried in this

2   case, and I'm going to cite specifically from Judge Whelan's

3   order at page 23.

4           Page 23 says, "Based on these undisputed facts, there

5   exists a disputed issue of material fact regarding whether the

6   Garniers' comments actually disrupted MOR and Zane's original

7   posts.  This is important because if the Garniers' comments did

8   not disrupt the original posts, then it's reasonable to infer

9   that MOR and Zane's claimed justification for blocking the

10  Garniers was a pretext, and that they actually blocked the

11  Garniers because of the content of their comments."

12          I have one question, one question, and that is this:

13          Given Judge Whelan's rulings, I have previously had a

14  case where the question came up as to whether or not the

15  blocking of access to a website or -- by the way, I know

16  absolutely nothing about Facebook or Twitter.  I don't use

17  either one of them, and really don't know much at all about

18  them other than they exist.

19          But I do know that there is this electronic social

20  media, and websites, and so on, and I seem to recall that

21  there's also a limitation -- that there can be a limitation

22  based on reasonable time, manner, and place.

23          So I have a question for counsel, which is a question

24  that arose as I was looking at the material.

25          Given Judge Whelan's comments that the Garniers might

1   have been blocked because of the content of their comments,

2   even if we were to assume, hypothetically, that that was the

3   case, but if there was a blocking that occurred that was based

4   reasonably on time, place, and manner, what impact would that

5   have on the outcome of this case?

6           In other words -- by the way, this is all

7   hypothetical, and this is all simply for purposes of educating

8   me.

9           Let's assume, hypothetically, that we were at, say, a

10  School Board meeting, or a City Council meeting, and there's an

11  open forum, the ability for the public to speak.

12          But you have someone who decides to abuse that

13  ability.  They decide to squat on the microphone and, for

14  example, not to allow, basically, other people to use it or for

15  there to be an exchange between the Board members or the City

16  Council members and the public.

17          Is there not the right to regulate reasonable time,

18  place, and manner for use of the forum?

19          And I think that -- I'm not sure, but I think that may

20  be an issue in this case, if I'm reading all of this --

21          I've read the plaintiffs' trial brief, the defendants'

22  trial brief, I've read Judge Whelan's summary judgment order,

23  and so on, and I'm just wondering.

24          So if we assume -- let's just assume, hypothetically,

25  that it was content -- that there was a content-based

1  restriction, but it was based on reasonable time, place, and
2  manner use of the forum.

3       So the question is:  Would the defendants have the
4  ability to restrain the use of their Facebook and Twitter
5  accounts if, even though it might possibly be content-based,
6  but if it was an unreasonable use by the plaintiffs?

7       Mr. Briggs, I'll give you the first shot.

8       MR. BRIGGS:  Sure, Your Honor.  I haven't had the
9  privilege of trying a case with you.  Do you want me to stand
10 when I address the Court?  Use the lecturn?

11      THE COURT:  Let's not use the lecturn because
12 everybody's so concerned about, you know, COVID and so on.  You
13 don't have to stand.

14      By the way, I think there's sufficient room for
15 everybody to spread out, if you wish to spread out.  It's hard
16 for me to understand you when you're wearing these facemasks.
17 You notice I'm not wearing one, although I have a shield.

18      But if you feel comfortable not wearing one, please
19 spread yourselves out, but that way, I can hear you.

20      Mr. Sleeth, you can take your mask off.

21      MR. SLEETH:  Thank you, Your Honor.  Appreciate it.

22      THE COURT:  So Mr. Briggs, what's your thoughts on my
23 question?

24      MR. BRIGGS:  I agree that there is a rule that allows
25 for reasonable time, manner, and place restrictions.  That's

1   not disputed.  That rule exists.

2           THE COURT:  So even though it might be

3   content-based -- I mean, the content of the speech might be

4   restricted, but also the fact that it's a reasonable

5   restriction based on time, manner, and place.

6           MR. BRIGGS:  I wouldn't agree with Your Honor that

7   there can be content restrictions.  There can be reasonable

8   time, manner, and place restrictions set up upfront, and that

9   includes, if comments were to become disruptive and preventing

10   the meeting from proceeding in an orderly manner, causing harm

11   to observers and the body, of course.

12           THE COURT:  Okay.

13           MR. BRIGGS:  But -- sorry.  I didn't mean to --

14           THE COURT:  Go ahead.  Go.

15           MR. BRIGGS:  But you don't really know what the person

16   is going to say until the person has said it.  And so there's

17   case law indicating that, because a person has been a problem

18   in the past, you can't have an absolute blanket prohibition

19   against that person attempting to express himself or herself in

20   the future.

21           THE COURT:  All right.  Great.

22           Mr. Shinoff.

23           MR. SHINOFF:  Yes, Your Honor.  I'm going to attempt

24   to answer what I believe to be a very narrow question by the

25   Court.

1      And yes, there is the absolute right to restrict time,

2  place, and manner.  It happens at City meetings, it happens at

3  School Board meetings, so that's -- that's the most direct

4  answer I can give you to your question.

5      THE COURT:  All right.  So even though the content may

6  be relevant, may be appropriate, but if it's not being

7  reasonably put forth based on the time, place, and manner, then

8  there can be a restriction on that --

9      MR. SHINOFF:  Yes.

10      THE COURT:  -- correct?

11      MR. SHINOFF:  So let me give you an example.

12      If there's a proscription to three minutes of comment,

13  that's the proscription.

14      THE COURT:  Okay.  Fair enough.  That was the question

15  I have.

16      So getting back to my point, there's one issue to be

17  tried in this case, and the issue is, as laid out by Judge

18  Whelan in his order, the issue is whether the Garniers'

19  comments actually disrupted MOR's and Zane's original posts.

20  That's it.

21      So everybody ready to go forward, I assume?

22      MR. BRIGGS:  I have a couple of procedural questions.

23      THE COURT:  Sure.  Go ahead.

24      MR. BRIGGS:  For the admission of evidence, does Your

25  Honor like it -- do you like exhibits to be moved in exhibit by

1  exhibit, or before the plaintiff rests in mass?

2        THE COURT:  You know, I prefer exhibit by exhibit, and

3  the reason why is because that way, if there's any argument --

4  hopefully, you've all gotten together and gone over the

5  exhibits.

6        I just finished, I think it was a three-week trial in

7  a patent case where there were two objections in the entire

8  trial.  I thought it was one of the best trials I ever had the

9  pleasure of presiding over.  Why?  Because the counsel got

10 together beforehand and actually worked most of these things

11 out before we tried the case.

12       So I prefer that you bring them -- or offer them for

13 admission one by one in case there's any argument about it.

14 Okay?

15       MR. BRIGGS:  Okay.  Understood.

16       Secondly, in light of Your Honor's ruling that there's

17 really just one issue, I was going to put my clients up, they

18 were going to provide some background as to why their comments

19 are important to them, the substance of the comments, because

20 the content would help the Court understand that there may have

21 been retaliation.  I'm not sure --

22       THE COURT:  I don't have a problem, for purposes of

23 laying out your story, if you want to do it briefly.

24       MR. BRIGGS:  Yeah.  Okay.

25       THE COURT:  If you want to spend all morning --

1     MR. BRIGGS:  No.

2         THE COURT:  -- then the answer is no.

3         MR. BRIGGS:  I want to spend five to ten minutes,

4  tops, and then move on.

5         THE COURT:  Great.  Good.  Anything else?

6         MR. BRIGGS:  Lastly, I take it, because you're

7  familiar with everything, you don't need an opening statement,

8  and we can proceed to call our first witness?

9         THE COURT:  I don't think I need one, but I certainly

10  don't want to deprive you of your ability to show your

11  eloquence in front of your clients.  So if either one of you

12  wants to make an opening statement, I'll certainly listen to

13  it.

14         MR. BRIGGS:  It's clear to me that Your Honor

15  understands the case, so I'd rather just get to the witnesses.

16         THE COURT:  Okay, great.

17         So Mr. Shinoff, Mr. Basel, Mr. Sleeth, do you want to

18  present an opening argument?

19         MR. SHINOFF:  An opening statement?

20         THE COURT:  I mean, an opening statement?

21         MR. SHINOFF:  I will leave that to Mr. Sleeth because

22  I know that he has eagerly prepared, but if he wants to waive,

23  that would be fine, as well, Your Honor.

24         THE COURT:  Mr. Sleeth, the ball is in your court.

25         MR. SLEETH:  I would like to make a very brief

1  statement --

2        THE COURT:  Okay.

3        MR. SLEETH:  -- in light of the comments that the

4  Court has already made.

5        THE COURT:  All right.  Go ahead.  I'm listening.

6        MR. SLEETH:  All right.  I want to be sure that we

7  preserve the other issues.

8        Our case included a question whether there was state

9  action.  We raised some of those issues on the motion for

10  summary judgment, and I want to preserve the idea that, because

11  a judge denies judgment doesn't stop us from putting on

12  evidence that goes to an issue such as state action.

13        These legislators are in a different position than an

14  executive.  They cannot act independently, so they could not

15  use their websites for official action.  They can't do anything

16  unless they're in a properly-noticed Board meeting, and then

17  they can make a motion or vote, but they can't take state

18  action, the most they can do is report what they did.

19        We would like to preserve the opportunity to put on

20  some evidence about their use of their sites, and the

21  Board's -- the District's use of their sites to argue the state

22  action.

23        But in addition to that, I agree with the Court that

24  the fundamental, critical issue is whether there was viewpoint

25  harassment, viewpoint discrimination or harassment, but the one

1  small point I'd make, by way of an opening statement, is that,

2  under the law, if a person reaches the level of disruption,

3  we're no longer talking about content discrimination, we're

4  talking about disruption.

5          So one of the defendants gets up and testifies that

6  there were 216 consecutive posts on Twitter on the same day, on

7  the same time, and that it felt like harassment, it's the

8  harassment, it's the SPAM that creates the issue, and blocking

9  them because of the 100, 216, or 40, or whatever number they

10  testify to, it's -- that's not the content.

11         They will also testify to you that it wasn't the

12  content.  They didn't care about the content.  It was the

13  number of times they rang the bell and the belief that they had

14  that that obscured their campaign message.

15         These are campaign sites.  They'll testify that they

16  were running for office, that they were running for office from

17  the day they took office, and they needed those sites in order

18  to get ready for the next campaign.

19         They'll also testify that they used the sites for

20  other political activities separate from their School Board

21  positions.  So this really isn't state action, but the message

22  that they have, their campaign message was being obscured by

23  the same site, the same post being repeated over and over and

24  over again, and that isn't time, place, and manner, that's --

25  that goes to manner, it goes to the issue of the manner of the

1   attempted speech, but there just isn't any content issue there.

2   You step over the content issue if the manner is unacceptable

3   or unreasonable.

4           And I think, for the very limited purposes and because

5   Mr. Briggs waived his opening statement, those would be my

6   remarks.

7           Thank you, Your Honor.

8           THE COURT:  All right.  Well, thank you.

9           With regards to the state action issue, as I said, I

10  have no desire to reinvent the wheel.  Judge Whelan spent

11  considerable time, and I thought he did a fantastic job on his

12  order, so I'm not going to go back and revisit that issue.  I

13  think that the evidence that was submitted in connection with

14  the state action issue at the summary judgment stage is

15  sufficient.

16          Obviously, Mr. Sleeth, you're preserving your issue on

17  appeal, but I will not allow evidence to be taken on that

18  issue.

19          So Mr. Briggs, please --

20          MR. SLEETH:  Thank you, Your Honor.

21          THE COURT:  -- please call your first witness.

22          MR. BRIGGS:  Your Honor, we'd like to call Christopher

23  Garnier.

24          THE COURT:  Will you do me a favor?  Instead of taking

25  the witness stand here, go over to the jury box.  It has to do

 1   with our video conferencing capabilities and all of that.

 2          So, Glenn, if you'll do me a favor and direct him to

 3   the appropriate spot.

 4          THE WITNESS:  Right here, sir?

 5          THE CLERK:  Yes.

 6          THE WITNESS:  And I can take my mask off, Your Honor?

 7          THE COURT:  I believe you're sufficiently distanced

 8   from everybody else.  If you feel comfortable, I'm comfortable.

 9    CHRISTOPHER GARNIER,

10       called as a witness by the Plaintiffs,

11       having been duly sworn, testified as follows:

12          THE CLERK:  Please state your full name for the

13   record, spelling both first and last name.

14          THE WITNESS:  My first name is Christopher,

15   C-h-r-i-s-t-o-p-h-e-r.  Garnier, G-a-r-n-i-e-r.

16          THE COURT:  Let me make sure we're clear.  If any of

17   you feel uncomfortable without masks, not masks, the

18   distancing, any of that sort, please let us know.  We want to

19   make sure that everybody's comfortable, everybody feels safe,

20   and that we can go forward and have a good trial.  Okay?

21          All right.  Mr. Briggs,

22          MR. BRIGGS:  Thank you very much, Your Honor.

23          When I have an exhibit to show the witness, my

24   understanding is I will let your courtroom deputy know, and it

25   will be projected from my computer; is that right?

1          THE COURT:  That's my understanding.

2          MR. BRIGGS:  Okay.

3   DIRECT EXAMINATION

4   BY MR. BRIGGS:

5   Q.  Mr. Garnier, good morning.

6   A.  Good morning.

7   Q.  Are you currently employed?

8   A.  I am currently employed.

9   Q.  Where do you work?

10  A.  Currently, I am an adjunct professor for the Asian

11  Institute of Technology in Bangkok, Thailand.

12  Q.  So what's your educational background?  Let's start with

13  the most recent.

14  A.  I have a Doctorate in education from the University of

15  Southern California.

16  Q.  How long were you working on your Doctorate?

17  A.  My entire life.  I mean, it's my life's work.

18  Q.  How long were you enrolled at USC?

19  A.  If you include my Master's, my Master's is also in

20  education from the University of Southern California, seven

21  years.

22  Q.  Okay.  And you received your Doctorate last year; is that

23  correct?

24  A.  I did.

25  Q.  Okay.  What did you do before you were at USC?

1    A.   I've done a few things before USC, but my immediate job

2    before was I am a former combat helicopter pilot from the

3    United States Marine Corps.

4    Q.   How long were you in the Marine Corps?

5    A.   Just under ten years.

6    Q.   Any decorations or anything?

7    A.   Numerous decorations.

8    Q.   Okay.  Was there something about the Marine service that

9    was important to you?  Why did you serve?

10   A.   Wow, Mr. Briggs.  That's a challenging question.

11        There's numerous things that are important to me, but

12   the most fundamental importance to me -- you know, I entered

13   the Marine Corps just after 9/11/2002 -- freedom.  There's

14   nothing more important to me than freedom.  That's why I joined

15   the Marine Corps.

16   Q.   Do you live in the Poway Unified School District?

17   A.   I do.

18   Q.   Do you have children?

19   A.   I have three.

20   Q.   What schools do they attend?

21   A.   Currently, my two oldest are at Twin Peaks Middle School,

22   and my youngest is at Painted Rock Elementary School.

23   Q.   Are those all in Poway Unified?

24   A.   All three.

25   Q.   You're married, yes?

1    A.   I am.

2    Q.   Kim is your wife?

3    A.   Kim is my beautiful wife.

4    Q.   You had some interactions with Poway Unified Board members

5    T.J. Zane and Michelle Ratcliff over the years?

6    A.   Numerous.

7    Q.   Okay.  Can you just give me the general flavor of what

8    those interactions were about?

9    A.   Ultimately, T.J. and Michelle -- excuse me -- Trustee

10   O'Connor and Ratcliff were elected at a time when our former

11   superintendent, Dr. John Collins, was actually on his way out

12   for stealing from our School District.

13        At the time, I had a strong relationship with

14   Dr. Collins.  And as our relationship went sour from

15   understanding the scrupulous and amoral behavior that he was

16   partaking in, that I exposed, I went to Michelle and T.J. --

17   excuse me -- Trustee Zane and Trustee O'Connor to ask for their

18   help within these situations.

19        Instead, though, instead of helping me, more than

20   anything, they actually chose the side -- the corrupt side of

21   Dr. Collins.

22   Q.   Okay.  And so did you ever go to School Board meetings and

23   try to express your views about Dr. Collins?

24   A.   Numerous.  Numerous School Board meetings.

25   Q.   When you go to the School Board meetings, what's the

1   process for members of the public to comment?  Is there a limit

2   on time, or do you have to sign up?  How does that work?

3   A.  Well, at the beginning, the process was quite simple.  You

4   were able to send an email to the Board's executive assistant,

5   state what it is that you wanted to speak about, and then they

6   would place you on the speaker chart.

7          That got a lot more difficult and a lot more

8   challenging the more times I arrived to talk about the

9   challenges that were going on with the School District.

10  Q.  How did it get more difficult?

11  A.  They put up a lot more parameters, a lot more challenges of

12  being able to speak.  The timeframe was within -- the timeframe

13  that the Board gives you is three minutes to speak, but in the

14  past, you were able to -- if my wife wanted to speak, I could

15  parlay her three minutes, or we could have a group that could

16  come together, and I could speak for their particular time.

17         So as time went on, the rules definitely were changed,

18  in particularly as Michelle O'Connor -- excuse me -- Trustee

19  O'Connor took over as President of the Board.

20  Q.  Okay.  You keep referring to the two Trustees by first

21  name.  Did you have a friendly relationship with them up until

22  this litigation, or even since then?

23  A.  That's a challenging question, again, too.  When you say

24  "friendly" --

25  Q.  Well, let me just ask you.  Why do you keep slipping into

1  their first names?

2  A.  There's a couple reasons why.  First, I believe my military

3  background believes in structure and honoring people's titles.

4         From the very beginning, I have given nothing but --

5  you read my emails and my correspondence with these two, it's

6  always "Trustee Zane", it's always "Trustee O'Connor".  That's

7  how I live my life, and that's how I -- that's part of it.

8         Another challenging part of it is that Trustee Zane

9  and I actually attended church, the same church, for many

10  years.  Same church that my parents attended, that I brought my

11  children to.

12         I guess the challenging part is, once he became a

13  Trustee, he forgot about people that he actually spent time

14  with, us little people, I guess.

15  Q.  So during the School Board meetings, was there a time limit

16  that was imposed on the speaker?

17  A.  Yes.  For everyone who speaks, it's three minutes.

18  Q.  Okay.  And when you speak, is it a question and answer

19  session, or do the Trustees just sit there and listen?

20  A.  You simply are allowed to speak.  There is -- it's

21  actually -- it gets Brown -- it gets -- it's a Brown Board

22  violation, if I could speak.

23  Q.  The Brown Act?

24  A.  The Brown Act violation to have the Trustees speak or

25  respond.

1    Q.   Okay.  So it's a one-way information exchange --

2    A.   Yes, sir.

3    Q.   -- is that a fair statement?

4    A.   That's correct.

5    Q.   Did you ever try to sit down with Trustee Zane or Trustee

6    Ratcliff to share your concerns with them?

7    A.   Multiple.  Numerous occasions.  Begged.  Pleaded.  As a

8    Marine, as a combat veteran, as someone that's served -- as my

9    children are in your school, as my wife attended Brownie

10   meetings, Girl Scouts with Trustee O'Connor, I begged.  I had

11   my wife plead.  And they would never, ever respond to me.

12   Q.   Okay.  Apart from concerns about Superintendent Collins,

13   did you have other concerns about the way the District was

14   being managed?

15   A.   Yes.  You know, what's interesting is, I'm a product of

16   Poway Unified School District.  I attended K through 12.  A

17   proud product of Poway Unified School District.

18           But being one of few black children within the School

19   District, especially considering the 80s, though I had a bit of

20   success, there were some immense challenges being different,

21   being black at that time.

22           Now, today, the challenges are still prevalent, but I

23   bring that up to you simply because my profession and what I

24   do, my expertise, what I study is equity in education.  In

25   other words, looking at diversity within education and bringing

1   and helping our young people to thrive in challenging

2   situations.

3           And to answer your question, yes, it had a great deal

4   to do with Mr. -- a lot more to do with Dr. Collins, it had a

5   great deal to do with my work and my profession.  My work as a

6   former black K through 12 student at Poway Unified, and also

7   having black children currently in the School District.

8           So my expertise and my understanding and the research

9   that I do within this very field, I continue to try to share

10  with both Trustee Zane and Trustee O'Connor.

11  Q.   Did you write a dissertation?

12  A.   Absolutely, I did.

13  Q.   Was the subject on issues of equity?

14  A.   The subject was on access to gifted and -- access for black

15  children to gifted and talented education within public

16  education.

17  Q.   Okay.  Did you at some point find out that Trustees Zane

18  and O'Connor-Ratcliff were using Facebook concerning the

19  District?

20  A.   Absolutely.

21  Q.   How did you discover that?

22  A.   Well, I'm kind of a local political junky, I guess you

23  would say.

24  Q.   Okay.

25  A.   So before they were actually elected to the Board, I kept

1   up with them.  In fact, I even voted for T.J., for Trustee

2   Zane.

3          So I followed the Facebook, I followed them through

4   their social media.

5   Q.  What about Twitter?  Did you follow them on Twitter?

6   A.  Absolutely.

7   Q.  Did you ever -- well, let me ask you this:  How long have

8   you been a Facebook user, roughly?

9   A.  15, 20 years, maybe.

10  Q.  Okay.

11  A.  It's been a long time.  Since the beginning.

12  Q.  And do you use Twitter?

13  A.  Rarely, but I have an account.

14  Q.  And how long have you been on Twitter?

15  A.  Five, six, seven years.  Somewhere around there.

16  Q.  Okay.  Can you explain to me how, if you have a Facebook

17  page, content is put onto the page if you're the one who runs

18  the page?  How do you generate content?  What's the mechanics

19  of it?

20  A.  Well, it's interesting.  I run my own personal Facebook

21  page.  I also run Dr. Garnier's Facebook page.  So the one that

22  we're talking about is the business page.

23  Q.  Okay.  Let's do -- let's talk about Dr. Garnier.

24  A.  The business page, right.  The business page is I decide

25  what content I want to place on it.

1  Q.  Okay.

2  A.  I place it.  If I -- if I'm talking about -- for instance,

3  I just posted about my teachings in Bangkok, and I had posted

4  for some of my students.

5      And I control the posts.  They're able to comment.  I

6  control who's able to comment.  I control who's able to like.

7  I control the messages that come and go.  It's all mine.

8  Q.  So I want to try to get some terminology down.

9      I think you said that you create a post.  Is the word

10  "post", p-o-s-t, is that the word Facebook uses when you, as

11  the person who controls the page, put out some original

12  content?

13  A.  Yes.

14  Q.  Okay.  And if Cory Briggs wanted to go read Dr. Garnier's

15  post and respond to it, what is that response called?  Is it a

16  comment?  Is it a response?

17  A.  It's called a comment.

18  Q.  Okay.  Can you prevent me from commenting?

19  A.  Yes.

20  Q.  How do you do that?  How would you do that?

21  A.  Simply go to the settings, find your name, and plunk you in

22  whatever capacity that I see fit.

23  Q.  Okay.  You haven't done that.

24  A.  No.

25  Q.  Okay.  So if I were to go to your Facebook page right now

1  and look at what you posted recently about your Thailand --

2  that your Thailand students can see, what would I see on the

3  page in order to know I'm allowed to comment?  What does it

4  look like to me?

5  A.  So there is a -- I would call it a message box.  I don't

6  know the exact terminology.  But there's a blinking cursor that

7  let's you click right there, and then you can type or write to

8  your heart's content.

9  Q.  Okay.  I'd like to show you Exhibit 3.

10          THE CLERK:  Your Honor, am I publishing these to the

11  witness automatically or just wait after admission?

12          THE COURT:  There's no jury, so just publish them.

13          THE CLERK:  Okay.

14  BY MR. BRIGGS:

15  Q.  Mr. Garnier, can you see --

16  A.  I don't have anything on my screen right now.  I'm sorry.

17  Q.  Hang on.  Don't go anywhere.

18  A.  It's back here.

19          THE WITNESS:  Is this all right for me to sit here?

20          THE COURT:  Sure.

21  BY MR. BRIGGS:

22  Q.  Okay.  I'm showing you right now what's page 3 of

23  Exhibit 3.

24  A.  Yes.

25  Q.  There's a microphone, and it says "Public Hearing"?

1  A.  "Public hearing", yes.

2  Q.  Okay.  So this -- do you recognize -- let me go back to

3  page 1.

4         MR. BRIGGS:  For the record, this is a September 8,

5  2017, printout from Michelle O'Connor-Ratcliff's Facebook page.

6  BY MR. BRIGGS:

7  Q.  Do you see, on the first page, where it says "government

8  official" on the right side about a third of the way down?

9  A.  I do.

10 Q.  Okay.  Do you recognize this page?

11 A.  I do.

12 Q.  Okay.  Is this what her Facebook page looked like back in

13 September 2017?

14 A.  It is.

15 Q.  Okay.  So I'm going to have you take a look at the -- at

16 page 3 where it now says "public hearing", and there's a

17 microphone.

18 A.  Yes.

19 Q.  Do you see that?  Okay.

20        Above the microphone and public hearing picture, there

21 is some -- or it looks like three paragraphs between the

22 picture and the words "Michelle O'Connor-Ratcliff".

23        Do you see that?

24 A.  Yes.

25 Q.  Okay.  And are those three paragraphs, is that the post?

1    A.   That is the post.

2    Q.   Okay.  That's something that she would have typed in and

3    uploaded herself in order to get it on her Facebook page.

4    A.   She makes those -- that content.

5    Q.   Okay.  And then below the microphone and public hearing,

6    you see the words "like", "comment", and "share", correct?

7    A.   I do.

8    Q.   And then below that, there is a fish and an icon, and next

9    to it it says "Write a comment".  Do you see that?

10   A.   I do.

11   Q.   Do you know what the "Write a comment" window is?

12   A.   That's where you're able to post or comment in regards to

13   the post that she -- that she incorporated within her page.

14   Q.   So if you haven't been blocked from a Facebook page, and

15   you go look at someone's post, you would have a window like

16   this that says "Write a comment"; is that correct?

17   A.   That's correct.

18   Q.   Okay.  Now, if you go back above the microphone and the

19   public hearing sign, the third paragraph is actually truncated,

20   and then it says "See more" underneath it.

21          Do you see that?

22   A.   I do, yes.

23   Q.   Okay.  Do you know what the "See more" means?

24   A.   Yes.  It means that the post -- the content that she added

25   to her site, it was a bit long, or it's longer than the system

1  allows me to see the visual.

2  Q.  Okay.

3  A.  So it's telling me, click "see more", and so I can see her

4  full message.

5  Q.  Okay.  Do you know whether the same "see more" option

6  exists when people post comments that are long?

7  A.  It does.

8  Q.  Okay.  So if somebody were to write a response that was

9  within Facebook's default length, you've seen that it just

10  shows the comment without the words "See more"; is that

11  correct?

12  A.  That's correct.

13  Q.  Have you ever seen any long comments where "See more"

14  appeared in the middle of a comment?

15  A.  Of course.

16  Q.  Have you ever clicked on the "See more"?

17  A.  I have.

18  Q.  And what did you see when you clicked on it?

19  A.  The conclusion of the statement.

20  Q.  Okay.

21          MR. BRIGGS:  Your Honor, I'd like to move Exhibit 3

22  into evidence.

23          THE COURT:  Any objection?

24          MR. SHINOFF:  I have no objection, Your Honor.

25          THE COURT:  All right.  It will be admitted.

1        (Plaintiffs' Exhibit 3 received in evidence)

2   BY MR. BRIGGS:

3   Q.  I'd like to have you take a look at Exhibit 5.

4        MR. BRIGGS:  For the record, Exhibit 5 is what appears

5   to be Michelle O'Connor-Ratcliff's Twitter printout from

6   October 2017.

7   BY MR. BRIGGS:

8   Q.  Do you have that, Mr. Garnier?

9   A.  I do.

10  Q.  Okay.  Let's look at this, and tell me whether you

11  recognize that page.

12  A.  I do.

13  Q.  And what do you understand it to be?

14  A.  I understand it to be Michelle's -- Trustee

15  O'Connor-Ratcliff's Twitter page.

16  Q.  Okay.  And did you ever --

17       THE COURT:  Mr. Briggs, just, as I said, I know

18  nothing about Facebook.  You actually flashed about three or

19  four pages on my screen, and I just want to make sure we're all

20  talking about the same thing.

21       So the three or four pages that you flashed on my

22  screen, is that the exhibit, or is this one page that's up in

23  front of me right now, is that the exhibit?

24       MR. BRIGGS:  Good question, Your Honor.  The 25 pages

25  in Exhibit 5 is the printout of the entire Twitter feed as it

1    existed on October 26 of 2017.

2              THE COURT:  Twitter feed, meaning?  I have no idea

3    what that means.

4              MR. BRIGGS:  It means that sometimes, if people have

5    posted a lot of things, you'll get lots of pages printed out.

6    If they've only posted one or two things, you'll only have one

7    or two pages.

8              It's sort of like the Court's docket.  If it's -- the

9    lawsuit was just filed and a summons was issued, you'd only

10   have a couple entries.  But if you were to look at this

11   particular case, you'd see that we have about 75 entries, and

12   it will print on multiple pages.

13             THE COURT:  Does that means responses, or does that

14   mean -- I believe Dr. Garnier referred to it as a post.

15             MR. BRIGGS:  He referred to the Twitter feed as a

16   post.  The post is the original content from the page owner --

17             THE COURT:  Okay.

18             MR. BRIGGS:  -- and then the comment is what a member

19   of the public provides in response to the post.

20             THE COURT:  So -- I'm sorry.  Go ahead.

21             MR. BRIGGS:  Twitter has a different vernacular.

22             THE COURT:  Okay.

23             MR. BRIGGS:  Twitter --

24             THE COURT:  This is Twitter.

25             MR. BRIGGS:  Yeah.  Twitter -- and I'll offer this --

1  I'll make this as an offer of proof, and hopefully, my

2  colleague will agree with it.

3            THE COURT:  Okay.

4            MR. BRIGGS:  On Twitter, the equivalent of an original

5  post is called a tweet, t-w-e-e-t.

6            THE COURT:  Got it.

7            MR. BRIGGS:  A person who sees that has a couple of

8  options.  The person may reply to it by clicking the reply

9  icon, which looks like a circle with a point at the bottom.

10  Like you see in cartoons where a statement is attributed to

11  somebody, that's a reply.

12            The next option is a retweet, which is essentially

13  taking somebody's tweet and sharing it with your own audience,

14  in toto, meaning you just take it as it is.  You click

15  "retweet", and it suddenly appears on your own Twitter feed.

16            And then the third option is for you to like it.  And

17  that's basically clicking on a heart icon or a thumbs up icon.

18  In Twitter, it's a heart icon.

19            But those are the three ways of engaging in Twitter.

20  Now is probably a good time to ask my colleague whether he

21  accepts that.

22            THE COURT:  Mr. Shinoff?

23            MR. SHINOFF:  I'm not doubting what Mr. Briggs is

24  saying.  I'm just looking at the first page, for example, of

25  Exhibit 5, and I see the reply, I see the retweet, and then I

1   see a number.

2          MR. BRIGGS:  The 6, Your Honor, that you see on the

3   first page of Exhibit 5, is an indication of how many people

4   have liked it.

5          MR. SHINOFF:  Oh, okay.  I'll accept that, Your Honor.

6          THE COURT:  Okay, good.  All right.

7          MR. BRIGGS:  We're making progress.

8          THE COURT:  All right.  I have a feeling, by the time

9   this case is over, I'm going to be an expert on Facebook and

10  Twitter.

11         (Laughter)

12         THE COURT:  Maybe I'll have my own accounts.  Who

13  knows.

14         MR. BRIGGS:  That may be true, Your Honor, be if

15  you're as smart as your reputation, you still won't sign up for

16  Facebook or Twitter, you'll just stay away from it.

17         THE WITNESS:  It's true.

18         THE COURT:  Okay.

19         MR. BRIGGS:  All right.

20         So I can't remember whether I moved Exhibit 5 in?

21         THE COURT:  You did not.

22         MR. BRIGGS:  I did not.  Okay.

23         I'd like to move Exhibit 5 into evidence, Your Honor.

24         THE COURT:  Any objection?

25         MR. SHINOFF:  No objection.

 1          THE COURT:  All right.  It will come in.

 2          (Plaintiffs' Exhibit 5 received in evidence)

 3  BY MR. BRIGGS:

 4  Q.  I'm now going to show you Exhibit 4.

 5          Exhibit 4 is the "About" page for Michelle

 6  O'Connor-Ratcliff for her Facebook as of September 28, 2017.

 7          Do you recognize that page, sir?

 8  A.  I do.

 9  Q.  And do you recall looking at her "About" page around this

10  time?

11  A.  I do.

12          MR. BRIGGS:  Your Honor, I'd like to move Exhibit 4

13  in.

14          THE COURT:  Any objection?

15          MR. SHINOFF:  No objection.

16          THE COURT:  All right.  It will come in.

17          (Plaintiffs' Exhibit 4 received in evidence)

18  BY MR. BRIGGS:

19  Q.  I'd now like to have you take a look at Exhibit 6.

20  Exhibit 6 is 88 pages.

21          Did you look at this exhibit before this morning,

22  Mr. Garnier?

23  A.  I looked at it this weekend, actually.

24          MR. BRIGGS:  Your Honor, do you need me to have him

25  look at all 88 pages?  I'm going to move it into evidence.

1      THE COURT:  I don't know.  Ask Mr. Shinoff or

2  Mr. Basel or Mr. Sleeth.  If there's no objection, then the

3  answer is "no".

4      MR. SHINOFF:  That wouldn't be necessary.

5      MR. BRIGGS:  Okay.

6      THE COURT:  All right.  Then it will come in.

7      MR. BRIGGS:  Thank you.

8      (Plaintiffs' Exhibit 6 received in evidence)

9      MR. BRIGGS:  And the next one is Exhibit 7.  This is

10  Mr. Zane's "About" Facebook page.

11  BY MR. BRIGGS:

12  Q.  Do you recognize --

13  A.  I do.

14      MR. BRIGGS:  I'd like to move Exhibit 7 in, Your

15  Honor.

16      MR. SHINOFF:  No objection.

17      THE COURT:  Any objection?  All right.  It will come

18  in.

19      (Plaintiffs' Exhibit 7 received in evidence)

20      THE COURT:  You know, before you go any further,

21  Mr. Briggs, I've got a question.

22      MR. BRIGGS:  Sure.

23      THE COURT:  So how do you know that somebody has a

24  Facebook page or a Twitter page?  Is there some way to search?

25      MR. BRIGGS:  Yeah.

1    THE COURT:  How does that happen?

2    MR. BRIGGS:  I'm showing you right now, Exhibit 6.

3    THE COURT:  I want to hear from him.

4    MR. BRIGGS:  Sorry.  I thought you were asking me.

5    THE COURT:  No.  That's okay.

6    THE WITNESS:  I listen to the Judge.

7    THE COURT:  I was asking anyone.  But, you know, I'll

8    listen to him.  He can tell me.

9    THE WITNESS:  So anyone can simply go to Facebook or

10   Twitter, and on the top there's a little magnifying glass --

11   THE COURT:  Okay.

12   THE WITNESS:  -- which is a search glass.  I can type

13   in Chris Garnier or Cory Briggs  or --

14   THE COURT:  Okay.

15   THE WITNESS:  -- and all their pages will pop up and

16   show me.  So, yes, sir.

17   THE COURT:  How about Twitter?

18   THE WITNESS:  Same thing, sir.

19   THE COURT:  All right, good.

20   MR. BRIGGS:  Your Honor, I had put on a monitor for

21   you Exhibit 6.  And if you look in the upper left quadrant,

22   you'll see where it says "T.J. Zane"?

23   THE COURT:  Yeah, I see that.

24   MR. BRIGGS:  And to the right of that is that

25   magnifying glass.

1    THE COURT:  All right.  That's the standard --

2    MR. BRIGGS:  That's the search field.

3    THE COURT:  Yeah, that's a standard search -- okay.

4  Got it.

5    MR. BRIGGS:  Do you want to see it for Twitter, as

6  well?

7    THE COURT:  No, that's fine.  I'll take your word for

8  it.

9    MR. BRIGGS:  Okay.

10  BY MR. BRIGGS:

11  Q.  So at some point, did you take to Facebook in order to

12  communicate with Trustees Zane and O'Connor-Ratcliff?

13  A.  I did.

14  Q.  And why that route?

15  A.  Because other methods of trying to communicate with them

16  had been exasperated.

17  Q.  Okay.  You found that other methods not fruitful?

18  A.  That's true.

19  Q.  Okay.  So you started commenting; is that correct?

20      If I understood you correctly before, you can't post

21  original content to their Facebook page; is that right?

22  A.  Correct.

23  Q.  So how is it that you would interact?  How would you post

24  your own content?

25  A.  So, again, if we're looking at this current page right

1  here --

2  Q.  I'll tell you what.  I'm going to go to the second page.

3  That will be easier for you.

4  A.  Thank you.  So if I'm looking at the second page here, it

5  says --

6          THE COURT:  And what exhibit is this?

7          MR. BRIGGS:  Exhibit 6.

8          THE COURT:  Okay.

9          THE WITNESS:  So we'll see the first one where it

10  says, "Resident for -- vote for Zane."  The picture there.  On

11  the bottom, Trustee Zane, that is his post.

12          Now, once I see that post, as you can see, I have the

13  ability to like, comment, or share.

14          And from there, if I like the fact or that -- if I

15  enjoy this picture, I can say, "T.J." or "Trustee Zane, I'm

16  voting for you," something of that nature within that comment

17  box.

18  Q.  Okay.  So did you ever find original posts by the Trustees

19  talking about Poway Unified official business?

20  A.  I don't think I can recall a time where Poway Unified

21  School District was not on their page, and I check it

22  regularly.

23  Q.  Okay.  So did you ever submit comments in response to those

24  Poway Unified posts on their Facebook pages?

25  A.  Of course.  That's the point of social media, to engage.

1   Q.   Okay.  Did you ever submit a comment when you used

2   profanity?

3   A.   Never.  That's not my nature.

4   Q.   Did you ever post a comment -- or did you ever submit a

5   comment where you threatened any of them physically?

6   A.   Never.  Not my nature.

7   Q.   Did you ever submit a comment where you were talking about

8   harming their family or their children?

9   A.   Never.  Not my nature.

10  Q.   Okay.  What was the substance of your comments?

11  A.   Always, always in context of District business.

12  Q.   Okay.  Can you give me an example of the sort of things you

13  were commenting on?  I'm not asking for word for word, but

14  general topics.

15  A.   Sure.  Things as in regards to the new districts that were

16  created within the -- the new voting districts.  I would

17  comment on things of that nature.  On a -- the budget that

18  would come up.  Anything that I would find.

19        I'm their constituent.  They represent me.  So would I

20  go find information from the Trustees about Poway?  Yes.

21        I can't give you something specific, but the only time

22  that I would ever comment had to do with business with Poway

23  Unified School District.

24  Q.   When you mentioned "the districts", are you talking about

25  the districts that changed to the district seats representing

1   the School Board, or are you talking about some other

2   districts?

3   A.  So prior to last election cycle -- and I might be off, it

4   might be two times before, I can't remember -- the District

5   seats were open, which means that anyone that lived in Poway

6   Unified School District could run for the chair.

7          The change since then is where the District has now

8   been divided -- I don't know the exact terminology, but we'll

9   call them regions, divisions, where they are divided

10  geographically, and now, certain constituents represent that

11  particular area, however, they still represent the entire

12  School District.  They're still making decisions for the whole

13  of the District.

14  Q.  Let me see if I can help you out here.  It sounds to me

15  like you're describing a change from at large --

16  A.  Thank you.

17  Q.  -- seats that were voted on by all voters in Poway Unified

18  to district-by-district seats where constituents in some subset

19  of the overall district choose their particular representative.

20  A.  Thank you for the terminology.

21  Q.  Is that what you mean?

22  A.  Yes, sir.

23  Q.  Okay.  But then once they're seated on the Board, they're

24  casting decisions for the whole District?

25  A.  That's correct.

1    Q.   Okay.  I understand.  Thank you.

2         Did you ever repeat the same comment when you

3    responded?

4    A.   Oh, I know I did.

5    Q.   Okay.  So --

6         THE COURT:  I'm sorry.  I didn't hear you.

7         THE WITNESS:  Yes, sir, I did.  I know I did.  Yes,

8    sir.

9    BY MR. BRIGGS:

10   Q.   Okay.  Why did you post the same comment repetitively?

11   A.   There's a couple reasons.  The first is, when you have

12   multiple posts, then -- that have to do with the School

13   District, my post, or my comment, was relevant to their

14   particular initial post.

15        There's other reasons for that, as well, too.

16        One of the reasons is that social media provides an

17   opportunity, as I said, to create engagement, to have

18   discourse, maybe banter.  And when you have an opportunity to

19   write a comment -- to write a comment after a post, you are

20   able to utilize their platform or their page to engage.

21        So when I see someone else respond or post -- respond

22   or make a comment to something they post, I find that the

23   information that I was -- that I'm going to post, or that maybe

24   I posted, I don't know, the other day, the day before, is

25   relevant to that particular post.

1    Q.   So you had a comment, the substance of which you thought

2    was both related to content from the post or related to what

3    some other member of the public submitted as his or her own

4    comment; is that a fair statement?

5    A.   That's the point of social media.

6    Q.   Did I --

7    A.   Absolutely.

8    Q.   Okay.  And it's also true that those comments you submitted

9    were identical or substantially the same subject matter?

10   A.   The subject matter was Poway Unified School District.

11   Q.   But were the particular comments substantially the same?

12   A.   I would say they were.

13   Q.   Okay.  And is that because the content of what you were

14   saying in response, was it important to you or was it

15   frivolous?  I'm trying to figure out why you would post the

16   same repetitive comments.

17   A.   Well, the content was relevant to the original post.

18   Q.   Okay.

19   A.   Also, we have to look at the place of being a public

20   servant myself.  You know, serving as a Marine Corps officer,

21   we're public servants.

22        When you serve the country in the capacity that I

23   served the country, and you reach out to your public officials

24   multiple times over multiple years, you begin to feel as if

25   that service and that freedom that you fought for is

 1  disregarded and irrelevant.

 2          I say that because the multiple times, the pleading,

 3  the begging just for a minute of one meeting with Trustee

 4  O'Connor.  Just give me a meeting.  One meeting with Trustee

 5  Zane.  Just one.

 6          When there's not a response, you have to figure out a

 7  way to utilize that God-given right that we have.

 8          So I utilized the only resource that I had for

 9  communication and engagement, and that was through social

10  media.

11  Q.  Were you airing grievances or -- I mean, were your comments

12  critical of Trustees Zane and O'Connor?

13  A.  Of course.

14  Q.  Okay.

15  A.  Let me say this:  Critical of decisions that they made.

16  It's our responsibility as citizens to question our public

17  officials.

18  Q.  I wasn't suggesting you made personal attacks.  You said

19  that earlier.  Constructive criticism --

20  A.  Absolutely.

21  Q.  Okay.  Are you still engaged as a concerned parents in the

22  affairs at Poway Unified?

23  A.  Of course.  It's my job.  I'm an advocate.  It's what I do.

24  Q.  How have -- let me withdraw that.

25          How has access to School Board meetings changed in,

1  let's say, the last six months, if it's changed at all?

2  A.   Tremendously.

3  Q.   So what's different now?

4  A.   Well, COVID has made School Board meetings online.  If you

5  go -- I know I watch -- and as I told you, I'm somewhat of a

6  local political junky.  I watch all the Board meetings now

7  via -- via recordings.

8        You can see when they are there, that on the dais,

9  President O'Connor is in the middle, the superintendent is two

10 chairs back now, so on and so forth.  It wasn't like that

11 before.

12       So to answer your question, meetings now are virtual.

13 And if they're not virtual, because of certain -- of current

14 situations, the opportunity to engage has -- has been greatly

15 diminished.

16 Q.   Do you know whether Trustees Zane and O'Connor-Ratcliff

17 still maintain Facebook pages?

18 A.   Of course.  I get my information from their sites.

19 Q.   Do those Facebook pages continue to be predominantly about

20 Poway Unified School District business?

21 A.   Again, I will reiterate, I cannot remember -- there might

22 be a time, but I can't recollect -- of any information that did

23 not have to do with Poway Unified School District.

24 Q.   Do you remain blocked to this day --

25 A.   I do.

1   Q.   -- let me finish.

2        For Trustee Zane's Facebook page, do you remain

3   blocked?

4   A.   I am blocked on Trustee Zane's Facebook page currently.

5   Q.   Okay.  When is the last time you checked?

6   A.   Yesterday.

7   Q.   Okay.  Are you still blocked on Trustee O'Connor-Ratcliff's

8   Facebook page?

9   A.   I am.

10  Q.   Are you still blocked on Trustee O'Connor-Ratcliff's

11  Twitter page?

12  A.   I am.

13  Q.   When is the last time you checked?

14  A.   Yesterday.

15  Q.   And I forgot to ask you, when is the last time you checked

16  on Trustee O'Connor-Ratcliff's Facebook page?

17  A.   Yesterday.

18  Q.   Okay.  I'd like to show you Exhibit 14.  Exhibit 14 is a

19  screen shot, one page, for Trustee O'Connor-Ratcliff.

20        Do you recognize Exhibit 14?

21  A.   I do.

22  Q.   Toward the top, toward the right of the search field, it

23  shows the word "Christopher".  Do you see that?

24  A.   I do, yes.  Sorry.  I do, yes.  Thank you.

25  Q.   This exhibit is a screen shot of what you would see when

1  you go to --

2  A.  That's correct.

3  Q.  -- okay -- when you go to her Facebook page, yes?  Is that

4  correct?

5  A.  That's correct.

6  Q.  Okay.  Can you tell me where, under the first comment, is

7  the field for -- sorry -- on the first post, can you tell me

8  where you see the field where you comment?

9  A.  Where I -- this is exactly it.  I don't have the

10 opportunity to comment.  There is no field for me to comment.

11 Q.  Okay.  And Trustee Zane's Facebook page is similar?

12 A.  It is.

13       MR. BRIGGS:  Your Honor, I'd like to move Exhibit 14

14 into evidence.

15       THE COURT:  Any objection?

16       MR. SHINOFF:  No objection.

17       THE COURT:  All right.  It will come in.

18       (Plaintiffs' Exhibit 14 received in evidence)

19 BY MR. BRIGGS:

20 Q.  I'd like to show you Exhibit 15.  One page.

21       Do you recognize Exhibit 15?

22 A.  I do.

23 Q.  Is this a screen shot of what you see when you log into his

24 Facebook page?

25 A.  It is.

1    Q.   And do you, again, see the word "Christopher" on it?

2    A.   I do.

3    Q.   And do you see anywhere on this page where you would be

4    allowed to submit a comment in response to his post?

5    A.   Again, no comment or response.  Not even the ability to add

6    my little emoji character, the like or happy face or any

7    response whatsoever.

8    Q.   Okay.

9         MR. BRIGGS:  Your Honor, I have about five more

10   minutes.  I just want to doublecheck something.

11        (Pause in the proceedings)

12   BY MR. BRIGGS:

13   Q.   Has Trustee Zane ever spoken disparagingly of you?

14   A.   He has.

15   Q.   What did he say to you?

16   A.   In front of the entire Board of Education members, he

17   talked about me suffering with PTSD.

18   Q.   Okay.  Did he ever refer to you using a derogatory term?

19   Did he ever refer to you as "boy"?

20   A.   He did not.

21   Q.   He hasn't used any other --

22   A.   He has not.

23   Q.   But he did accuse you of having some sort of mental or

24   physical --

25   A.   He did.

1   Q.   -- condition as a result of your service in the Marines?

2   A.   Well, let me actually give some more context to that.

3            You know, the service that my brothers and sisters put

4   in, when we share about those experiences, probably the most

5   hurtful thing and the most challenging thing is to diminish

6   those real feelings.  It's tough for us to just share --

7            THE COURT:  I'm sorry.  I didn't hear what you said.

8            THE WITNESS:  I said it's tough for us to share about

9   those experiences, period.

10           THE COURT:  You're talking about your military

11  experience?

12           THE WITNESS:  I'm talking about the reasons why I

13  suffer with PTSD, sir.

14           THE COURT:  Okay.  So you do suffer from PTSD.

15           THE WITNESS:  I do, yes, sir.

16           THE COURT:  Okay.  All right.  Now -- okay, got it.

17           So what you're talking about is it's difficult to

18  share the experiences --

19           THE WITNESS:  It's difficult, sir, to let anyone know

20  that I suffer from PTSD.  It's an embarrassment, if you want to

21  know the truth.

22           THE COURT:  Well, it shouldn't be, but okay, great.

23  Now I understand what you're saying.  Got it.

24           THE WITNESS:  So the information was shared flippantly

25  within -- the information was actually shared with the former

1  superintendent, Dr. Collins.

2          Dr. Collins, my understanding, shared that information

3  with the Board of Education.  Within the middle of the Board of

4  Education, Trustee Zane, out of nowhere, said, "Hey, if you

5  ever need me to help you with your PTSD, let me know."

6          It's also written down, as well, too.  It's an

7  unfortunate thing because, though, Your Honor, you might say

8  that I shouldn't be embarrassed by it, that's what us

9  veterans -- it's a weak point for us.

10          MR. BRIGGS:  Your Honor, I don't have anymore

11  questions for this witness, but I just want to make sure I got

12  my exhibits in.

13          THE COURT:  All right.  Why don't you read them, and

14  my courtroom deputy will tell you whether they're in or not.

15          MR. BRIGGS:  I believe that we've admitted in

16  Exhibits 3, 4, 5, and 6, and 7.  So 3 through 7?

17          THE CLERK:  Yes.

18          MR. BRIGGS:  As well as Exhibits 13, 14, 15, and 16.

19          THE CLERK:  Your Honor, are those -- are those in,

20  Your Honor?  You're allowing them to come in, 13 through 16?

21  Just to doublecheck.

22          THE COURT:  I honestly can't remember.

23          MR. BRIGGS:  Would you like me to go through them

24  again?

25          THE COURT:  Is there any objection?

1     MR. SHINOFF:  No.

2     THE COURT:  Okay.  They'll come in.

3     THE CLERK:  Perfect.

4     MR. BRIGGS:  So 3 through 7 and 13 through 16.

5     THE COURT:  Got it.

6          (Plaintiffs' Exhibits 13, 15, and 16 received in

7     evidence)

8     MR. BRIGGS:  Your Honor, I have no further questions

9     for Mr. Garnier.

10    THE COURT:  All right.  Well, does the defense wish to

11    cross examine?

12    MR. SHINOFF:  Absolutely.

13    THE WITNESS:  Your Honor, may I have a bathroom break,

14    sir?

15    THE COURT:  This would go so much quicker if I didn't

16    give you a bathroom break.

17    THE WITNESS:  I'm sorry.  I will hold it.

18    THE COURT:  No, I'm teasing you.  So maybe everybody

19    could use a bathroom break.

20         According to my -- I can't see that clock very well.

21    According to my watch, it's 15 minutes to 11:00, so plan to be

22    back here at 11:00.  Okay?

23    MR. SHINOFF:  Thank you very much.

24    THE WITNESS:  Thank you.

25    THE COURT:  Thank you.  We're in recess.

1        (Recess)

2        THE COURT:  We're back.

3        Mr. Shinoff?

4        MR. SHINOFF:  Thank you very much, Your Honor.

5   CROSS EXAMINATION

6   BY MR. SHINOFF:

7   Q.  Good morning, Dr. Garnier.

8   A.  Good morning, Mr. Shinoff.  How are you, sir?

9   Q.  Very well, sir.  And congratulations on your

10  accomplishments.

11  A.  Why, thank you.

12  Q.  To the best of your memory, when was it that T.J. Zane

13  became a Trustee with Poway Unified School District?

14  A.  I want to say 2014.

15  Q.  Okay.  And to the best of your recollection, when was it

16  that Michelle O'Connor-Ratcliff became a Trustee?

17  A.  The same time.  They came in with the same group.

18  Q.  Okay.  And when was it that you first began attending Board

19  meetings with the Poway Unified School District, in person?

20  A.  Well, Mr. Shinoff, I attended Board meetings when I was --

21  the first time, I think I was six years old with my parents.

22  So I've actually attended Board meetings with the Poway Unified

23  School District multiple times.

24  Q.  Okay.  Did you become more consistent in your attendance

25  after 2014?

1    A.   I became more consistent with my attendance because I was

2    employed by the School District.

3    Q.   Okay.  And as one of your responsibilities, did it call

4    upon you to attend Board meetings?

5    A.   My civic responsibility, as a concerned parent and

6    community member, is to attend Board of Education meetings.

7    Q.   I apologize if my question was unclear.  My question

8    specifically referenced your employment.

9         Was there anything about your employment that required

10   you to attend Poway Unified School District Board meetings?

11   A.   Besides the need to understand how the system works.  That

12   is a requirement for me.

13   Q.   Okay.  That was a personal choice you gave of your personal

14   time and you attended those Board meetings, correct?

15   A.   Absolutely.

16   Q.   And on occasion, you would fill out a speaker slip, and you

17   would be afforded the opportunity to speak to the Governing

18   Board on any issue that wasn't on the agenda; is that true?

19   A.   Yes.

20   Q.   Okay.  And if there was an item that was on the agenda, you

21   could also sign up to speak to a matter on the agenda, as well;

22   is that true?

23   A.   That's correct.

24   Q.   The issue of a Trustee being a constituent.  As I

25   understand your testimony earlier, before 2018, the elections

1    held by Poway Unified School District were general elections,

2    there were a number of seats that were open, and then anyone

3    could run for one of the open positions, regardless of where

4    they lived; is that your understanding, as well?

5    A.   That's correct.

6    Q.   And at some point, there was a decision made by the Poway

7    Unified School District to change from the general election to

8    an election by Trustee area, correct?

9    A.   So they were actually being sued, so they had to be in

10   compliance.

11   Q.   You're sure about that, that they were sued?

12   A.   They were being sued, so they had to be in compliance.

13   Q.   The particular area that you and your wife currently reside

14   in, who is your representative on the Poway Unified School

15   District Board?

16   A.   Currently, it's a woman by the name of Ginger Corvet or

17   Corvette.   I'm sure I butchered her name, and I apologize.

18   Q.   In terms of communicating with Board members, you could

19   attempt to communicate with them through email; is that true?

20   A.   To a public email account, yes.

21   Q.   Was it your practice to share your concerns regarding the

22   School District by email with Trustees?

23   A.   Continuous.

24   Q.   And the emailing of Trustees, did that include Michelle

25   O'Connor-Ratcliff and T.J. Zane?

1    A.   Both were Presidents of the Board, both make total

2    decisions for the Board, so, of course, they would be included

3    within those correspondence.

4    Q.   Okay.   You referred to a meeting between yourself and T.J.

5    Zane.   Was that during the course of this litigation?

6    A.   I never referred to a meeting.

7    Q.   You didn't have a meeting with Mr. Zane?

8    A.   Not that I've referred to in court.

9    Q.   Okay.   Then I apologize.

10            Did you ever have a meeting with T.J. Zane?

11   A.   I've had, since after the lawsuit's been filed, two, maybe

12   three meetings with Trustee Zane.

13   Q.   During those meetings, did you have an opportunity to share

14   with Mr. Zane your concerns, your objectives for the School

15   District?

16   A.   The meetings had a particular agenda.

17   Q.   Okay.   And who set the agenda?

18   A.   The first time, after the unscrupulous former

19   superintendent John Collins was fired from his job, I reached

20   out to our new superintendent, Dr. Kim Phelps.   And as the

21   unifier that I believe she is, she set the agenda for the first

22   meeting for Trustee Zane and myself.

23   Q.   Okay.   And the second meeting, was there also a set agenda?

24   A.   There was.

25   Q.   And who set the agenda for that meeting?

1   A.   I believe that it was probably a combined effort between

2   myself, Trustee Zane, and Dr. Kim Phelps.

3   Q.   And did you use that second meeting as an opportunity to

4   share with Mr. Zane your concerns regarding the School

5   District?

6   A.   That's such a broad question, Mr. Shinoff.

7   Q.   Okay.

8   A.   My concerns of the entire School District, there are -- I

9   mean, it's a gigantic School District.  You know.  You would

10  have to rephrase that question.  What in particular are you

11  asking that I -- the conversation that I had with Mr. Zane?

12  Q.   Well, let me not be ambiguous, Dr. Garnier.  Your point is

13  well taken.

14           What did you discuss?

15  A.   I think we discussed multiple things.  I know I brought him

16  some research in regards to hiring more -- the question -- one

17  of the largest things that I advocate for is the hiring of more

18  black and brown teachers in the profession.  I know I brought

19  Trustee Zane, as well as the superintendent, research within

20  that regard.

21  Q.   Okay.  Anything else that you can recall?

22  A.   I'm sure we had other discussions.

23  Q.   Fair enough.

24           When is it that you were first blocked from Mr. T.J.

25  Zane's Facebook account?

1    A.   Again, that's another challenging question.  I would say

2    2017, in that area.

3    Q.   Okay.  And how is it that you could tell that you were

4    being blocked?

5    A.   I went to comment and wasn't able.

6    Q.   Okay.  When were you first blocked by Michelle

7    O'Connor-Ratcliff?

8    A.   Around the same time.

9    Q.   And did you learn that you were blocked in the same manner

10   that you just described for Mr. Zane?

11   A.   I did.

12   Q.   Do you know whether T.J. Zane has a personal Facebook

13   account?

14   A.   I don't.

15   Q.   Did you ever attempt to access T.J. Zane's Facebook

16   account?

17   A.   His personal Facebook account or his Poway Unified School

18   District Facebook account?

19   Q.   I want to be real clear on the question.  His personal

20   Facebook account.

21   A.   I think I just said I didn't even know that he had a

22   personal Facebook account.

23   Q.   I understand.  Thank you.

24        If you were to search T.J. Zane's name, would that

25   name include his personal Facebook account?

1    A.   I don't know if he has a personal Facebook account.

2    Q.   Okay.  So with that magnifying glass, as I understand it,

3    you put in the name, and then this particular T.J. Zane name,

4    his identity would come up with -- along with others who may

5    have the same name, correct?

6    A.   Correct.

7    Q.   And do you know whether Michelle O'Connor-Ratcliff has a

8    personal Facebook account?

9    A.   I do not.

10   Q.   Does T.J. Zane have a Twitter account?

11   A.   He does.

12   Q.   Do you know whether you've been blocked by T.J. Zane's

13   Twitter account?

14   A.   I have.

15   Q.   When was it that you were blocked by T.J. Zane's Twitter

16   account?

17   A.   Around the same time that I was blocked from his Facebook

18   account.

19   Q.   Does Michelle O'Connor-Ratcliff have a Twitter account?

20   A.   She does.

21   Q.   And were you blocked by Ms. O'Connor-Ratcliff on her

22   Twitter account?

23   A.   I was.

24   Q.   And when was that?

25   A.   Around the same time.  I'm sure within -- around the same

1    time.

2    Q.  Now, if you have a complaint regarding a Trustee, are there

3    administrative regulations in place that allow you to make a

4    complaint to the Poway Unified School District about an elected

5    official for the Board?

6    A.  Sure.  There are protocol within the Board policy, but

7    there is no teeth or ramifications for action accordingly.

8           THE COURT:  Excuse me.  I'm sorry.  I didn't quite

9    catch that.

10          THE WITNESS:  Yes, sir.  I said there was policy that

11   discusses how to make complaints on Trustees, but there are no

12   ramifications or teeth within that policy, sir.

13          THE COURT:  Okay.  Got you.

14   BY MR. SHINOFF:

15   Q.  Did you ever afford yourself the opportunity to file

16   internal complaints against T.J. Zane or Michelle

17   O'Connor-Ratcliff?

18   A.  Absolutely.  Both.

19   Q.  And can you elaborate on what it is that you did?

20   A.  I wrote a letter.  I submitted it to all the Board of

21   Education.  I followed the policy.

22          The response was -- well, you didn't ask that.

23   Q.  Okay.  And what was the response?

24   A.  There was no response.

25   Q.  Okay.  When you attended these public meetings, and you

1  were a speaker, did you share your complaints with the Board

2  and the general public about T.J. Zane and Michelle

3  O'Connor-Ratcliff?

4  A.   The Board meetings were to discuss topics, not to complain

5  about the Trustees.

6  Q.   Are you aware that, at the beginning of each Board meeting,

7  that you are afforded an opportunity to make comment on issues

8  that aren't on the agenda but within the jurisdiction of the

9  Poway Unified School District?

10 A.   I'm also aware that those conversations, it's just a

11 one-side conversation, there is no dialogue.

12 Q.   Well, if you could answer my question, Dr. Garnier.  Are

13 you aware of that?

14 A.   I'm perfectly aware of that, sir.

15 Q.   Thank you.

16      Dr. Garnier, I'd like to draw your attention, if I

17 may, to Exhibit U, and beginning on page 25.

18      Dr. Garnier, I will represent to you that your

19 comments are contained between pages 25 and page 130 of

20 Exhibit U.  And if you'd like, I'm happy to give you a binder

21 that has all of the pages within it.

22      MR. BRIGGS:  Your Honor, I don't know that the witness

23 has -- unless it's electronic, I don't think the witness has a

24 binder of the exhibit.

25      THE WITNESS:  I do not, sir.

1        THE COURT:  Would you like one?

2        THE WITNESS:  If you can just put it on the screen, I

3   would be content -- that would be fine with me.

4        THE COURT:  Okay.

5        MR. SHINOFF:  If I may ask that pages 25 through 130

6   be scrolled through.  I apologize that it's inconvenient.

7        THE COURT:  It's okay.

8        MR. SHINOFF:  I will provide to Mr. Briggs the binder,

9   and he can provide it to his client.

10        MR. BRIGGS:  Okay to approach, Your Honor?

11        THE COURT:  That's fine with me.

12        (Pause in the proceedings)

13   BY MR. SHINOFF:

14   Q.  Dr. Garnier, if you would just peruse those pages for us,

15   please.

16   A.  They've been perused, Mr. Shinoff.

17   Q.  Pardon me, sir?

18   A.  They've been perused.

19   Q.  Okay.  Thank you for doing that.

20        The comments that we see on pages 25 through 130,

21   those are comments in response from you to a posting by

22   Michelle O'Connor-Ratcliff; is that true?

23   A.  Are you asking if this comment on U069, where it says

24   "Christopher Garnier", and I discuss Reverend James Harris and

25   Martin Luther King, Jr., if you're asking if that's the

1  comment, yes, it is.

2  Q.  Okay.  And so, for example, if we go on page 25 to page 26,

3  we would see the entirety of your comment; is that true?

4  A.  Page 25 through 26.

5  Q.  Of Exhibit U, yes.

6          MR. BRIGGS:  Your Honor, just so we're clear, my copy

7  has different page numbers.  I assume we're using the U number

8  at the bottom?

9          MR. SHINOFF:  Yes.

10          MR. BRIGGS:  The page number at the top is off by a

11  digit.

12          THE WITNESS:  Okay.  I'm looking at the top where it

13  says 25 of 154.  That's not where I should be looking.

14  BY MR. SHINOFF:

15  Q.  My fault, Dr. Garnier.  If you take a look at the bottom

16  right-hand side -- or the bottom, almost middle --

17  A.  Yes.

18  Q.  -- you'll see 25 --

19  A.  Oh, got you.  So U, uniform, 025.

20  Q.  Correct.

21  A.  Okay.  Yes, I see that comment.

22  Q.  And is that the entirety of your comment that we see on

23  Exhibit U on page 25 and 26?

24  A.  That is the entirety of the comment.

25  Q.  Now, if we continue on to page 27, is that your comment,

1  once again, that continues on to page 28?

2  A.  I mean, it's -- I assume -- it looks like the same comment,

3  yes.

4  Q.  And it is the same comment.

5  A.  Okay.

6  Q.  Yes.  Okay.

7       And I will represent to you, Dr. Garnier, that it

8  continues -- this pattern continues with the same comment all

9  the way through page 130.

10 A.  Without any response from Trustee O'Connor-Ratcliff?  Wow.

11 I wonder why.  I wonder why, sir.  I wonder why, if that

12 email -- if that message was also sent to her in an email.

13      THE COURT:  Dr. Garnier, I'm sorry.  I don't mean

14 to --

15      THE WITNESS:  I apologize.

16      THE COURT:  -- I don't mean to trouble you, but if you

17 can just do me a favor and please listen to the question and

18 answer the question.

19      THE WITNESS:  Yes, sir.

20      THE COURT:  I appreciate it.  Thank you.  All right.

21      MR. SHINOFF:  Thank you.

22      THE COURT:  By the way, am I going to get to see this

23 comment, or is this like -- or are we saving that for some got

24 you moment?

25      MR. SHINOFF:  Your Honor, I'm having problems hearing.

1   My apologies.  It's my --

2           THE COURT:  Okay.  So apparently, a comment was posted

3   at page 25 and 26.  As I understand it, a comment was posted on

4   page 27 and 28.  And then, if I understood you correctly,

5   Mr. Shinoff, that same comment appears throughout, up to

6   page 130.

7           MR. SHINOFF:  That is my understanding, Your Honor --

8           THE COURT:  Okay.

9           MR. SHINOFF:  -- and I just wanted Dr. Garnier to

10  confirm that.

11          THE COURT:  All right.  And so all I was asking was,

12  am I going to get to see this comment, or is this some top

13  secret --

14          MR. SHINOFF:  It's not top secret.  I personally have

15  trouble reading it.

16          THE COURT:  Okay.

17          MR. SHINOFF:  It's a rather lengthy comment by

18  Dr. Garnier.  If he wishes to -- if he's able to see it and

19  read it, that would be great.

20          THE COURT:  You can put it up on the screen, at least

21  give me an idea of what it is we're talking about.

22          MR. SHINOFF:  Okay.  So if we begin on page 25,

23  hopefully that would help.

24          THE COURT:  Yeah.

25          MR. SHINOFF:  This is of Exhibit U.

1        THE CLERK:  Who is putting it up?

2        MR. SHINOFF:  If you would do so.

3        THE CLERK:  I don't have it.

4        MR. SHINOFF:  We provided flash drives this morning.

5        THE CLERK:  I don't have it.  Do you have a computer

6   hooked up through HDMI, like plaintiffs?

7        MR. BASEL:  No.  I provided a flash drive.  I do have

8   a laptop, but I provided the Court with a flash drive.  If I

9   get an HDMI cord, I'm happy to --

10        THE CLERK:  Well, flash drives, they weren't for the

11   purpose of putting up exhibits, though.

12        THE COURT:  Never mind.  Never mind.  I'll look at it

13   when the case has been submitted, I suppose.  Okay.

14        By the way, is there an objection to Exhibit U coming

15   in?

16        MR. BRIGGS:  No.

17        THE COURT:  Okay.  So it will be admitted.

18        (Defendant's Exhibit U, pages 25 through 130 received

19   in evidence)

20        MR. SHINOFF:  I would offer Exhibit U pages 25 through

21   130.

22        THE COURT:  Mr. Briggs was kind enough to indicate

23   that he has no objection to it.

24        MR. SHINOFF:  Yes.  Thank you.  I appreciate that.

25

1   BY MR. SHINOFF:

2   Q.  Dr. Garnier, I don't know if you were able to read --

3   A.  I am.

4   Q.  Oh, you are?  Okay.

5   A.  I've got those pilot eyes still.

6   Q.  Oh, good.  Great.  Would you share that with us?

7   A.  Sure.  "President Michelle O'Connor-Ratcliff.  Good

8   morning, ma'am.  I hope that you had a pleasant weekend and

9   that you are looking forward to a productive week.

10          "It's unfortunate that you still continue to refuse to

11  meet with me, with my wife and me, and have the pleasure of

12  meeting our beautiful children.  They're the same children that

13  you claim to represent, but I understand that they are

14  associated with a man of color, so they must not be worthy of

15  your time.  That is unfortunate.

16          "I also find disheartening that you refuse to meet

17  with Reverend Shane Harris.  He is an up and coming young

18  advocate that is passionate about tolerance, acceptance, and

19  humanity.

20          "Ms. O'Connor-Ratcliff, the past Saturday you missed

21  an amazing night of inspiration as a powerful Reverend Al

22  Sharpton delivered a message inspiring young people to continue

23  the movement galvanized by the great Martin Luther King, Jr.

24          "Now, I know that the event was not in the confines of

25  Poway and Rancho Bernardo where you feel safe, far away from

1  people of color, but as a Democrat, as you claim to be,

2  Reverend Sharpton made news as he met with both Democratic

3  presidential candidates, Secretary Clinton and Senator Sanders.

4        "Ms. O'Connor-Ratcliff, surely you cannot feel or

5  believe that you are of greater importance than our next

6  potential President of the United States of America.  Your

7  obstinance to meet with Reverend Harris illustrate your

8  feelings about Reverend Sharpton and your feelings of people of

9  color, especially considering that during Reverend Sharpton's

10 visit, he highly praised the Reverend Harris and said,

11 "Reverend Harris speaks for me here in San Diego, and if you

12 disrespect Reverend Harris, you're disrespecting me."

13       "Ms. O'Connor-Ratcliff, I would want to be in your

14 position -- Ms. O'Connor-Ratcliff, I would not want to be in

15 your position, nor allow my School District to continually be

16 exposed for the segregated school system that you have been

17 charged to "lead" as the President of Poway Unified School

18 District -- as the President of Poway School District Board of

19 Education -- as the President of the Poway Unified School

20 District Board of Education."  My apologies.

21       "I have included a picture of Reverend Harris as he

22 stands hand-in-hand united with Reverend Sharpton.

23       "Again, ma'am, it was a night of inspiration filled

24 with San Diego councilmen and women, and the superintendent of

25 San Diego Unified School District, and the President of the

1   San Diego chapter of the NAACP, Dr. Branch.

2                "I have included data from the Public Request Act,

3   PRA, which requires Poway Unified School" -- let me repeat

4   that -- "I have included data from a Public Request Act

5   acquired of Poway Unified School District.  I want to let you

6   know, ma'am, that my PRA was not complete and full.  I asked

7   for the last 10 years of demographics of children who have been

8   suspended within Poway Unified School District.  I was only

9   provided with information from 2011 to 2015."

10                It's a bit cut off there.  I can't see.

11                "2011 to 2015," and it says, "anti sequel."

12                "I know how Poway Unified School District operates.

13  You will excuse your lack of providing information I requested

14  as a simple mistake or an oversight.  I'm looking forward to

15  the excuse that you and Dan Shinoff will produce to explain

16  your error and lack of due diligence to provide the requested

17  information.

18                "The data that was turned over is an inconvenient

19  truth for Poway Unified School District and their handling of

20  people of color.  The document is included, and I will allow

21  you to justify the data presented by the School District you

22  lead.  The most disturbing statistic is the disparity between

23  black children and white children.  According to the data the

24  Poway Unified School District provided, there is an average of

25  less than 1,000 black students who attend schools within Poway

1  Unified School District.  White students average about

2  18,500 within the District.  Black children are being suspended

3  from schools within Poway Unified School District at a rate of

4  over 4 percent higher than that of their white counterparts.

5           "President Michelle O'Connor, if you truly want to

6  eliminate the achievement gap, stop suspending students of

7  color at the rate of 4 percent times that of their white

8  counterparts.

9           "I also suggest that Poway Unified School District

10  begins hiring more people of color."

11          And it's cut off.

12  Q.  Thank you, Dr. Garnier, for reading those.

13          And those comments, again, they continue throughout

14  the exhibit that we've offered through page 130; is that true?

15  A.  Powerful comments.

16          MR. BRIGGS:  Your Honor, part of the comment was

17  misread.  I think it's partly because it's hard to read.  I

18  don't know whether that matters.  But one of the lines was just

19  misread.  I don't know whether the Court cares.

20          THE COURT:  Do you want to tell me what the misreading

21  was?

22          MR. BRIGGS:  Sure.  It was at the end where the

23  witness was talking about the percentage.  It says, "Black

24  children are being suspended from schools within Poway Unified

25  School District at a rate of over 4 percent.  White children

1   are being suspended at a rate of just over 1 percent."

2              THE COURT:  Okay.

3              MR. SHINOFF:  Thank you for that clarification,

4   Mr. Briggs.

5   BY MR. SHINOFF:

6   Q.  If I could direct your attention next, Mr. Garnier, to

7   Exhibit V, as in Victor.

8   A.  Okay.

9   Q.  And specifically, I would like to draw your attention to

10  page 1.  It has a number 1 at the bottom.

11             Do you have that?

12  A.  I do.

13  Q.  Okay.  And could you explain that heading for us at the

14  top, "From Christopher Garnier at MOR4PUSD".

15  A.  Can I explain it?

16  Q.  Yeah.

17  A.  It looks like it's from me --

18  Q.  Yes.

19  A.  -- to Michelle O'Connor's Poway Unified School District

20  social media page.

21  Q.  Okay.  And with the @ symbol, does that mean this is a

22  Twitter account?

23  A.  It does.

24  Q.  And if we take a look at pages 1 through 11, these are

25  comments for you on Ms. O'Connor-Ratcliff's Twitter account

1  over these 11 pages; is that true?

2  A.  Looks like I was working to assure Michelle O'Connor would

3  not win the next Board election.

4  Q.  Okay.  If you would be so kind just to answer my question.

5      Are these the same comments that we see from page 1

6  all the way through page 11?

7  A.  Yes.

8  Q.  And the date that I see on the first entry from you is

9  October 6th, I believe, or 16 -- my apologies -- 2017; is that

10  true?

11  A.  From this document, yes.

12  Q.  Okay.  And if we continue through the 11 pages, it appears

13  to me -- and tell me if I'm in error -- that they were all

14  entered October 16, 2017, by you.

15  A.  That's what it would appear.

16      MR. SHINOFF:  Your Honor, I would offer Exhibit V,

17  pages 1 through 11.

18      MR. BRIGGS:  No objection.

19      THE COURT:  All right.  They'll come in.

20      (Defendant's Exhibit V, pages 1 through 11 received in

21  evidence)

22  BY MR. SHINOFF:

23  Q.  Next, Mr. Garnier, I'd like to draw your attention, if I

24  may, to Exhibit W.

25      And if we take a look at the first page, this appears

1  to me -- and correct me if I'm wrong -- to be on the Twitter

2  account of T.J. Zane @TJZane; is that true?

3  A.  That's what it looks like.

4  Q.  Okay.  And the comments that we see on the first page,

5  those are all your comments?

6  A.  That's the way it appears.

7  Q.  Then if we go to the second page, those are all your

8  comments, as well; is that true, Mr. Garnier?

9  A.  That's correct.

10 Q.  Just bear with me for one moment, Mr. Garnier.

11 A.  Absolutely.

12          (Pause in the proceedings)

13 BY MR. SHINOFF:

14 Q.  The examples, Dr. Garnier, that we see in the exhibits that

15 I've just shown you, is this exclusively the times that you

16 repeated your message, or did that occur on more than the three

17 occasions that I've referenced?

18          MR. BRIGGS:  Objection.  Vague as to which exhibits.

19          MR. SHINOFF:  Well, the exhibits that I'm referring to

20 are the exhibits that I showed you.

21          THE COURT:  Yeah.  I think he's referring to V, as in

22 Victor, U, and W.

23          MR. SHINOFF:  Yes, Your Honor.

24          MR. BRIGGS:  Okay.  Thank you.

25          THE WITNESS:  I'm sorry.  Can you repeat your

1    question?

2    BY MR. SHINOFF:

3    Q.   I'm glad to, Dr. Garnier.

4         That is, was this a pattern of yours to repeat the

5    comments in the same manner that we see on multiple occasions

6    on entries by Ms. O'Connor-Ratcliff and T.J. Zane?

7    A.   A pattern is more than once.  I see the repeat happening

8    one time.

9    Q.   Okay.  Well, what's your view?  What was it?  Was it

10   repeated or was it a pattern?

11   A.   Your question to me, was it a pattern --

12   Q.   Yes.

13   A.   -- to go to different places and repeat.  I see one time,

14   one time where there was multiple comments.

15        So a pattern would be me doing that multiple times.  I

16   see this one time, hence, that's not a pattern.

17   Q.   So if Mr. Zane were to testify that this occurred multiple

18   times, are you saying that he would be in error?

19   A.   Well, you asked me specifically, specifically about this

20   evidence.  I'm commenting specifically from here.

21        Now, if you'd like to show me something else, I can

22   comment about that.

23   Q.   Well, Dr. Garnier, let me ask you this:  Were you aware

24   that at some point, Michelle O'Connor-Ratcliff began to -- or

25   my apologies -- that T.J. Zane began to delete your messages?

1   A.   Not aware at all.

2   Q.   Okay.  And you began exchanging your comments, either by

3   way of Facebook or Twitter, with Michelle O'Connor-Ratcliff and

4   T.J. Zane as early as 2014?

5   A.   As early as they began to run for their current Board seat.

6   Q.   And your memory is that the sole examples that we have of

7   repetition of your comments are these exhibits; is that your

8   testimony?

9   A.   My testimony is you have one exhibit, and I'm testifying on

10  behalf of this one exhibit.

11  Q.   Okay.  Well, then let me not ask you about an exhibit.

12       Did you do this more than one time or not?

13  A.   Do what more than one time?

14  Q.   Repeat your comments, Dr. Garnier.

15  A.   It's a vague and challenging question.  Repeat my comments

16  in what capacity?  For what reason?  It's a tough question to

17  answer.

18  Q.   Okay.  Well, I'm sorry that my question is ambiguous and

19  unclear.

20       We've seen comments of yours that were repeated; would

21  you agree with me?

22  A.   I've seen -- you've seen one -- one exhibit of repeated

23  comments.

24  Q.   Okay.  Do you have any memory, outside of seeing an

25  exhibit, of repeating comments on the Facebook pages of

1    Michelle O'Connor-Ratcliff and T.J. Zane?

2    A.  I do not.  I don't have that recollection.

3    Q.  Okay.  Do you have any recollection of repeating comments,

4    aside from the comments that we see on the Twitter pages of

5    T.J. Zane and Michelle O'Connor-Ratcliff --

6    A.  No current recollection, no.

7         MR. SHINOFF:  Dr. Garnier, I thank you for your time

8    and patience with me.

9         THE WITNESS:  Hey, Mr. Shinoff, always good to see

10   you, sir.

11        THE COURT:  You don't get off that easy.

12        Mr. Briggs, do you have any redirect?

13        MR. BRIGGS:  Yes, a few, please.

14        THE COURT:  All right.

15   REDIRECT EXAMINATION

16   BY MR. BRIGGS:

17   Q.  Mr. Garnier, could you go back to Exhibit U, page 26,

18   please?

19   A.  I am there.

20   Q.  Okay.  If you compare U26 to the prior page U25, I want to

21   make sure that I'm understanding this correctly.

22        It appears to me that U25 has Michelle

23   O'Connor-Ratcliff's original post with a portion of a comment

24   under it, and then page 25 stops with your comment truncated,

25   right?  Your complete comment is not there.

1    But then page 26, is it correct that it's your

2  complete comment without showing her post above it?

3  A.  It is bizarre.  I don't -- it's hard to see this on paper.

4  It's hard to really make a determination on what's going on

5  here on paper.

6  Q.  What I'm trying to figure out is, on these two pages, is it

7  two separate comments, or is it one comment with just a

8  different image on each page?

9  A.  I believe it's one comment, and this is the followup from

10  the one comment.  Again, it's hard to look at this and make a

11  determination on paper.

12  Q.  Okay.

13  A.  It's a digital platform.

14  Q.  And then, if you look at U27 and U28, you see on U27

15  there's the original post at the top with only a portion of

16  your comment, but then on the next page there's the entirety of

17  your comment without the original post.  Do you see that?

18  A.  I do.

19  Q.  So I'm just trying to figure out whether these pages are --

20  A.  The same or --

21  Q.  I mean, is it two different vantage points looking at the

22  same comment, or is it the same comment appearing twice in

23  different places on Facebook?

24  A.  Again, it's a challenging -- I was asked this question

25  before.  It's a challenging question to answer simply because

1   we're not looking at the digital product.

2   Q.   Okay.  You don't know --

3   A.   I do not know.

4   Q.   Okay.  If you take a look at page U032.  After where you

5   sign off, you write, "Very respectfully, Chris Garnier."

6   A.   Yes.

7   Q.   Do you see that?

8   A.   Yes.

9   Q.   And do you have an understanding of what the entries are

10  underneath that by Stacey Cavaglieri?

11  A.   Yeah.  This is the beautiful thing about --

12  Q.   Hang on just a second.

13          MR. BRIGGS:   It's Stacey, S-t-a-c-e-y.

14  C-a-v-a-g-l-i-e-r-i.

15  BY MR. BRIGGS:

16  Q.   Do you see that?

17  A.   I do.

18  Q.   Okay.  So what is the beautiful thing about this?

19  A.   This is a beautiful thing about being able to engage in

20  elected officials' social media pages.

21          Right there, the comment from Stacey is, "Senate

22  Appropriations Committee just voted unanimously and passed

23  AB-1369.  Watch out Governor Brown," just under my comment.

24  This is the beginning of the banter.

25          THE COURT:   I'm sorry.  What does that mean?  I have

1   no idea what that's talking about.

2           THE WITNESS:  So, sir, right under my comment that I

3   talked about the Reverend Harris and Reverend Sharpton, this is

4   right underneath Trustee O'Connor's post.

5           THE COURT:  Okay.

6           THE WITNESS:  So I wrote my comment, then someone read

7   my comment and then decided, you know what?  Maybe it's

8   relevant to what he said, maybe it's relevant to

9   O'Connor-Ratcliff's initialing post, but I want to comment, as

10  well.  This is the beautiful part about social media and public

11  servants.

12          So she says, part of the original post, hey -- just so

13  you know, these are -- these people that go to these pages,

14  they're local -- they're local nerds who love politics.  I like

15  this stuff.

16          She says, "Senate Appropriation Committee just voted

17  unanimously and passed AB-1369.  Watch out Governor Brown."

18          Trustee O'Connor replies directly from her comment,

19  just from where my comment was, as she is now engaging in the

20  banter.  "Thanks for the update, Stacey."

21          This is how, in today's world, we engage with our

22  political leaders.

23  BY MR. BRIGGS:

24  Q.  Okay.  And then if you go to Exhibit V, these are a

25  series --

1    THE COURT:  Wait, just a second.

2         So tell me how this other -- this post by this one

3    person you just told me about, how does that relate to your

4    post?

5         THE WITNESS:  So the original post, sir -- I'm going

6    to go back to U.

7         THE COURT:  Okay.  Your post had to do with Reverend

8    Sharpton and --

9         THE WITNESS:  Well, her initial post --

10        THE COURT:  -- and so on.  Okay.

11        THE WITNESS:  Yes, sir.

12        So I would have to go back and see what Trustee

13   O'Connor's initial post was.  Something in regards to Poway

14   Unified School District.

15        Whatever her initial post was, I then responded to her

16   initial post, and I wrote all that long paragraph.

17        THE COURT:  So what was her initial post?

18        THE WITNESS:  I need to go back and take a look.

19   That's the question.

20        MR. BRIGGS:  Your Honor, I can tell you what it is, if

21   you'd like to know.

22        THE COURT:  Sure.  Tell me.

23        MR. BRIGGS:  Yeah.  So the original post says -- it's

24   a picture of like a buffet table of food, and it says,

25   "Teachers and many staff members are back to school today

1    meeting with their teams, fixing up their classrooms, and

2    preparing a great year for their students.  Here's the

3    PTA-sponsored welcome back breakfast spread at my kids' school.

4    Looks good."

5              THE COURT:  Okay.  So I'm trying to understand what's

6    going on here.

7              THE WITNESS:  So --

8              THE COURT:  So your post talks about Reverend Sharpton

9    and Reverend Harris or somebody else?

10             THE WITNESS:  Sure.

11             THE COURT:  And the number of kids -- five kids that

12   are suspended --

13             THE WITNESS:  Sure.

14             THE COURT:  -- and so on and so forth, which doesn't

15   strike me as being responsive to the original comment.  Agree?

16             THE WITNESS:  Disagree.

17             THE COURT:  Okay.  Explain that to me.

18             THE WITNESS:  So when we're talking at this time at

19   this comment, we're talking about going back to school.

20             THE COURT:  Okay.

21             THE WITNESS:  That's what she's commenting.  She's

22   commenting about going back to school.

23             THE COURT:  Yes.

24             THE WITNESS:  At this juncture, I've already sent her

25   multiple emails, tried to reach out to her multiple ways about

1  the new school year coming up, and about the things that we

2  need to discuss and talk about within the new school year.

3          So instead of responding to me within the email of

4  this exact -- almost verbatim, this exact same response, she's

5  talking about, hey, we're celebrating all the new kids and

6  students that are coming back to school.

7          Guess what, Your Honor.  My kids are coming back to

8  school, as well, too.  They're not as excited, being black

9  children, as the other children are.  There is some challenges

10  that we need to discuss.

11          So maybe in her world she can reach out and say

12  everything is great.  Look at me.  Trustee O'Connor.  I'm

13  writing everything is perfect.  But my constituent, who just

14  sent me an email about this exact same thing last week, I'm

15  going to forget him.

16          My -- my goal then, freedom of speech.  I'm going to

17  put it out there.  Fine, Trustee O'Connor.  You don't want to

18  discuss what's relevant to my family?  I'm going to put it out

19  there publicly so other people can see what I'm trying to reach

20  out to you about.

21          Also, on top of that, I also invited Trustee Zane and

22  Trustee O'Connor to see Reverend Sharpton.

23          So you may not see it as relevant, Your Honor.  To me,

24  this is all Poway.  This is relevant.  Why are you talking

25  about how exciting --

1          THE COURT:  Okay.

2          THE WITNESS:  -- it is for students to return to

3     school --

4          THE COURT:  All right.

5          THE WITNESS:  -- but I have a massive concern as a

6     parent.

7          THE COURT:  So how is this other post that you were

8     telling me about following your post --

9          THE WITNESS:  Right.

10          THE COURT:  -- how is that responsive to your -- to

11     your post?

12          THE WITNESS:  Again, this is the -- I would say,

13     almost the chaos sometimes when it comes to social media.

14          Sometimes, you can just speak in generalities of the

15     School District.  So this bill right here -- again, I need to

16     look up the bill, but I'm sure in some capacity it affected the

17     School District.  And this individual was letting the Trustee

18     know that the Governor had just signed something that would

19     affect her position or her decision-making ability as a

20     Trustee.

21          THE COURT:  So that post could have been posted even

22     if you had not posted yours.

23          THE WITNESS:  Absolutely.  Anyone could.

24          THE COURT:  This had nothing to do with your post.

25          THE WITNESS:  Nothing at all.  No, sir.

1          THE COURT:  Okay, got it.  Thank you.

2          MR. SHINOFF:  Your Honor, may I represent to the Court

3     that the bill in question is a bill dealing with dyslexia.

4          THE COURT:  Okay.

5          THE WITNESS:  Again, a problem for Poway Unified

6     School District.

7          THE COURT:  Got it.

8          Mr. Briggs, I'm sorry.  I hated to interrupt, but I

9     just was puzzled about some of this.

10         Okay, go ahead.

11         MR. BRIGGS:  Your familiarity is the most important

12    thing, so by all means, interrupt me if you need to.

13    BY MR. BRIGGS:

14    Q.  Okay.  So looking at Exhibit V.  These are a series of

15    tweets, correct?

16    A.  They are.

17    Q.  From your account, right?

18    A.  Yes.

19    Q.  Okay.  And if you look at the various tweets along the

20    way --

21    A.  Yes.

22    Q.  -- it appears that you are sending them to different

23    people.

24    A.  Thank you.  Thank you for making that point.

25    Q.  So I'll just have you look at the first one -- I'm sorry --

1  it's really the second one on the page.  It says that you're

2  replying to Poway Unified -- @PowayUnified, and @MOR4PUSD --

3  that's Michelle O'Connor-Ratcliff's account?

4  A.  Yes.

5  Q.  -- and to 6 others.

6  A.  Yes.

7  Q.  Yes?  Okay.  So you were sending this to multiple people,

8  yes?

9  A.  Thank you for -- I -- I knew there was a -- another

10 element, yes.

11 Q.  I'm asking, not telling.

12 A.  Yes.

13 Q.  Okay.

14 A.  That's right.

15        THE COURT:  Ha.  Good job, Mr. Briggs.

16 BY MR. BRIGGS:

17 Q.  So if you go down the page, eventually you see

18 @AbraxisHigh.

19 A.  Yes.

20 Q.  Is that a high school in the Poway --

21 A.  Poway Unified, correct.

22 Q.  So what was your purpose in sending this same message to

23 different people each time?

24 A.  The message is clear.  I know that I have a strong voice in

25 the community.  It was to reach out to people that might

1  potentially support Michelle in her next bid to become Board of

2  Education, and I wanted people to know that I did not support.

3  Q.  So these tweets you were doing to alert people not to

4  support her for re-election?

5  A.  Correct.

6  Q.  Okay.

7       THE COURT:  So now I'm a little confused.

8       So are these not tweets that are

9  Ms. O'Connor-Ratcliff's Twitter account, or --

10       THE WITNESS:  No.

11       THE COURT:  -- are they in her account?

12       MR. BRIGGS:  No, they're -- I'll get you the answer.

13  BY MR. BRIGGS:

14  Q.  Are these from your account or from her account, Mr. --

15  A.  From my account.

16  Q.  Okay.  And so these are messages that you are sending out

17  into the world; is that correct?

18  A.  That's correct.

19       THE COURT:  Okay.

20  BY MR. BRIGGS:

21  Q.  Here in Exhibit V, correct?

22  A.  Correct.

23  Q.  Okay.  When the Facebook -- withdrawn.

24       When you go to Facebook to look at someone's posts and

25  the comments, does Facebook show you comments based on

1   relevance or something else?

2   A.   Relevance.

3   Q.   Okay.  So if you were to log in today, just for fun, to

4   Cory Briggs' Facebook page, and you wanted to look at something

5   I posted, and you wanted to see the world's comments, you would

6   at first see Facebook displaying those comments based on its

7   view of relevance.  Do I have that right?

8   A.   Correct.

9   Q.   Okay.  And that's not something that you set, correct?

10  That's -- Facebook gives it to you?

11  A.   That's Facebook's algorithm.

12  Q.   Okay.  And then, I think you mentioned something about the

13  School District changing to -- from at large to

14  district-by-district elections -- or representation because of

15  a lawsuit?  Do I have that right?

16  A.   That's correct.

17  Q.   Was it a lawsuit or just a threat of a lawsuit?

18  A.   A threat of a lawsuit.

19  Q.   Okay.  Do you know who made the threat?

20  A.   Oh, I'm not sure, but it was the same -- the same person

21  that was making threats -- the same entity that was making

22  threats to other school districts --

23  Q.   Okay.

24  A.   -- and City Council members.

25  Q.   How did you actually learn that?

1  A.  It was made clear to the entire School District.  We --

2  there was meetings that were called in regards to changing the

3  at large bids.

4  Q.  This issue was discussed publicly?

5  A.  Yes.

6  Q.  Got you.  Okay.

7         MR. BRIGGS:  Your Honor, I don't have any further

8  questions for the witness.

9         MR. SHINOFF:  Just one --

10         THE COURT:  All right.  Just one.

11         MR. SHINOFF:  -- follow-up, Your Honor.  Yes.

12  RECROSS EXAMINATION

13  BY MR. SHINOFF:

14  Q.  Could we take a look at Exhibit V?

15         You are asking and telling everyone not to vote for

16  Michelle O'Connor-Ratcliff.  That's the intent of your message,

17  right?

18  A.  That's correct.

19  Q.  And you could have disseminated the same message on your

20  social media or any other social media, true?

21  A.  This is my social media.

22  Q.  Okay.  So nothing precluded you from accomplishing what you

23  did, right?

24  A.  Correct.

25  Q.  Okay.

1           MR. SHINOFF:  I have nothing further.

2           THE COURT:  Thank you, sir.  You may step down.

3           (Witness excused)

4           THE COURT:  Please call your next witness.

5           MR. BRIGGS:  Kimberly Garnier.

6           THE COURT:  Okay.

7    KIMBERLY GARNER,

8        called as a witness by the Plaintiffs,

9        having been duly sworn, testified as follows:

10          THE CLERK:  State your full name for the record,

11   spelling your first and last name.

12          THE WITNESS:  Kimberly Garnier.  Kimberly,

13   K-i-m-b-e-r-l-y.  Garnier, G-a-r-n-i-e-r.

14          THE COURT:  Please be seated.

15          THE WITNESS:  Thank you.

16          THE COURT:  Mr. Briggs, go ahead.

17          MR. BRIGGS:  Thanks, Your Honor.

18   DIRECT EXAMINATION

19   BY MR. BRIGGS:

20   Q.  Ms. Garnier, you are married to Chris Garnier, yes?

21   A.  Yes, I am.

22   Q.  You have children in the Poway Unified School District?

23   A.  Yes, we do.

24   Q.  Were you married to Mr. Garnier when he was in the Marine

25   Corps?

1    A.   Yes, I was.

2    Q.   Have you ever tried to post comments about Poway Unified

3    School District business on the Facebook page of Michelle

4    O'Connor-Ratcliff?

5    A.   Yes, I have.

6    Q.   Have you ever tried to do so on the Facebook page of T.J.

7    Zane?

8    A.   Yes, I have.

9    Q.   Have you ever tried to do so on the Twitter account of

10   Michelle O'Connor-Ratcliff?

11   A.   I believe so.

12   Q.   And have you ever tried to do so on the Twitter account of

13   T.J. Zane?

14   A.   I believe so.

15   Q.   Did Mr. Zane or Ms. O'Connor-Ratcliff try to block you from

16   any of their social media accounts?

17   A.   Both Michelle O'Connor-Ratcliff and T.J. Zane blocked me

18   from commenting on their Facebook pages.

19   Q.   Okay.  And how do you know that you were blocked?

20   A.   When I went to their sites, their Facebook pages, I was

21   unable to comment, like, or engage in any way.

22   Q.   Okay.  And do you have an understanding that, when you are

23   allowed to comment, there is a window --

24   A.   Yes.

25   Q.   -- under a post?

1   A.   Yes.

2   Q.   Okay.  And did you ever see the window?

3   A.   Originally, I did.  Once I was blocked, I could no longer

4   see that.

5   Q.   Okay.  Is that true for the Facebook accounts of both

6   Ms. O'Connor-Ratcliff and Mr. Zane?

7   A.   Yes.

8   Q.   Okay.  What were you trying to post?

9   A.   Beginning in about 2013, I started to become aware of some

10  issues within our School District.

11        Again, my husband and I went K through 12 at Poway

12  Unified, and our three children attend.  And I noticed it

13  wasn't functioning the way that I had remembered it to when it

14  was a stellar school district.

15        And so I started noticing interesting situations

16  regarding minorities in the District, as well as financial

17  issues within the District from the capital appreciation

18  bond -- the billion dollar bond in the District, which is now

19  illegal, which is what really started me in thinking something

20  wasn't right within Poway Unified.

21  Q.   And did you raise concerns to Mr. Zane?

22  A.   Yes, I did.

23  Q.   Did you raise concerns to Ms. O'Connor-Ratcliff?

24  A.   Yes, I did.

25  Q.   Did they ever respond to you?

1  A.   With Trustee Zane, I believe the only response was an

2  out-of-office reply that I would get from his email.

3         And I think Ms. O'Connor at one point said she didn't

4  want to meet or talk with us, and that was it, as far as I can

5  remember.

6  Q.   What were you able to successfully submit as a comment on

7  Ms. O'Connor-Ratcliff's Facebook page before you were blocked?

8  A.   I would bring up issues of the bond, the Dolinka Group, who

9  was behind the bond, questionable actions with the

10 superintendent, really fiscal matters.

11        And there were issues with race -- blatant racism that

12 I would address on her page.

13        There is an incident, death threat against black

14 students using the N word on social media.  It was spray

15 painted at one of the schools "f-u-c-k", and then the N word.

16 Nooses left for students.  Really concerning things.

17        And I have children of color in the District, and I

18 don't want them going to school and seeing a noose or the

19 profanity like that, so I was passionately trying to reach out

20 to the Board members and reach out to both Michelle

21 O'Connor-Ratcliff and T.J. Zane about this on their social

22 media.

23 Q.   Were your comments submitted to Mr. Zane's Facebook page of

24 a similar nature?

25 A.   Yes.

1   Q.  Did you ever try to submit a comment that was physically

2   threatening toward either one?

3   A.  Never.

4   Q.  Did you ever try to submit a comment that was threatening

5   toward their families?

6   A.  Never.

7   Q.  Did you ever swear at them or use profanity?

8   A.  Never.

9   Q.  Were your comments always about substantive issues in the

10  District?

11  A.  Yes.

12  Q.  You were never blocked on Ms. O'Connor-Ratcliff's Twitter

13  page; is that correct?

14  A.  As far as I know, I never was blocked on her Twitter.

15  Q.  Okay.  And you weren't blocked on Mr. Zane's Twitter page,

16  correct?

17  A.  That's also correct.

18  Q.  So with respect to you, your blocking has only been on

19  their two Facebook pages, correct?

20  A.  Yes.  If I can, I -- I use Facebook frequently.  Twitter

21  infrequently.

22          I suffer from technological wherewithal sometimes, and

23  so Facebook is a little bit more user friendly for me, and I'm

24  able to engage in a more simple way.  So I prefer to use

25  Facebook, and that is the majority of the way I would

1   communicate with them.

2   Q.  When was the last time you looked to see whether you were

3   still blocked by Ms. O'Connor-Ratcliff?

4   A.  I believe I checked in the last couple of days, and I was

5   still blocked.

6   Q.  Okay.  When is the last time you checked to see whether you

7   were still blocked by Mr. Zane?

8   A.  In the last couple of days.

9   Q.  And were you still blocked by Mr. Zane?

10  A.  It appears as if I am able to comment and engage with

11  Mr. Zane at this time.

12  Q.  Okay.

13          THE COURT:  I'm sorry.  Did you say you are?

14          THE WITNESS:  Yes, sir.  Yes, your Honor.

15  BY MR. BRIGGS:

16  Q.  That was not the case when you filed this lawsuit, correct?

17  A.  That's correct.  I was blocked.

18  Q.  Okay.  And do you recall your deposition being taken

19  roughly a year ago or so?

20  A.  Yes.

21  Q.  Okay.  And at the time of your deposition, do you recall

22  checking to see whether you were still blocked by Mr. Zane?

23  A.  I believe that I checked, but I don't have a clear

24  recollection of what I found.

25  Q.  What's your best recollection?

1  A.   I believe I was blocked at that time.

2  Q.   Okay.  You're just not 100 percent certain?

3  A.   I'm not 100 percent sure, but I believe at that time I was

4  still blocked.

5  Q.   You are 100 percent sure that when the lawsuit was first

6  filed, you were blocked.

7  A.   Absolutely.  Absolutely.  No doubt.

8  Q.   Okay.  And you're 100 percent certain that months and

9  months into the lawsuit, you remained blocked, right?

10  A.   That's correct.

11  Q.   Okay.  Do you get a lot of feedback from people commenting

12  on your posts on Facebook?

13  A.   Yes.

14  Q.   Do you have any frequent flyers, frequent commenters?

15  A.   Yes.

16  Q.   Do their frequent comments in any way impede your ability

17  to get your message out there?

18  A.   Absolutely not.

19  Q.   How do those repeat comments appear on your Facebook posts?

20  What do you see?

21  A.   If I post original content, there's an open forum for

22  people to participate, so there's no interference in people

23  being able to write their thoughts and feelings.

24  Q.   Do you ever go back to your original posts to look at the

25  comments that people have made in response?

1    A.    Yes.

2    Q.    Do you have any difficulty reading their comments because

3    of frequent commenters?

4    A.    No.    In fact, that's one of -- again, my husband addressed

5    this -- that with social media, it really is a conversation, a

6    dialogue.    Sometimes people insert new information, sometimes

7    they comment on something that was posted days before.

8          And so you can go back and look at something that was

9    posted 10 comments prior, or 10 days prior, and then you can

10   comment on that, you can address something else somebody else

11   brought into the conversation.    So it's easy to navigate.

12   Q.    Do you ever have anybody post something so long that

13   Facebook shortens it?

14   A.    Not where it would be cut off, but where you would have to

15   click to see more.

16   Q.    You literally click on the words s-e-e, m-o-r-e?

17   A.    That's correct.

18   Q.    Okay.    And when you do that, the full post expands, right?

19   A.    That's correct.

20   Q.    Okay.

21   A.    And if I want to go past that, I scroll my mouse.    Within

22   less than a second, I could pass up 100 comments, if I chose

23   to.

24   Q.    Okay.    You don't find any of the lengthy repeat comments to

25   in any way interfere with your ability to interact with those

1   posting comments; is that right?

2   A.   No.

3   Q.   Okay.   When you see comments to posts on Facebook, are they

4   sorted by relevance or by something else that you're aware of?

5   A.   I believe they're sorted on my page by date.   And I think

6   you can alter if you see them by relevance or date.   But I'm

7   not sure, and I don't know if that is different for my personal

8   page versus if I would go to, say, the San Diego Union Tribune

9   and how they would sort their comments.

10  Q.   Okay.   Either way, you don't have any difficulty reading

11  through lengthy comments?

12  A.   Oh, no, not at all.

13  Q.   Okay.   Were your comments to Mr. Zane and

14  Ms. O'Connor-Ratcliff, were you critical of their performances

15  as Trustees?   How would you characterize it?

16  A.   Yeah, I would say that I was critical of their performance.

17  I felt that they owed their constituents more transparency, and

18  I felt that they needed to be more accountable.

19          For example, Trustee O'Connor-Ratcliff vowed to

20  disengage with the Dolinka Group, who was behind the billion

21  dollar bond.

22          THE COURT:   I'm sorry.   I couldn't hear you because

23  you're speaking away from me.

24          THE WITNESS:   I apologize.

25          So I said that I was critical of the work they were

1   doing on the Board.  And one example was that Trustee

2   O'Connor-Ratcliff vowed to sever ties with the Dolinka Group,

3   who was behind the now-illegal billion dollar bond at Poway

4   Unified.  And when she became a Trustee, she continued to work

5   with them for years.  And so that would be one of the things

6   that I would demand more accountability from, more

7   transparency, that sort of thing.

8           MR. BRIGGS:  Your Honor, I have no further questions

9   of the witness.

10          THE COURT:  All right.  Mr. Shinoff?

11          MR. SHINOFF:  Certainly, Your Honor.  Is the Court's

12  plan to have a lunch recess, or no?

13          THE COURT:  Yes.  I have a judge's meeting at 12:45,

14  so my plan is to break at 12:30 --

15          MR. SHINOFF:  Okay.

16          THE COURT:  -- and then come back shortly after 2:00.

17          MR. SHINOFF:  Thank you very much, Your Honor.

18  CROSS EXAMINATION

19  BY MR. SHINOFF:

20  Q.  Good afternoon, Ms. Garnier.

21  A.  Hello, Mr. Shinoff.

22  Q.  I wanted to make sure that I heard exactly what you had

23  testified, and so I apologize if I misheard it.

24          Is it your testimony that you are no longer blocked by

25  one of the Trustees?

1    A.   That's correct.   When I just looked, it looks as if I was

2    unblocked.

3    Q.   And unblocked by both Trustees?

4    A.   No, sir.   Michelle O'Connor-Ratcliff still has me blocked.

5    Mr. Zane, it looks as if he has unblocked me.

6    Q.   Are you familiar with how blocking works on Facebook?

7    A.   Yes, sir.

8    Q.   Could you explain for us your understanding?

9    A.   Yes.   So if you no longer want somebody to participate in

10   your social media, you can go to the settings on Facebook, and

11   you can find the person's name, and then you can click "block",

12   and that is what I believe happened.

13   Q.   To your knowledge, is there also a filtering process where

14   you could filter the elimination of particular words?

15   A.   I wouldn't be able to testify competently to that.

16   Q.   Okay.   I thank you for that.

17        Do you remember when it was that you were first

18   blocked by Michelle O'Connor-Ratcliff?

19   A.   I do not.   I feel it was maybe a little bit earlier than my

20   husband testified to, but perhaps around 2016, I just can't

21   remember exactly.

22   Q.   Okay.   And did you follow up the blocking with an email to

23   Ms. O'Connor-Ratcliff?

24   A.   I don't recall.

25   Q.   Do you recall saying anything in public comment about this

1   issue of being blocked in or around that same period of time?

2   A.   I cannot recall that.

3   Q.   If I may draw your attention to Exhibit U.  There should be

4   a binder right next to you on your --

5   A.   Oh, sorry.

6   Q.   -- right-hand side.  I apologize for the weight of those.

7   A.   That's okay.

8   Q.   If you would just let me know when you're there.

9   Exhibit U.  And specifically to page 10.  So 10.  At the bottom

10  middle, you'll see the number 10.

11  A.   Okay.  I'm there.

12  Q.   You're there?

13  A.   Yes, sir.

14  Q.   Great.  So would you agree with me that there appears to be

15  a post at the top from Michelle O'Connor-Ratcliff, and

16  apparently, it has something to do with student performance.

17  Do you see that?

18  A.   Yes, I do.

19  Q.   And then you post, if I understand it correctly, you post

20  below that.

21       And is your post a video?

22  A.   Yes, sir.

23  Q.   And this was a video regarding your family?

24  A.   Our experiences within the School District, to include our

25  children's.

1    Q.  Okay.  And so -- and I apologize for my ignorance -- but I

2    assume what you're posting is a link?

3    A.  Yes.  It's a link to an interview.

4    Q.  Okay.  And then, if we go to page 11 of Exhibit U, we see

5    another post by Michelle O'Connor-Ratcliff, and below that we

6    see a posting by Mr. Garnier, but right below that is a posting

7    by you, and it's the same YouTube that you're posting; is that

8    true?

9    A.  Yes, sir.

10   Q.  Again, a link to that page, correct?

11   A.  Yes.

12   Q.  Then, if we go to 12 of Exhibit U, we have a post by

13   Michelle O'Connor-Ratcliff, and then, once again, we have the

14   same link, the YouTube that you posted.

15   A.  That's correct.

16   Q.  Then, if we go to page 13 of Exhibit U, we have a post by

17   Ms. O'Connor-Ratcliff, and then -- I know it's faint, and I

18   apologize for that -- but we have a posting by you; is that

19   true?

20   A.  Yes.

21   Q.  Okay.  Then if we go to page 14 of Exhibit --

22              THE COURT:  I'm sorry.  Is that the same video or just

23   a different post?

24              MR. SHINOFF:  I can't represent to the Court that it's

25   a video.

1        THE COURT:  Okay.  That's fine.

2        MR. SHINOFF:  I just can't see it.

3        THE COURT:  All right.  That's fine.

4        MR. BASEL:  I believe it appears to be the same text,

5   but it has been expanded to show a preview of what the video

6   is.  The link --

7        THE COURT:  I have no idea what you just said.

8        MR. BASEL:  The link appears to be the same, it just

9   doesn't happen to appear to be showing the picture of what the

10  video will be playing.

11       THE COURT:  I see.  So the link -- the link to the

12  video would be the same --

13       MR. BASEL:  Yeah.

14       THE COURT:  -- but you don't see the picture.

15       MR. BASEL:  Yeah.  Sometimes Facebook may not expand

16  something like that.

17       THE COURT:  Got it.  All right.

18  BY MR. SHINOFF:

19  Q.  Next, Ms. Garnier, if I could draw your attention to

20  page 14 of Exhibit U.  There appears to be a post by Michelle

21  O'Connor-Ratcliff, and then the same video you post, is that

22  true, on page 14?

23  A.  Yes.  I'm sorry.  I thought you had already asked me about

24  that one.

25  Q.  If I could draw your attention to page 15 of Exhibit U.  We

1  have another posting by Michelle O'Connor-Ratcliff, and it

2  apparently had to do with the local control funding formula and

3  the local control accountability plan, and you posted the

4  family video; is that true?

5  A.   The family video contains information about the School

6  District.

7  Q.   Okay.

8  A.   Yes.

9  Q.   Okay.  If we go to page 16 of Exhibit U, another posting by

10 Ms. O'Connor-Ratcliff, and then you, once again, post the video

11 of your family experience; is that true?

12 A.   Yes, it is.

13 Q.   Then, if I can draw your attention to page 17.  I don't see

14 a posting from you, but apparently, your husband, Dr. Garnier,

15 he posts that same link following Ms. O'Connor-Ratcliff's

16 posting.  Would you --

17 A.   Yes, among other comments, as well.

18 Q.   If I can draw your attention to page 18 of Exhibit U.

19 There's a posting, again, from Michelle O'Connor-Ratcliff at

20 the top, and then this time you post the same video; is that

21 true?

22 A.   Yes.  And again, there's other comments, as well.

23 Q.   And the posting by Ms. O'Connor-Ratcliff was apparently

24 about the importance of music programs in school?

25 A.   It looks like it addresses that, yes.

1  Q.   Then, if I can draw your attention to page 19 of Exhibit U.

2  You see the post of Ms. O'Connor-Ratcliff?

3  A.   Yes, sir.

4  Q.   Then I would draw your attention to the next page, page 20.

5  Following your husband's comment that's on both 19 and 20,

6  again, you post the video of your family's experience in Poway

7  Unified; is that correct?

8  A.   That's correct.

9  Q.   Then, if I can draw your attention to page 21 of Exhibit U.

10 There's a posting of Michelle O'Connor-Ratcliff which

11 references a picture of the District with the six pillars of

12 character, everywhere, all the time.  And below that, you post

13 the YouTube link with your family experience in Poway Unified

14 School District?

15 A.   Yes, sir.

16 Q.   Okay.  Then, if I could draw your attention to page 22 of

17 Exhibit U.  We have a posting from Michelle O'Connor-Ratcliff,

18 and again, we have a posting below that by you with the same

19 link regarding your family experience in Poway Unified School

20 District?

21 A.   Yes, sir.

22 Q.   Then, if I could draw your attention to page 23.  We have a

23 posting at the top by Ms. O'Connor-Ratcliff, two comments from

24 your husband, and then below that, there is another posting by

25 you with a link to your family experience in the Poway Unified

1  School District, correct?

2  A.   Yes, sir.

3  Q.   Then, on page 24 of Exhibit U.  We have another posting by

4  Michelle O'Connor-Ratcliff, and this apparently had to do with

5  a new teacher orientation, and then below that is a posting by

6  you with the same YouTube link of your family experience in

7  Poway Unified School District, correct?

8  A.   Yes, sir.

9  Q.   Ms. Garnier, I thank you for your time and patience.

10 A.   Thank you.

11        THE COURT:  Mr. Briggs?

12        MR. BRIGGS:  Thank you, Your Honor.

13 REDIRECT EXAMINATION

14 BY MR. BRIGGS:

15 Q.   Ms. Garnier, why did you post a video about someone calling

16 your husband "boy" so many times?

17 A.   Well, I'm so grateful you asked me that.

18        Each one of Michelle O'Connor's posts had to deal with

19 Poway Unified and a narrative she wants to depict of the happy,

20 positive messages.  And while I appreciate that, I also need to

21 call attention to those who are struggling.

22        And I found that disinfectant -- or excuse me --

23 sunlight is the best disinfectant, and I wanted to make it --

24 give it as much sunlight as possible, that there are

25 inequities, that there are problems with the budget.

1    One of the posts that Mr. Shinoff highlighted was

2  about our former superintendent.  And in that video, we are

3  talking about our former superintendent, who was eventually

4  charged with four or five felonies.

5    So while, at face value, it looks like I'm repeating a

6  family video, each one of her posts was directly related --

7  directly related in some capacity to what was in the video,

8  what we spoke to.

9    So I'm absolutely confident I would do it again in a

10  heartbeat, because my post was absolutely relevant to each

11  issue she addressed within Poway Unified.

12    THE COURT:  So just out of curiosity, how long is this

13  video?

14    THE WITNESS:  I'm sorry?

15    THE COURT:  Just out of curiosity, how long is this

16  video?

17    THE WITNESS:  I believe the video is two hours.  It's

18  a two-hour interview.

19    THE COURT:  Two-hour video.

20    THE WITNESS:  Yes.  It's an interview.  And we go

21  through -- we were interviewed by a man named Walter Davis.

22  And he asked us about what we --

23    THE COURT:  Who is Mr. Davis?

24    THE WITNESS:  He runs a podcast.  He is an author.

25  He's a civil rights icon.

 1            THE COURT:  He's a what?

 2            THE WITNESS:  Civil rights icon.

 3            THE COURT:  Civil rights icon?

 4            THE WITNESS:  Yes, sir.

 5            THE COURT:  Okay.

 6            THE WITNESS:  And so, because my husband and I have

 7     knowledge as students and parents and community members, and

 8     through our work to get to the bottom of the former

 9     superintendent syphoning off money, and the racial issues, and

10     the bond issues --

11            THE COURT:  Wait.  Excuse me.

12            THE WITNESS:  Yes.

13            THE COURT:  I hate to interrupt you, but I'm trying to

14     sort through this.

15            So what does the fact that the prior superintendent

16     was charged with or convicted of, apparently, financial

17     impropriety, what does that have to do with civil rights?

18            THE WITNESS:  We address all of it.  We address --

19     so -- and at the time that the interview was being posted --

20            THE COURT:  Yes.

21            THE WITNESS:  -- it was not yet public what the

22     superintendent was doing.  We were communicating with other

23     community members and the deputy district attorney to get

24     information out there so that people would know what was going

25     on and our taxpayers would be protected.

1        THE COURT:  Okay.  But I'm struggling with the idea of

2    somehow merging these two seemingly disparate issues.

3        So the one has to do with financial abuse, and the

4    other one has to do with civil rights.

5        Your video apparently encompasses --

6        THE WITNESS:  Yes.

7        THE COURT:  -- all of it --

8        THE WITNESS:  Yes, sir.  Yes, Your Honor.

9        THE COURT:  -- for two hours and however long, right?

10        THE WITNESS:  Yes, sir.  Yes, Your Honor.

11        THE COURT:  Okay.  All right.  Thanks.

12        Mr. Briggs, I apologize

13        MR. BRIGGS:  Yes.  No problem.

14    BY MR. BRIGGS:

15    Q.  Were you -- did you intend the video in some way to be a

16    response to points that Ms. O'Connor-Ratcliff was making?

17    A.  Yes.

18    Q.  Okay.

19    A.  Yes.

20    Q.  Do you know whether she has much of a following on

21    Facebook?

22    A.  It doesn't seem to be -- you know, she's not followed by

23    the millions, but community members will go on her page and

24    look, and comment, and like, and that sort of thing.

25    Q.  Did you understand that your posts would be viewed by other

1  people in the community who visit her Facebook page?

2  A.  Yes.  In fact, that is how some -- many more community

3  members became aware was the transparency with which we

4  revealed this information.

5          And so it was a useful tool.  And people would say

6  frequently that they had no idea this was going on.  And they

7  would watch the video.

8          And I think our video has, you know, thousands of

9  views and that sort of thing.

10          So it was -- it was received, it was viewed, and it

11  was useful in exposing some of the issues in the District.

12          THE COURT:  I've got another question.

13          Remember I said I don't know anything about Facebook

14  or --

15          THE WITNESS:  Yes.

16          THE COURT:  -- or Twitter, but somewhere along the

17  line I've heard something about monetizing posts or videos or

18  something to that effect.

19          Is this video monetized?  Every time somebody looks at

20  it, does somebody --

21          THE WITNESS:  No, Your Honor.

22          THE COURT:  -- get money?  Okay.  All right.  Good.

23  All right.

24          THE WITNESS:  There's no benefit other than

25  transparency.

1    THE COURT:  Okay, got it.  Thank you.

2    MR. BRIGGS:  You may be thinking of what you've heard

3    about how Facebook and Twitter monetize that data they gather

4    about people who use their platforms.

5    THE COURT:  I don't know.  Somewhere I heard something

6    about people make money by people clicking on something.  I

7    don't know if that's true or not.

8    MR. BRIGGS:  The only people making money here are the

9    lawyers, Your Honor.

10   THE COURT:  Okay.  Good point.

11   MR. BRIGGS:  I expected my colleague to stipulate to

12   that or join in the comment, but anyway.

13   MR. SHINOFF:  I'll stipulate to that.

14   MR. BRIGGS:  Okay.  A moment of levity among

15   colleagues.

16   BY MR. BRIGGS:

17   Q.  So anyway, is it fair to say that you were trying to

18   educate her audience as much as her with these posts?

19   A.  Yes.

20   Q.  Okay.  Now, when you would post a link to the video, does

21   the video automatically play when somebody goes to those

22   comments, or would someone have to take an additional step to

23   watch the video?

24   A.  They would have to take an additional step.  They wouldn't

25   just go on to her page and a video would start playing, they

1   would have to make the conscious choice to watch the video.

2          And if they chose not to, it would be no different

3   than me scanning the room and seeing the exit sign.  If I don't

4   want to stare at it, I don't have to.

5   Q.  Okay.  Earlier you testified that you could just scroll

6   past comments in a second.

7   A.  Yes.

8   Q.  Is this --

9   A.  As quickly as you can click your finger, you can disregard

10  things.

11  Q.  And that's true even when you posted a video like this?

12  A.  That's correct.

13  Q.  Okay.

14          MR. BRIGGS:  I don't have any further comments, Your

15  Honor.

16  RECROSS EXAMINATION

17  BY MR. SHINOFF:

18  Q.  Ms. Garnier, like His Honor, I'm not particularly adept at

19  Facebook or Twitter, but I've heard another expression that's

20  used in terms of these posts, and I've heard the term of

21  weaponizing posts.

22          Was it your intent to weaponize your posts against

23  Ms. O'Connor-Ratcliff?

24  A.  Could you clarify what you mean by "weaponize", please?

25  Q.  Using something as a weapon.  A weapon to destroy, or hurt,

1  or harass.

2  A.  Ha.  Absolutely not.  I apologize for laughing.  I didn't

3  mean to disregard your comment.

4  Q.  It's okay.

5  A.  But I don't know when the truth can be a weapon, other than

6  when you don't want the truth to come out.

7       So I take that very seriously what you just said.  If

8  you can categorize truth as harassment or a weapon, then, in my

9  judgment, you're on the wrong side.

10 Q.  Ms. Garnier, you understand this isn't the discussion -- it

11 was simply a question.  I wasn't offering a viewpoint of mine,

12 I was simply asking you a question.

13 A.  And Mr. Shinoff, I apologize if I was a little bit too

14 aggressive in that.  I'm very passionate about this, and so I

15 apologize if I took your question out of context.

16 Q.  No apologies necessary.

17      MR. SHINOFF:  I have no further questions.

18      THE COURT:  All right.  Well, it's time for us to take

19 a break.  See you at -- I'll try to be here at 2:00 or soon

20 thereafter, if I possibly can be.

21      We're in recess.  Thank you.

22      (Luncheon recess)

23

24

25

1      AFTERNOON SESSION

2             2:00 p.m.

3      THE COURT:  Welcome back.

4      MR. SHINOFF:  Thank you, Your Honor.

5      MR. BRIGGS:  Thank you, Your Honor.

6      THE COURT:  Please call your next witness.

7      MR. BRIGGS:  Your Honor, we're going to call T.J.

8   Zane, but I just wanted to let you know that we added one

9   exhibit.  I've updated the paperwork, but I'll need to put an

10  electronic copy on your clerk's thumb drive in between Mr. Zane

11  and the next witness, I just didn't have a chance to give it to

12  him yet.

13     THE COURT:  Okay.  Let's see if we can work through

14  that.  All right.

15  THOMAS JOSEPH ZANE,

16      called as a witness by the Plaintiffs,

17      having been duly sworn, testified as follows:

18     THE CLERK:  Please state your full name for the

19  record, spelling your first and last name.

20     THE WITNESS:  Thomas Joseph Zane, Jr.  T-h-o-m-a-s,

21  Joseph, Zane, Z, as in zebra, a, n, as in Nancy, e, Jr.  Also

22  known as T.J.

23     THE COURT:  Okay.  Have a seat.  Have a seat, T.J.

24      Go ahead, Mr. Briggs.

25     MR. BRIGGS:  Thank you, Your Honor.

1    DIRECT EXAMINATION

2    BY MR. BRIGGS:

3    Q.   Good afternoon, Mr. Zane.

4    A.   Good afternoon.

5    Q.   You are on the Poway Unified School District Governing

6    Board; is that correct?

7    A.   Yes, I am.

8    Q.   Is that an elected position?

9    A.   Yes, it is.

10   Q.   When were you first elected to the office?

11   A.   2014.

12   Q.   When were you elected?

13   A.   2014.

14   Q.   And you've been on the Board continuously since; is that

15   right?

16   A.   That's correct.

17   Q.   Is the Board currently holding in-person meetings?

18   A.   It is.  Modified.

19   Q.   Modified in what way?

20   A.   The Board is present, cabinet, administration is present,

21   but the public is not present.

22   Q.   Okay.  The public participates by Zoom?

23   A.   By Zoom and submitting comments.

24   Q.   Okay.  Before those changes, were members of the public

25   allowed to come and address the Governing Board at meetings in

1   person?

2   A.   Yes.

3   Q.   Did you ever have any members of the public who showed up

4   regularly at meetings to press the same points?

5   A.   Sure.  Yes, we did.

6   Q.   Is it fair to say that there's more than a handful of

7   people who do that?

8   A.   Fair to say.

9   Q.   Okay.  And when they press the same points meeting after

10  meeting, you eventually come to anticipate what it is they're

11  going to say the next time; is that a fair statement?

12  A.   You can often assume what they're going to cover.

13  Q.   In general, you know the people, you know their issues, and

14  you know what they're going to say each time.

15  A.   With a few exceptions.  Some individuals cover a number of

16  topics.

17  Q.   Okay.  But you have others who have a consistent focus,

18  yes?

19  A.   Yes.

20  Q.   Okay.  Does it ever get redundant having to listen to them?

21  A.   I wouldn't say redundant.  It's part of the job.

22  Q.   Okay.  They're not told that they can't come to a

23  subsequent meeting and repeat themselves, correct?

24  A.   Correct.

25  Q.   Do you have a Facebook page that you use related to the

1  subject matter of Poway Unified?

2  A.  I do.

3  Q.  And how long have you had that page?

4  A.  Since approximately 2013.

5  Q.  And that page is different from --

6  A.  Excuse me.  I'm sorry.  2014, I should say.

7  Q.  Five or six years, or six years or so, yes?

8  A.  How long -- I've had it since the Spring or Summer of 2014.

9  Q.  Okay.  But you were -- you were elected in the Fall of

10 2014?

11 A.  Correct.

12 Q.  Okay.  Who has access to the Poway Unified page?  Are you

13 the only one?  As an administrator.

14 A.  The Poway Unified page being the District page?

15 Q.  No, your Poway Unified page.

16 A.  The political campaign page.

17 Q.  Let's -- so let's establish that.

18      You have a personal T.J. Zane page that you use just

19 for friends and family, correct?

20 A.  My profile page, correct.

21 Q.  Okay.  And then you have a second page that you use for

22 Poway Unified School District matters, correct?

23 A.  And campaign matters, political matters, correct.

24 Q.  For both, right?

25 A.  Correct.

1   Q.   Okay.  And on your Poway Unified page, you post Poway

2   Unified subject matter quite regularly, yes?

3   A.   My political campaign page, yes, I do.

4   Q.   Concerning Poway Unified, right?

5   A.   Concerning Poway Unified.

6   Q.   Okay.  Do you, on that particular Facebook page, do you

7   have any rules of etiquette that you require members of the

8   public to follow?

9   A.   There's no established rules of etiquette on there.  Like

10  many Facebook page administrators, to use your term previously,

11  there are settings, one of which precludes individuals from

12  being able to do unique postings to my page, among other

13  settings.

14  Q.   In terms of original comment -- sorry -- in terms of

15  original content, you're the only person who can initiate a

16  post; is that correct?

17  A.   That's correct.

18  Q.   And then members of the public, who haven't been blocked or

19  banned, can then post comments, right?

20  A.   Theoretically.  Practically, no.

21  Q.   What's the difference?

22  A.   I mentioned the ability -- the options -- adjusting the

23  options for my Facebook page to preclude individuals from being

24  able to post a unique post as opposed to a comment on one of my

25  posts.

1    There are -- there's another feature within Facebook

2  for -- on pages that you can go in, and you can set up a --

3  basically, it's a language filter.

4    And so if anybody mentions a particular word, it would

5  preclude his or her words from being posted as a comment on one

6  of my unique posts.

7    And so what I've done is uploaded approximately 2,000

8  different words into my language filter that functionally

9  precludes anyone from being able to post a comment on any one

10  of my posts.

11  Q.   What sort of words have you affirmatively filtered out?

12  Profanity?

13  A.   There are profane words, he, she, it, that, and, we, you.

14  I mean, just about any possible word you can think is most

15  likely to be used in any given post.

16  Q.   When did you do that?

17  A.   Probably in December of 2018.

18  Q.   Why?

19  A.   Prior to that time, I wasn't aware -- I thought my only

20  ability as a Facebook page administrator was to block people

21  from being able to put posts on my page.  But my intention all

22  along was to not utilize the page as a two-way form of

23  communication.

24    When I realized, oh, Facebook has this other

25  functionality, this feature that precludes the ability for

1    anybody to post a comment by putting in this language filter

2    and uploading a ton of words, that had the effect of not

3    allowing, basically, anybody to be able to post anything as a

4    comment to posts on my Facebook page.

5    Q.   When this lawsuit was filed in 2017, were you blocking

6    Chris Garnier and Kim Garnier from your Poway Unified page?

7    A.   No.

8    Q.   Do you know whether they were able to comment?

9    A.   I don't.  And this is actually a technical issue that's

10   never been addressed during this whole deliberation.

11        It's a matter of record, I have blocked them from my

12   personal profile Facebook page.

13        Unbeknownst to anybody who can testify authoritatively

14   to it is whether or not, by default, when I blocked them from

15   my personal profile page, it precludes a person, an individual,

16   from being able to post on any page that I create separate from

17   my profile page.

18        Because to understand in Facebook world, in order to

19   operate within Facebook, first you need to create a profile.  A

20   profile page.

21        After you've done that, you can create a whole series

22   of pages.

23        I have a page for my business.  I have a page for my

24   political and campaign work, and School District related

25   issues.  I have a page for a non-profit organization.  So I'm

1   the administrator for all of those.

2          But if I block somebody from being able to view or

3   post or do anything on my personal profile page, it's my belief

4   that that has the effect of blocking them from being able to

5   post and comment or do anything on any pages that I create

6   within Facebook.

7   Q.  You said that's your belief.  Have you verified that with

8   anybody?

9   A.  I've attempted to find out through Facebook.  I've asked

10  the questions, and I haven't got any answers.

11  Q.  Okay.  So you're speculating as to whether Facebook works

12  that way, you don't know that for sure, correct?

13  A.  Yes, but I can claim that I've never blocked anybody from

14  my Facebook -- my political campaign Facebook page.

15  Q.  Have you ever unblocked anybody from any of your pages?

16  A.  Have I ever unblocked anybody that I blocked from my

17  personal page?

18  Q.  Yeah.

19  A.  I don't know.  Maybe.  I don't know.

20  Q.  Have you ever unblocked Kim Garnier?

21  A.  No.

22  Q.  So in the last three and a half years, you've not changed

23  your settings in Facebook one way or the other with respect to

24  Kim Garnier; is that correct?

25  A.  That is correct.

1  Q.  And within the last three and a half years, have you

2  changed any of your Facebook settings with respect to Chris

3  Garnier?

4  A.  No, I have not.

5  Q.  Okay.  Do you have any reason to doubt that they are unable

6  to post comments -- let me withdraw that.

7          Do you have any reason to doubt that, at this time,

8  Mr. Garnier's unable to post comments on your Poway Facebook

9  page?

10  A.  No.  Because I just stated, I put in a language filter that

11  precludes anybody from being able to comment on my Facebook

12  page.

13  Q.  Before you put in that filter, do you have any doubt that

14  Mr. Garnier was unable to comment on your Facebook page?

15  A.  All I can do is take his word for that.

16  Q.  You don't have any reason to doubt it, correct?

17  A.  I guess not.  I mean, I don't know.  I don't know why he

18  would claim it if it wasn't true.

19  Q.  When did you first start using Facebook?

20  A.  If I had to guess, maybe around 2010, maybe.  A good ten

21  years, at least, probably.

22  Q.  Have you ever deleted a comment that somebody submitted in

23  response to one of your posts?

24  A.  Yes.

25  Q.  Have you ever hidden a comment that somebody submitted in

1  response to one of your posts?

2  A.  Yes.

3  Q.  Can you explain the difference between deleting and hiding?

4  A.  Sure.  When someone posts a comment to a post on your

5  Facebook page, you have the option then of either deleting the

6  comment altogether or hitting "hide".

7       If you hit "hide", it basically means that only the

8  person who posted it and -- I'll just use myself as an

9  example -- I can see the comment.  But members of the public

10  would not be able to see the comment, save friends of the

11  individual, as well.

12  Q.  So let me see whether I heard you correctly.

13       If Cory Briggs were to go post a comment -- let me

14  rephrase that.  I shouldn't use the word "post".

15       If T.J. Zane posts some original content on his Poway

16  page, and Cory Briggs wants to submit a comment in response to

17  it, and let's assume I manage to avoid your 2,000-word

18  filter --

19  A.  Testing 123 is now --

20  Q.  Fair enough.

21  A.  Fair enough.

22  Q.  If you want to delete my comment, there's a "delete" button

23  that would make that comment disappear from Facebook

24  altogether?

25  A.  That's correct.

1  Q.  However, if you want to hide my comment, it wouldn't delete

2  it, it would still show up in my feed, my friends on Facebook

3  could still see my comment to you, but people who are not my

4  friends and visit your page would not see the comment.

5  A.  That's correct.

6  Q.  Okay.  How long did it take you -- well, think of the last

7  time that you deleted somebody's comment.  How long did it take

8  you to delete the comment?  It was just a matter of seconds,

9  right?

10  A.  About the same amount of time it takes to hide a comment.

11  Q.  Which is a matter of seconds, correct?

12  A.  Few seconds.

13  Q.  You essentially click on the comment, and you get a menu

14  from Facebook that asks whether you want to delete it or hide

15  it, correct?

16  A.  Correct.

17  Q.  Couple seconds?

18  A.  Couple seconds.

19  Q.  Not onerous, correct?

20  A.  Not onerous.

21  Q.  Have the Garniers been critical of your performance as a

22  Poway Unified Trustee?

23  A.  Not recently, but in the past, yes.

24  Q.  They never used any profanity against you, did they?

25  A.  No.

1  Q.  They've never threatened your well-being or that of your

2  family, have they?

3  A.  No, they haven't.

4  Q.  Have their criticisms always been of substantive Poway

5  Unified business?

6  A.  No, not always.

7  Q.  What -- when has it deviated from that?

8  A.  There was an instance where there was a series of posts

9  where Dr. Garnier had called into -- misinterpreted something I

10 had said from the dais at a meeting, questioning my motivations

11 for running for School Board that were inaccurate, but they

12 were not germane to school business.

13 Q.  But it was in response to something he heard you say from

14 the dais, correct?

15 A.  That would be correct.

16 Q.  Okay.  So with that one exception, is it fair to say that

17 the Garniers' criticisms of you have all dealt with Poway

18 Unified matters?

19 A.  That would be fair to say.

20 Q.  Okay.

21        MR. BRIGGS:  Your Honor, I would like to show the

22 witness Exhibit 6.  And it would just be the first page of

23 Exhibit 6.

24 BY MR. BRIGGS:

25 Q.  And it should show up on your scene, Mr. Zane.

1  A.  It is.

2  Q.  Does this look to you like what your Facebook page would

3  have looked like in September of 2017?

4  A.  Yes.

5  Q.  And do you see, on the right side of the page, there's a

6  blue box that says "send message"?

7  A.  Yes.

8  Q.  And below that, you see where it says "government

9  official"?

10  A.  I do.

11  Q.  And you were the only person, in September of 2017, who had

12  administrative access to your Facebook page; is that right?

13  A.  That's correct.

14        MR. BRIGGS:  Your Honor, I'd now like to show the

15  witness Exhibit 7.

16  BY MR. BRIGGS:

17  Q.  Mr. Zane, on your screen you should see Exhibit 7.

18        This is the "About" section of your Facebook page in

19  September of 2017.  Do you recognize that?

20  A.  I do.

21  Q.  Is that how your page looked back at that time?

22  A.  Yes.

23  Q.  Sorry to be redundant, but this is Facebook.  In the

24  "About" section, toward the bottom of that page, above where it

25  says "government official", it says, "This is the official page

 1  for T.J. Zane, Poway Unified School District Board Member, to

 2  promote public and political information."  Do you see that?

 3  A.  I do.

 4  Q.  You typed that in, yes?

 5  A.  Yes, I did.

 6          MR. BRIGGS:  Your Honor, I have nothing further for

 7  this witness.

 8          THE COURT:  All right.  Anything, Mr. Shinoff?

 9          MR. SHINOFF:  Yes.  Thank you, Your Honor.

10  CROSS EXAMINATION

11  BY MR. SHINOFF:

12  Q.  Mr. Zane, could you give us a brief thumbnail sketch of

13  your educational background, please?

14  A.  Sure.  Born and raised, went through public school in

15  Connecticut.  I was third in my class.  Went to University of

16  Pennsylvania for my undergraduate.  I got degrees in political

17  science and communications.  That is the extent of my formal

18  schooling.

19  Q.  Okay.  And could you give us just a brief overview of your

20  professional life since graduation?

21  A.  I have worked as a political and public affairs

22  professional and consultant starting in Washington, D.C. for a

23  brief time before coming to San Diego in 1976.

24          I've worked a number of years for myself, as well as

25  the head of the Local Republican Party and the head of a Local

1  Political Action Committee.

2  Q.  Mr. Briggs showed you both a portion of Exhibit 6 and

3  Exhibit 7, I believe, that identifies you as a government

4  official.  Do you recall that?

5  A.  I do.

6  Q.  So both on the first page of Exhibit 6, there's a reference

7  to "government official", and then on the only page on

8  Exhibit 7, that identifies you as a public official --

9  government official, correct?

10  A.  It did then, yes.  Correct.

11  Q.  Are you a frequent user of your Twitter account?

12  A.  Very irregularly.  I don't use it much at all.

13  Q.  Okay.  Have you recently received any notification from

14  Facebook in terms of the ability to you -- for you to identify

15  yourself as a government official on Facebook?

16  A.  I did, in June.

17  Q.  Okay.  And can you share with us what you were notified

18  about from Facebook?

19  A.  Facebook essentially sent an email to a number of its

20  users, particularly administrators of Facebook pages of elected

21  officials and candidates for public office, that essentially

22  said that, beginning June 30 of this year, Facebook was no

23  longer going to allow the title of government official to be

24  used as a moniker on their Facebook pages for political

25  candidates running for office, as well as political candidates

1  who may currently be serving in office and running for another

2  office.  It's just indicative of the changing nature of the

3  platform and the changing rules.

4         At the time that I selected "government official" as

5  the moniker for this, I was given a host of choices to choose

6  from, one of which was "politician", but given that the intent

7  of the Facebook page in and of itself was to present this in as

8  favorable light as possible for campaign purposes, I preferred

9  the term "government official" over "politician".  "Politician"

10  just sounds less nice.

11  Q.  And the notification that you received in June of 2020, was

12  that a notification that you received by email?

13  A.  It is, yes.

14  Q.  So explain us to, if you could, what effect that

15  notification has on your page.

16  A.  So now, if you were to go to my same page, it would

17  reference me as a "political candidate" as opposed to

18  "government official" --

19  Q.  Okay.

20  A.  -- by default.  Facebook just changed it to "political

21  candidate".

22  Q.  Now, when you first -- you mentioned a personal profile

23  page.  Can you explain that for us?

24         THE COURT:  Just a second.  Isn't that misleading,

25  though?  You are a government official, right?

1        THE WITNESS:  I am, yes.  That's correct.  And for

2   whatever reason --

3        THE COURT:  You're a member of the Board of Trustees,

4   right?

5        THE WITNESS:  That's correct.

6        THE COURT:  So to say you're a politician is kind of

7   misleading, because you really are a member of the Board of

8   Trustees, right?

9        THE WITNESS:  For whatever reasons of their own,

10  Facebook decided that it's no longer going to allow candidates,

11  or even elected officials who are running for re-election, to

12  identify themselves as "government official", and changed it by

13  default to "political candidate".

14       THE COURT:  Okay.  All right.

15  BY MR. SHINOFF:

16  Q.  Was there any explanation other than that notification that

17  you were provided with?

18  A.  That's it.

19  Q.  You have -- if I understood you correctly -- you have a

20  personal profile Facebook page; is that true?

21  A.  Correct.  In order to do anything on Facebook, you need to

22  establish yourself -- a presence.  A profile page.  And from

23  there, you can go and create a number of other types of pages

24  within Facebook.

25  Q.  Would it be fair to describe that as a page for friends and

1  family?

2  A.   Yes.

3  Q.   So, for example, if you wanted to post pictures of your

4  children, would you use that particular page for posting?

5  A.   I would.  And I do often, to my wife's chagrin, but yes.

6  Q.   Okay.  And I think you mentioned that you had other pages

7  with Facebook?

8  A.   Correct.

9  Q.   And so the page that you created for Facebook, let's say

10 before you ran for office in the Summer and early Spring of

11 2014, how would you have described that Facebook page?

12 A.   My personal profile page?

13 Q.   Yes -- no.  No.  The page that you used for running for

14 office.

15 A.   It's the same as the one seen here in the exhibit.  The

16 only thing that would have changed over the course of time, and

17 there is -- you can actually see a history of when I changed

18 the name of the page that is displayed across the screen here.

19 For instance, from Spring or Summer of 2014 through election

20 day, it would have read across the bottom "T.J. Zane For School

21 Board" or "For Poway School Board".  I can't remember exactly

22 what it said, "For School Board", or "For Poway Unified".

23        After the election, I changed it to be, across the

24 bottom there, "T.J. Zane, Poway Unified School District

25 Trustee."

1    Shortly, I believe, thereafter, leading into the next

2    election, I changed it back to "T.J. Zane For School Board".

3    And then I believe, if I remember the chronology

4    correctly here, after my latest election, I simply changed it

5    to "T.J. Zane", it doesn't say "Poway Unified School District

6    Trustee" after it, it doesn't say "For School Board", it just

7    says "T.J. Zane".

8    But all the while, the handle, a term I used

9    previously, but the URL that you would type into an internet

10   browser, has always remained, from the very beginning,

11   Facebook.com/ZaneForSchoolBoard, and has remained

12   Facebook.com/ZaneForSchoolBoard since I made the page in 2014.

13   Q.  So drawing your attention to Exhibit 7, for example, if you

14   take a look at the entry of your name of T.J. Zane.  Do you see

15   that?

16   A.  Beneath my -- beneath my picture?

17   Q.  Yeah.  Right above your picture.  I'm sorry.  Right above

18   your picture?

19   A.  Oh, correct.  In the search area.  Yes.

20   Q.  Okay.  So if I were to put in the search area "T.J. Zane",

21   will all of your Facebook pages show?

22   A.  All my Facebook pages entitled "T.J. Zane" -- which there

23   are two, my personal profile page, as well as my political

24   campaign page -- you would see two pages appear.

25   One has -- I believe still has this profile picture on

1   it, and a different profile picture for my personal profile

2   page.

3   Q.  And then your non-profit business, for example, what would

4   I have to search for in order to find that particular Facebook

5   page?

6   A.  If you were to type in San Diego County Prosperity.

7        If you were to type in the name of my business,

8   Dovetail Partners, the Facebook page for Dovetail Partners

9   would come up.

10  Q.  Have you ever considered your Facebook page as a bulletin

11  board?

12  A.  That's primarily what I consider it as.

13  Q.  Could you explain that for us, please?

14  A.  Well, from the very beginning, I established the features

15  on it such that, again, only I would be able to post original

16  posts to the page.

17        My intention was just to show my activity.  Sometimes

18  I'll do a -- I'll do a promotion to raise money for my

19  campaign.  I may do an endorsement of another political

20  candidate that I'll show on this page.  If I visited an

21  elementary school and I have some pictures from the visit to

22  the elementary school, I would post the pictures of my visit to

23  the elementary school.

24        And as I stated earlier, in much the same way as the

25  platform is evolving, the more I use the platform, the more I

1    become knowledgable as to all its features and my abilities to

2    do certain things.

3            It's -- you know, my car is a 2011.  I just discovered

4    six months ago it's got the special release to drop the back

5    seats that I wish I knew about years ago.

6            Now, I can go into Facebook and realize that, wow, if

7    I upload all these words into a language filter, not only can I

8    preclude posts from being able to be posted on my Facebook

9    page, I can preclude comments from being posted on my Facebook

10   page, which is full circle back to my original intention with

11   the creation of this page was to create a one-way form of

12   communication, like a bulletin board, not too dissimilar, one

13   might argue, than the one-way form of communication someone has

14   when they come to speak to a School Board at public comment and

15   the Board can't respond in kind.

16           So two different forms of one-way communication.  I

17   suppose that's the whole intention.  My desire is for my

18   political campaign page to simply be a bulletin board to post

19   the activities I'm involved with.

20           I've even hidden or deleted comments from my own

21   sister.  Because she just will go on there and just -- she

22   likes posting stuff on there.

23           So I've got it now to the point where there's no

24   comments on any -- on any of my posts going way back to when I

25   first created the page.

1  Q.  And are you familiar -- generally familiar with Facebook

2  community standards?

3  A.  Yes, generally speaking, with regard to spamming and all

4  that kind of stuff, yes.

5  Q.  So can you explain -- or share with us your understanding

6  of what Facebook community standards are defined as?

7  A.  I don't know, like, a most particular answer other than to

8  say that it's my general understanding that Facebook advises

9  against individuals posting repetitively to other Facebook

10  pages in a spamming nature.

11  Q.  Have you ever heard or seen the phrase, "Do not post,

12  share, engage content at very high frequencies," as being part

13  of the Facebook community standards?

14  A.  I have not personally read that, but -- I have not

15  personally read that as part of their policy.

16  Q.  Okay.  What is spamming?

17  A.  Spamming would just be a repetitive --

18       I mean, nowadays, everybody gets emails, so we get a

19  ton of emails that they're either unsolicited, or just so

20  repetitive in nature that it's just considered SPAM.

21       It's very similar in the social media context.  If

22  there's a number of posts that are so repetitive in nature,

23  it's akin to spamming the Facebook page or the social media

24  page.

25  Q.  As it relates to Dr. Garnier, did you -- was it your

1    experience that he was repetitively posting on our Facebook

2    page?

3    A.   Yes.

4    Q.   Was he repetitively posting at a high frequency?

5    A.   Yes.

6    Q.   Did the content of those posts -- were they of concern to

7    you?

8    A.   Not particularly.

9    Q.   So then, what was the issue that you had?

10   A.   Again, it just went contrary to just fill up the page.

11   And, you know, I like the page to just be very streamlined,

12   bulletin board nature.

13        And regardless of whether or not a comment is able to

14   be collapsed down so you only see a few lines, to the extent

15   that a comment is repeated over and over again, it does have a

16   net effect of slightly pushing down anything that I would have

17   put up there so it would just look nice and streamlined.

18        To Ms. O'Connor-Ratcliff's credit, she had more

19   patience and diligence in keeping or hiding the posts that

20   Dr. Garnier posted.  I just didn't necessarily see the utility

21   or value in keeping them, and I just deleted them.

22   Q.   Okay.  And at some point in time, I assume around 2014, you

23   began to receive comments on your campaign Facebook page from

24   Dr. Garnier?

25   A.   I believe it would have been after -- after the first part

 1  of 2015, thereabouts --

 2  Q.  Okay.

 3  A.  -- more likely than not.

 4  Q.  And again, were they repetitive in nature, these comments?

 5  A.  They were, but it didn't really, kind of, pick up that

 6  early, to my recollection.

 7          For lack of a better term, there was, sort of, a

 8  honeymoon period after having just been sworn in and,

 9  presumably, the Garniers getting to know us as individual Board

10  members.

11          And I think that the repetitive nature and outreach

12  with regard to, as was testified, Dr. Collins, the former

13  superintendent, really started to intensify probably a little

14  after six months after being on the School Board.

15  Q.  Okay.  And you've heard those comments in open session?

16  A.  There was no shortage of public comments.  There was

17  certainly no shortage of emails sent to the District email

18  address.

19          So I was getting the message loud and clear, not just

20  from the Garniers, but anybody who had the inclination to opine

21  about it.

22  Q.  Did you ever block either Dr. or Mrs. Garnier from your

23  emails?

24  A.  No.

25  Q.  At some point, did you have a concern with the repetitious

1   nature that your original posting was being muted or

2   obliterated by the repetitious nature of the postings?

3   A.   Yeah.   That was part of it.   Plus I testified that I really

4   had no intention of utilizing this as a two-way form of

5   communication.

6          In utilizing it for the purposes of communicating and

7   expecting two-way communication actually put an additional

8   responsibility onto me that I just didn't want to take on.

9          It was cumbersome enough just to stay on top of and

10  keep track of District emails, let alone trying to

11  theoretically conduct any sort of District communication by a

12  Facebook page that was set up for the intention of campaigning.

13  Q.   Why is it that you refer to your Facebook page as a

14  campaign page?

15  A.   Well, as I said, the handle, the URL that you type into a

16  browser is Facebook.com/ZaneForSchoolBoard.   From the very

17  beginning, campaign logos, donation solicitations showing the

18  precinct blocking, endorsements, all that sort of activity

19  taking place on this page.

20         And then, after having been elected and sworn in,

21  sharing the activities that I was taking part in to show that I

22  was being active and engaged, with the mindset of running for

23  re-election in 2018, which I did.

24         So in my view, and particularly as a lifelong

25  political and public affairs professional, you don't stop

1    running for office the day you win, you're essentially running

2    for office, not only before you win, but after you're sworn in,

3    you're running for re-election.  So you never stop running for

4    office until you really decide to hang it up, and that's it.

5    Q.  The filtering of words, when do you recall beginning to

6    utilize that feature on Facebook?

7    A.  The best of my recollection, it would have been shortly

8    after November of 2018, I believe.

9         It's ironic -- and I believe Ms. O'Connor-Ratcliff

10   will talk about this during her testimony -- but I learned of

11   the ability to actually put in the language filter to preclude

12   comments on your posts from Ms. O'Connor-Ratcliff, because

13   prior thereto, I was only limiting posts by other people onto

14   my Facebook page.

15        And to me, it was kind of like one of those ah-ha

16   moments.  I wish I knew about that when I set up the page.  I

17   would have done that earlier, and this would have precluded

18   this whole thing from even happening and being here today,

19   because it would have kept any comments whatsoever and limited

20   it to just my posts.

21        Again, my point of view of things is that, whereas I

22   understand the general consensus and belief is that social

23   media, it does have the ability by its very nature, as was

24   testified even by Dr. Garnier and Ms. Garnier, to be a two-way

25   dialogue.  But at the same time, the platforms themselves have

1    features that users can select to preclude that from being a

2    two-way dialogue.

3          And so those were the options that were my desire from

4    the very beginning, and as I've grown accustomed to using the

5    platform, I've incorporated into use today.

6          Even all the nice things that have been said, too,

7    which I would love to put up there, but that wouldn't be

8    appropriate.

9    Q.  Did any of Dr. Garnier's comments, for example, did they

10   ever end up on your personal friends and family page?

11   A.  They did.  It was the -- I believe the reason why -- or

12   what had led me to block Dr. Garnier and Mrs. Garnier from my

13   personal profile Facebook page, because I didn't want what I

14   had seen them posting elsewhere on friends' pages, on friends'

15   business pages, from being posted on my personal profile page.

16         So, yes, friends did contact me and asked what was

17   going on here.  Apparently, this person in your District is

18   posting stuff on my business page, on my personal page.  But,

19   yes, that did happen.

20   Q.  Was it the repetitious nature of the comments by

21   Dr. Garnier that were of concern to you?

22   A.  Yeah.  Absolutely.  Right?  It's just --

23         You know, I understand having gotten the point across

24   on one post, but then to keep putting it underneath every

25   single post thereafter, it just didn't make sense to me, and it

1  wasn't what I wanted for the page, so that's why I chose the

2  settings that I did.

3  Q.  And since this litigation, Dr. Garnier referred to, I

4  believe, two meetings that occurred between yourself and

5  Dr. Garnier.  Is that your recollection, as well?

6  A.  Yes.  The exact number was more than one.  I don't know if

7  it got to three.  But, yes, sir, he is correct in that.

8          And it's -- ironically, one of those meetings was a

9  result of a communication that occurred on Twitter, the

10  platform that I rarely ever use.

11          And Dr. Garnier had commented on Twitter something to

12  the extent about not being able to get a meeting with me,

13  probably even mentioned Ms. O'Connor-Ratcliff, as well.

14          I must have received notification that I received

15  something on my Twitter feed, so I went to check it out, and I

16  saw this communication from Dr. Garnier, and I acknowledged

17  receipt of it, basically, there in public, and within a few

18  minutes, someone from the superintendent's office was in

19  communication with Dr. Garnier to help facilitate a meeting

20  between me and him and the superintendent.

21  Q.  Okay.  Now, if you could help us understand how the work of

22  the Board is accomplished.

23          As I understand it, you meet -- your five members of

24  your Board have a meeting scheduled throughout the year?

25  A.  That's correct.

1    Q.   Those are regular meetings?

2    A.   Correct.

3    Q.   And then, on occasion, there will be special meetings, as

4    well?

5    A.   That's right.

6    Q.   In order to conduct business, is there a requirement that

7    there be a Board majority present?

8    A.   There is.

9    Q.   As an individual Board member, are you able to take action?

10   I mean, for example, are you able to direct the superintendent

11   to do something in your individual capacity?

12   A.   I am not.

13             MR. BRIGGS:   Your Honor, I'd object to this line as

14   irrelevant in light of your ruling at the very beginning.

15             THE COURT:   You took the words right out of my mouth.

16        I agree.   I think that this is irrelevant,

17   Mr. Shinoff.

18             I think what you're trying to get at is you're trying

19   to get at an issue that was already decided by Judge Whelan, so

20   the objection is sustained.   Okay?

21             MR. SHINOFF:   Thank you, Your Honor.   I will certainly

22   move -- I will certainly move on.

23             THE COURT:   All right.

24   BY MR. SHINOFF:

25   Q.   Your source of learning information from your constituents

1  occurs through email?

2  A.   And public comment, and in our regular meet -- and special

3  meetings, yes.

4  Q.   Okay.  And during the course of the meeting, you will be

5  updated on a whole host of things, as well as hearing public

6  comment, as well, correct?

7  A.   Correct.

8  Q.   Your decision to block Dr. Garnier, did it have anything to

9  do with the content of his messages?

10  A.   No.  And for clarification, just a reminder, I blocked

11  Dr. Garnier and Mrs. Garnier from my personal profile page,

12  they haven't been blocked from my other Facebook pages,

13  including my political campaign page, as well as they've never

14  been blocked from my Twitter feed, as evidenced by the meeting

15  that resulted from a communication on the Twitter feed.

16  Q.   As it relates to your personal friends and family page,

17  have you blocked Dr. and Mrs. Garnier?

18  A.   Yes.

19  Q.   And is there a feature where you can block an individual?

20  A.   There is, as a matter of fact.  That's what I chose to do

21  with my personal profile page.  You can go into the pages that

22  you create after you've created a profile page and select

23  individuals to block from those respective pages.

24       I've never blocked anybody from those pages that I've

25  created.

1    So that goes to my earlier point.  I don't know, I

2    can't speak to, whether or not I blocked them from my personal

3    profile page, if it has the net effect of blocking them from

4    any pages that I create subsequently.

5    But I've never blocked anybody from my political

6    campaign page.

7    Q.  What about your Twitter feed, your Twitter page?  Did you

8    block either Dr. or Mrs. Garnier?

9    A.  No.

10   Q.  Does the Poway Unified School District also have a Facebook

11   page?

12   A.  Yes.

13   Q.  And could you just briefly share with us what it is that

14   that Facebook page is utilized for?

15   A.  Certainly utilized much more than my own political page.

16   The District Facebook page will send out

17   communications regarding adopted -- Board adopted resolutions,

18   changes in school start times, schedule-related issues, just a

19   whole host -- anything you can think of School District related

20   that they're pushing through that District Facebook page on a

21   regular basis -- daily basis.

22   Q.  As an individual Board member, do you have any control over

23   that Facebook page?

24   A.  No.

25   MR. SHINOFF:  Mr. Zane, I have no further questions.

1    I thank you for your patience.

2              THE COURT:  Mr. Briggs?

3              MR. BRIGGS:  Thank you, Your Honor.

4    REDIRECT EXAMINATION

5    BY MR. BRIGGS:

6    Q.  Mr. Briggs, are issues of race a big deal in the Poway

7    Unified School District?

8    A.  They're always a big deal everywhere.

9    Q.  And they've been a big deal as long as you've been on the

10   Board, right?

11   A.  They've always been important, yes.

12   Q.  How about financial issues?

13   A.  Always important.

14   Q.  Government issues always important?

15   A.  Yes.

16   Q.  Management oversight always important?

17   A.  Yes.

18   Q.  Transparency always important?

19   A.  Yes.

20   Q.  Do you recall when it is that you blocked my clients from

21   posting on what you say is your personal page?  Do you remember

22   when that happened?

23   A.  I don't remember the specific year or time, but -- no, I

24   don't recall exactly when.

25   Q.  Was it around the time after you first had been sworn in

1   back in 2014, early 2015?

2   A.   I don't recall exactly when.

3   Q.   Okay.  Is there anything that would refresh your

4   recollection?

5   A.   I wouldn't know that.

6   Q.   My clients have never posted anything on your personal

7   Facebook page, right?

8   A.   Not to my recollection, no.

9   Q.   Okay.  I'd like to have you take a look at Exhibit 6, and

10  in particular, page 34.  Let me put it up on the screen for

11  you.

12          Do you have a picture -- three pictures of lots of

13  people in the room in front of you?

14  A.   Yes, I do.

15  Q.   Okay.  If you scroll down to the bottom, do you see a post

16  by Kim Garnier?

17  A.   Yes, I do.

18  Q.   And the date of that post is June of 2016, yes?

19  A.   I see the post of Mr. McNamara's post, but not

20  Ms. Garnier's.

21  Q.   Your post was June 15 of 2016, correct?

22  A.   That's correct.

23  Q.   And so her comment was likely sometime around June 15 of

24  2016, correct?

25  A.   One can only assume.

1  Q.  You don't have any reason to doubt that, do you?

2  A.  Yes.  Sometimes people go back and post something on a post

3  from over a year ago.

4  Q.  Well, if you had blocked my client at that point, she

5  wouldn't have been able to post, correct?

6  A.  Then I suppose that's right, yeah.

7  Q.  Okay.  And this lawsuit was filed in the latter part of

8  2017, by which point you had blocked my client, right?

9  A.  From my personal profile page, presumably, yes.

10          THE COURT:  Can I ask a question?

11          MR. BRIGGS:  Sure.

12          THE COURT:  So there's a comment here from Ms. Garnier

13  that says, "If only someone had warned the community for the

14  past three years that this man is crooked.  Yeah, we're the bad

15  guys."  I don't know what that means.  But who is the crooked

16  man?  Anybody know who the crooked man is?

17          THE WITNESS:  Referring to former superintendent

18  Dr. Collins.

19          THE COURT:  Who?

20          MR. BRIGGS:  Dr. Collins, the former superintendent.

21  The one who was charged.

22          THE COURT:  Thank you.

23          MR. BRIGGS:  Okay to proceed, Your Honor?

24          THE COURT:  Sure.  Go ahead.

25

1  BY MR. BRIGGS:

2  Q.  So sometime between the filing of this lawsuit and mid June

3  of 2016 is when you blocked my clients, right?

4  A.  I don't know for sure, but if I did block them, like I

5  said, I blocked them from the personal Facebook page.

6  Q.  You have verified that they're unable to post -- let me

7  withdraw that.

8       You have verified, at some point during the pendency

9  of this lawsuit, my clients were unable to post comments on

10 your Facebook page, correct?

11 A.  That is correct.  And anybody else, for that matter.

12 Q.  Okay.  Now, you said that you recently uploaded 2,000 words

13 to prevent people -- anybody from -- I'm sorry, from submitting

14 a comment on your Facebook page, correct?

15 A.  Correct.

16 Q.  So is there anything that anybody can post at this point?

17 A.  Sure.  Anything that's maybe not one of those words.

18 Q.  Is the word "vote" in the 2,000?

19 A.  Vote?  Probably, but I couldn't say with any certainty.

20 Q.  So if I wanted to go to your Facebook page right now and

21 submit a comment that says "Vote for T.J.", I might actually be

22 able to do that, correct?

23 A.  It's possible.

24 Q.  Okay.  Now, you mentioned that Facebook had made some

25 changes about how you designate yourself, right?

1    A.    Correct.

2    Q.    But other than the Facebook changes, you haven't made any

3    substantive changes to your Facebook page, correct?

4    A.    What's substantive?

5    Q.    In terms of the content that's there.  You haven't changed

6    that in any way, correct?

7    A.    May I have changed the description of the page?  Sure.

8    Q.    But in terms of the content that you would post --

9    A.    In terms of what I post?  The type of things that I post?

10   Q.    That remains the same, correct?

11   A.    Fundamentally, yes.

12   Q.    Yeah.  And that's remained the same the entire time you've

13   had the page, correct?

14   A.    That's correct.

15   Q.    Okay.  When you're doing public meetings, do you pay

16   attention to the public speakers?

17   A.    I do.

18   Q.    You've never fallen asleep, right?

19   A.    No, I have not.

20   Q.    And you've never walked out on any speakers, correct?

21   A.    Correct.

22   Q.    When you're on Facebook, have you ever seen a comment that

23   was long enough that the words "See more", s-e-e, m-o-r-e,

24   appeared so you would have to click on it to see the whole

25   comment?

1   A.   Sure.

2   Q.   Have you ever clicked on those comments?

3   A.   Occasionally.

4   Q.   Have you ever seen comments like that from people other

5   than my clients?

6   A.   Rarely.

7   Q.   But you have.

8   A.   Yes.

9   Q.   And people other than the Garniers have been able to

10  comment on your Facebook page, correct?  Or your Poway Facebook

11  page, correct?

12  A.   In the past, yes.

13  Q.   You mentioned that you viewed the page as a kind of

14  bulletin board.  Did I understand that correctly?

15  A.   Correct.

16  Q.   Does that mean you're trying to disseminate information to

17  Poway Unified residents and voters?

18  A.   That's correct.

19  Q.   Fair to say you're trying to educate the public?

20  A.   As to my activities and, sure, occasionally an important

21  piece of information, yes.

22  Q.   I mean, if -- for example, I think one of the posts I saw

23  you do was about a school going into lockdown.  There was some

24  threat at a school, and I think you posted that the lockdown

25  had been cleared, yes?

1   A.   That's correct.

2   Q.   You were trying to let parents and the community know that

3   everything was safe, the kids were safe, right?

4   A.   That's correct.

5   Q.   So you use this as a way of distributing information about

6   Poway Unified official business, yes?

7   A.   And my own political activities, yes, as a bulletin board.

8   Q.   And when you're in between elections, you are just a

9   Trustee, right?

10  A.   No.

11  Q.   Well, isn't there an official legal campaign season?

12  A.   You're -- no.  You're officially a candidate running for

13  office as long as you have a political campaign for re-election

14  open with the Fair Political Practices Commission.

15  Q.   Well, you don't get to fundraise for four years straight.

16  A.   You can.  There are no prohibitions to doing that in School

17  Board races.  And just last month, I did a post on my School

18  Board Facebook page soliciting contributions to my re-election

19  campaign for 2022, and received about 3, $400.

20  Q.   You just started that recently, right?

21  A.   Started what?

22  Q.   For 2022.

23  A.   No.  Actually, I filed my 2022 re-election paperwork, I

24  believe within a month or two after being re-elected in 2018.

25  Q.   Are you trying to use the following that you build as a

1  Poway Unified Trustee to help you get re-elected?

2  A.  No.  Arguably, I have more of a following on my personal

3  Facebook page.  So if I were -- you know, one could argue I can

4  get more mileage politically out of my personal page, but I

5  won't utilize my personal campaign -- my personal profile page

6  for that.

7  Q.  So you don't actually get much political mileage out of the

8  Poway Unified Facebook page; is that what you're saying?

9  A.  Well, I think, like any candidate, you need to maintain a

10  website.  And it's great to have a social media site.  Those

11  are just the basics that you do as a campaign -- as a candidate

12  for office.

13  Q.  Yeah.  And you're trying --

14  A.  I don't know if you get much mileage out of it, that's just

15  what you do.

16  Q.  You're trying to maintain some good will with the voters in

17  between election seasons?

18  A.  Sure.

19  Q.  And so if you were to change your Facebook official

20  designation, you'd actually have to start over building a

21  following; isn't that correct?

22  A.  I don't know if I follow your question.

23  Q.  Well, if you were to open a new Facebook page every time

24  you ran for election, as opposed to using the one that's the

25  subject of this lawsuit, you'd have to start all over getting

1   people to follow you, correct?

2   A.   Yeah, theoretically.  I don't know that I'd mind.  It's

3   more of a function of convenience that I maintain the same one.

4          THE COURT:  Mr. Briggs, I'm going to interject my own

5   objection.

6          MR. BRIGGS:  Sure.

7          THE COURT:  I'm not sure -- what's the relevance of

8   this?

9          MR. BRIGGS:  I'm -- the relevance goes to that he's

10  using it for Poway Unified business.  They're trying to create

11  this defense that it's not really about Poway official

12  business --

13         THE COURT:  I thought that had already been decided by

14  Judge Whelan, and that I had said that was not -- no longer an

15  issue.

16         In fact, I thought Mr. Shinoff started to venture into

17  that area, and I was thinking -- I was about to interject an

18  objection on my own when you did.  So --

19         MR. BRIGGS:  I actually got to the end of my question

20  on that line, so I'll --

21         THE COURT:  Oh, good.

22         MR. BRIGGS:  -- I'll save you an objection.

23         THE COURT:  Great.  Thank you.

24         MR. BRIGGS:  Fair enough.

25         THE COURT:  I appreciate it.

1    MR. BRIGGS:  I appreciate your kid gloves in telling

2 me to move on.

3    THE COURT:  Haha.  I've never been accused of having

4 kid gloves, trust me.

5    MR. BRIGGS:  You handled that very diplomatically,

6 Your Honor.

7    I don't have any further questions for the witness,

8 sir.

9    THE COURT:  All right.  Anything else?

10    MR. SHINOFF:  Nothing further, Your Honor.

11    THE COURT:  All right.  Thank you, sir.  You may step

12 down.

13    (Witness excused)

14    THE COURT:  Please call your next witness.

15    MR. BRIGGS:  Michelle O'Connor-Ratcliff, Your Honor.

16    MR. SHINOFF:  Your Honor, may we take a brief recess

17 for the restroom?

18    THE COURT:  A restroom recess?  Okay.

19    So according to my watch, it is 3:00.  Let's be back

20 at quarter after.

21    I understand we have a new judge.  The new judge is

22 going to be sworn in at 4:30, so I need to be at his

23 swearing-in function, so we will probably break about 20

24 minutes after 4:00.  Okay?

25    MR. SHINOFF:  Very good.  Thank you, Your Honor.

1     MR. BRIGGS:  Thank you.

2     THE COURT:  We're in recess.  Thank you.

3     (Recess)

4     THE COURT:  Welcome back.  Please call your next

5  witness.

6     MR. BRIGGS:  Your Honor, it will be Michelle

7  O'Connor-Ratcliff.

8     And I have this additional exhibit to give your

9  courtroom deputy.

10     THE COURT:  All right.  Ms. O'Connor-Ratcliff, if

11  you'd please raise your right hand and be sworn.

12   MICHELLE O'CONNOR-RATCLIFF,

13      called as a witness by the Plaintiffs,

14      having been duly sworn, testified as follows:

15     THE CLERK:  Please state your full name for the

16  record, and spell your first and last name.

17     THE WITNESS:  Michelle O'Connor-Ratcliff.

18  M-i-c-h-e-l-l-e, O, apostrophe C-o-n-n-o-r, hyphen,

19  R-a-t-c-l-i-f-f.

20     THE COURT:  Go ahead.

21  DIRECT EXAMINATION

22  BY MR. BRIGGS:

23  Q.  Good afternoon, Ms. O'Connor-Ratcliff.

24      You are on the Poway Unified School District Governing

25  Board, yes?

1   A.   Yes.

2   Q.   How long have you been on that Board?

3   A.   Since December 2014.

4   Q.   Elected to that position, correct?

5   A.   Yes.

6   Q.   Do you have a Twitter account?

7   A.   I do.

8   Q.   Do you have a Facebook account?

9   A.   Yes.

10  Q.   How many Facebook accounts?

11  A.   Two.

12  Q.   Is one personal and one for Poway Unified business?

13  A.   Yes.  Campaign, but we can talk about that some other time.

14  Q.   Yeah.

15       MR. BRIGGS:  Move to strike everything after the

16  "yes".

17       THE COURT:  Haha.  Okay.  We'll strike.  I'll pretend

18  I didn't hear her.

19  BY MR. BRIGGS:

20  Q.   I would like to -- let me do it this way.

21       When you were attending meetings preCOVID, when the

22  public could come, were you ever there when public speakers

23  spoke?

24  A.   Of course, yes.

25  Q.   Yes.  And there's a non-agenda public content where people

1    can talk about anything under the sun related to Poway Unified,

2    correct?

3    A.   Correct.

4    Q.   And then on each particular agenda item, the public can

5    direct its comments to that agenda item, yes?

6    A.   Yes.

7    Q.   I call them frequent flyers.  Other people have different

8    names.  But do you ever have members of the public who come and

9    speak on repetitive subject matter?

10   A.   Some.

11   Q.   And they normally do that during non-agenda public comment?

12   A.   Yes.

13   Q.   Do you walk out on them?

14   A.   No.

15   Q.   Do you turn off their microphones?

16   A.   If they go over their allotted time, yes.

17   Q.   But if they come and tell you the same thing meeting after

18   meeting after meeting during their three minutes, you sit there

19   and listen to them, correct?

20   A.   I do.   That's the perfect forum for it.

21   Q.   Okay.   On your Poway Unified Facebook page, have you ever

22   posted any rules of etiquette?

23   A.   No.

24   Q.   So somebody who goes to your Poway Unified Facebook page

25   would not know what rules you've imposed for submitting

1    comments to your posts; is that correct?

2    A.   That's correct.

3    Q.   Okay.  Is Mr. Garnier currently blocked from posting on

4    your Facebook page?

5    A.   Yes.

6    Q.   And is Ms. Garnier currently blocked from posting on your

7    Facebook page?

8    A.   Yes.

9    Q.   Is Mr. Garnier currently blocked from tweeting with your

10   Twitter handle?

11   A.   I think so.

12   Q.   He can't tweet to you; is that correct?

13   A.   I don't know that.  I know that he cannot respond to my

14   posts on Twitter.

15   Q.   Okay.  And that's because you affirmatively changed your

16   settings to prevent him from responding to your tweets,

17   correct?

18   A.   Yes.

19   Q.   Okay.  When did that happen?

20   A.   I believe that was October 2017.

21   Q.   And is that the same time when you blocked the Garniers

22   from your Facebook posts?

23   A.   Around that time, yes.

24   Q.   I'm sorry.  I said Facebook posts, I meant your Poway

25   Facebook account.

1    A.   Yes.  I understood.

2    Q.   Sometime in late Summer, early Fall of 2017; is that right?

3    A.   I think Octoberish, but I would have to check to be sure.

4    I'm not positive.

5    Q.   Okay.  I want to show you an exhibit we've marked as 19.

6    And I'm going to show you four pages marked MOR00001 through

7    000004.  They should appear on your monitor in just a moment.

8         Do you see the first one?

9    A.   I do.

10   Q.   I apologize.  This is how I got it from you.

11        But this is what appears to be a printout of your

12   Poway Facebook page.  Do you recognize it as such?

13   A.   Looks like it.

14   Q.   And do you understand that, during discovery in this case,

15   you exchanged some documents with -- your lawyer exchanged some

16   documents with my office.  Do you understand that?

17   A.   Yes.

18   Q.   Okay.  If we look at pages 2, 3, and 4 -- let me know when

19   you're done -- page 2 has a comment from Chris Garnier.

20   A.   Mm-hmm.

21   Q.   Do you see that?

22   A.   Mm-hmm.

23   Q.   Yes?

24   A.   Yes.

25   Q.   Okay.  And then page 3 has a comment from Kim Garnier and a

1   Bridget Sandoval.  Do you see that?

2   A.  Oh.  This would have been the exact day that I blocked

3   Mr. Garnier.

4   Q.  Okay.  That's good that I'm helping to trigger your memory.

5           If we look at page 4, you also recognize this post by

6   you on July 21 of 2018.  Do you recognize that?  Yes?

7   A.  I'm looking.

8   Q.  Okay.

9   A.  Yes.

10          THE COURT:  Can you go back for just a second?

11          MR. BRIGGS:  Sure, Your Honor.  Which page, 3 or 4?

12          THE COURT:  I'm trying to -- I just saw something.

13          "Why are you blocking people who disagree with you?

14   Your ego for being wrong is so embarrassing."

15          That doesn't sound like a response to a post.

16          MR. BRIGGS:  Are you reading on page 3, Your Honor?

17          THE COURT:  I think it's -- yeah, it is page 3.

18          MR. BRIGGS:  I don't see where you're -- oh, I see.

19   Yes.  At the top.  Kim Garnier's post.

20          THE COURT:  That doesn't sound like a response to a

21   post to me.  Is it?

22          MR. BRIGGS:  I don't know what it's responding to.

23   I'm about to ask a question about it.

24          THE WITNESS:  I do.

25          THE COURT:  Okay.

1    BY MR. BRIGGS:

2    Q.  So Ms. O'Connor-Ratcliff --

3           MR. BRIGGS:  Or, Your Honor, do you have a question,

4    or can I proceed?

5           THE COURT:  No.  I just -- it didn't sound to me, when

6    I read that real quickly, as you were going through it, it

7    struck me that that doesn't sound like a constructive response

8    to a post.  But anyway, go ahead.

9    BY MR. BRIGGS:

10   Q.  So I'm looking back at page 1.

11          On page 1, toward the bottom, there's a line that goes

12   across, and the superintendent search image is, sort of, cut

13   off, and then the bottom of it is skewed.

14          And you can see in the bottom part of the image, it

15   actually says "Michelle O'Connor-Ratcliff" again --

16   A.  Mm-hmm.

17   Q.  -- which is what's up above.  Do you see that?

18   A.  (Non-verbal response.)

19   Q.  Does this look like each page has got multiple screen shots

20   that overlap on it?

21   A.  Yes, I believe so, because the left-hand side would stay at

22   the top --

23   Q.  Right.

24   A.  -- as you're scrolling through, yes.

25   Q.  And the same on page 2.  We actually have three partial

1   screen shots.  Do you see that?  The top inch or so, then

2   another couple inches, and then another couple inches.  Do you

3   see that?

4   A.   Looks like it's overlapping.  I would have to read every

5   word on this to know for sure.

6   Q.   Well, I'm looking on the left, you know, and one place I

7   see endorsements and photos, but then I see that repeated --

8   A.   Mm-hmm.

9   Q.   -- with a different section of the window.

10          And then, when I go to page 3, I see the same thing.

11  It looks like two overlapping images.  Do you see that?

12  A.   On the side, yes.

13  Q.   Okay.  I just want to make sure that I'm interpreting it

14  the same way, because it came from you, and I want to make

15  sure, before I ask you the questions, I understand that we have

16  overlap.  Yes?

17  A.   I assume that's because it took more than one screen to see

18  a whole page?  I don't know.  But, yes.

19  Q.   Okay.

20  A.   Yes, there's a little bit of overlap, yes.

21  Q.   Fair enough.

22          On page 2, toward the bottom, above the Chris Garnier

23  post -- I'm going to make this bigger -- just above where it

24  says "Christopher Garnier", do you see the word "unhide"?

25  A.   Yes.

1  Q.  These comments from my client were hidden by you, correct?

2  A.  Probably automatically, based on my word requirements that

3  Mr. Zane has described --

4  Q.  Okay.  Well, when did you --

5  A.  -- previously.

6  Q.  -- when did you put in those word requirements?

7          And let me back up.  When you say "word requirements",

8  you mean words that would be filtered out?

9  A.  Yes.

10  Q.  So you entered words into Facebook that would allow it to

11  not post certain content from members of the public who submit

12  comments; is that right?

13  A.  It's intended to stop every post --

14  Q.  Okay.

15  A.  -- not certain members of the public.

16          I object to the way you stated that.  That's not how I

17  intended it.

18          All members of the public who put such crazy words

19  like "the" in their posts, yes.

20  Q.  Okay.  But you went in and used some function to hide the

21  comments, correct?

22  A.  No.  I didn't have to do that automatically.  If they fell

23  within -- if any of their comments had any of the filtered

24  words -- and Mr. Zane said he had about 2,000, I have about 20,

25  so mine is not nearly as extensive as his -- but it was good

1  for blocking almost every comment.

2  Q.  And when did you do that?

3  A.  You just asked me that a minute ago, and I'm trying to

4  decide.  Probably 2017.

5  Q.  You didn't mention that during your deposition, did you?

6  A.  No.  You didn't ask.

7  Q.  Okay.  And how did you learn about this filter function?

8  A.  It was when I was getting -- already getting spammed by

9  your clients, and looking for a way to prevent spamming that

10  was less intrusive than a complete block.

11        And I did a search on Facebook.  They didn't allow you

12  to block all comments.  I blocked posts, but I couldn't block

13  all comments in the settings that they had at that time.

14        They're changing their settings all the time, so I

15  would expect that that's probably something that could pop up

16  in there tomorrow.

17        But on a Google search, there are a lot of message

18  boards that talk about ways that you could try to do that.  And

19  this -- you know, using the 15 most common words in the English

20  language was one of the suggestions, so I did that --

21  Q.  But --

22  A.  -- and I succeeded in blocking nearly everything.

23  Q.  And --

24  A.  And that's not true.  It wasn't nearly everything, because

25  some things -- like names.  If someone was going to tag another

1  person, I can't possibly filter out everyone's name.  But it

2  would automatically hide those once I implemented that.

3  Q.  So using the filter has been largely effective; is that a

4  fair statement?

5  A.  It wasn't at first.  I was still learning how it worked.

6  It wasn't effective.

7       At this point, yes, it's nearly entirely effective.

8       In fact, Facebook has changed from this "hide/unhide"

9  language, they don't show it at all.  You have to -- it'll say

10 that -- it might have a dot dot dot to indicate that there was

11 a post, and I would have to physically go in and find it as --

12      Facebook has changed that recently, though.  It didn't

13 used to be that way.

14 Q.  So if the filter is pretty much effective, why are my

15 clients still blocked?

16 A.  At the time that they were blocked, they weren't -- it

17 wasn't effective, and they were spamming me repetitively.

18 Q.  So -- but they're still blocked today?

19 A.  They are.

20 Q.  And you said that the filtering has been effective?

21 A.  It has.

22 Q.  So why are they stilled blocked today?

23 A.  If I decided to take the filter off, if I decided to use my

24 page in a different way, they would be free to SPAM again.

25 Because I've changed the way I've used my page many times.

1   Q.   So do you think issues of race are important?

2   A.   Of course.

3   Q.   Do you think issues of financing are important?

4   A.   Yes.

5   Q.   And transparency is important.

6   A.   Yes.

7   Q.   Do you think it's important to be accessible and responsive

8   to your constituents?

9   A.   To my constituents, yes.

10  Q.   Do you think it's important to hear their feedback?

11  A.   I do, yes.

12  Q.   Do you think it's important to hear their criticisms?

13  A.   Sure.

14  Q.   Do you know how to delete a Facebook comment that somebody

15  submits?

16  A.   Yes.

17  Q.   When did you learn to do that?

18  A.   When my mother submitted something very cutsie on my

19  political page.

20  Q.   When was that?

21  A.   I decided that wasn't appropriate, I deleted it, and then

22  had to call and tell her, "Don't post on my page anymore.  Post

23  on my personal page."

24  Q.   When was that?

25  A.   I don't know.  I'm not sure.  Probably in 2014 before I was

1   elected.

2   Q.  What sort of comments can somebody submit today with the

3   filters?

4   A.  Generally, tagging someone by name would make it through.

5           THE COURT:  Excuse me.  What does that mean?

6           THE WITNESS:  If you want to draw someone's attention

7   to a post, sometimes in a comment, under the post, you would

8   just put their Facebook handle, and it would -- I guess it

9   pings on their regular Facebook page and tells them they should

10  come look at this.

11          MR. BRIGGS:  Let me make an offer of proof to try to

12  help you, Your Honor.

13          THE COURT:  Go ahead.

14          MR. BRIGGS:  I assume you're familiar with email.

15          THE COURT:  Yes.

16          MR. BRIGGS:  So in Facebook, and Twitter as well, you

17  are given a unique handle --

18          THE COURT:  Okay.

19          MR. BRIGGS:  -- @something.  So right now it might be

20  JudgeBenitez@CASD, something like that.

21          If you were in Twitter or Facebook, it might be

22  something like @JudgeBenitez, and that would apply only to you.

23          THE COURT:  Okay.

24          MR. BRIGGS:  And if somebody wanted to send you a

25  message, or include you -- like, let's say I wanted to tweet

1    that I was in trial with Judge Benitez this week, I would

2    tweet, "I was in trial with @JudgeBenitez," and if you were on

3    Twitter, everybody who follows you, if you were on Facebook,

4    everybody who follows you would see my comment that I was in

5    trial with Judge Benitez.

6              But the code that you give is @JudgeBenitez.

7              Is that fair, my colleague?

8              THE COURT:  I hear no objection, so I'm going to

9    assume that's accurate.

10             MR. BRIGGS:  Yeah.  His grandkids could testify that

11   what I'm telling was correct.

12             THE COURT:  Yeah.  That's the scary part.

13             (Laughter)

14             THE COURT:  That's really the scary part about all of

15   this is that our kids and grandkids could probably -- all

16   right.

17             MR. BRIGGS:  Hopefully that helps you understand.

18             THE COURT:  Somewhat.  Go ahead.

19             MR. BRIGGS:  Okay.

20   BY MR. BRIGGS:

21   Q.  I can't remember the last question I asked you.

22             Oh.  You had -- I had asked you what somebody could

23   post, and I think you said, if somebody wanted to tag somebody,

24   they could do that because you can't block names.

25   A.  Yeah.

1  Q.  If I wanted to -- I'm not blocked on your Facebook page, am

2  I?

3  A.  No.  But if you wanted to put "Testing 123", like you did

4  right before you filed this suit, at the time, that got through

5  my filter.  I added "testing" after that.

6  Q.  Okay, good.

7          If I wanted to comment and say "Vote for Michelle" --

8  A.  Mm-hmm.

9  Q.  -- could I post that comment today?

10  A.  No.

11  Q.  How come?

12  A.  I'm sure "for" is one of those words that's blocked.

13  Q.  How about if I just wanted to say "Vote Michelle"?

14  A.  I'm pretty sure my name is blocked, as well.  Because I did

15  put "Michelle", "Poway", "Unified", "School", "District".  So I

16  blocked those, as well.

17  Q.  Okay.  So --

18  A.  I think it would be hard to get to that post without using

19  one of those 50 most common words in the English language, but

20  a little overkill never hurt anybody.

21  Q.  You do still get some comments, though, correct?

22  A.  Very rarely something pops through.

23  Q.  At the break, I was scanning your Facebook page and noticed

24  that, on your post, you still have half a dozen to a dozen

25  comments here and there --

1   A.   Really?

2   Q.   -- other than just --

3   A.   That surprises me.

4   Q.   Okay.  That's -- I wasn't testifying, I was going to ask

5   you whether that would surprise you or not.

6   A.   It does surprise me.

7   Q.   It does surprise you.

8   A.   I should get through there and start to, yeah, filter those

9   out.

10  Q.   When is the last time you saw somebody's comment on your

11  Facebook page?

12  A.   Maybe a couple weeks ago.

13  Q.   Do you remember what the comment was?

14  A.   "Meaningful".

15  Q.   That's all it was?

16  A.   Mm-hmm.

17  Q.   "Meaningful"?  The word "meaningful"?

18  A.   So that made it through my filter, yes.

19  Q.   Since you've used the filter, has anybody commented

20  anything nice about you?

21  A.   "Meaningful" was a nice comment about the students that I

22  was talking about.

23  Q.   Ah.  You posted something about students, and then the

24  person's reaction was "meaningful" --

25  A.   Mm-hmm.

1   Q.   -- as if to say this is a meaningful post.

2   A.   Yes.

3   Q.   Got you.

4   A.   But as I'm now attempting to block all posts, I immediately

5   hid it as soon as I saw it.

6        So the fact that you have seen some that made it

7   through tells me that I'm not doing my job, and I'm even

8   getting their "hide all", and this is accidentally showing up.

9   Q.   And why is it that you don't want the public to see

10  comments on your Facebook page?

11  A.   That's not the way I'm intending to use it at this point.

12       When I first started using Facebook as a campaign

13  tool, I also had a website, and a newsletter for supporters,

14  and I posted the exact same thing on Facebook, newsletter,

15  website.  That is how I used it.  As Mr. Zane put it, it was a

16  bulletin board.  I was informing people what I was up to.

17       They were invited to email me their thoughts to my

18  campaign email address at that time.  That was

19  Michelle@MOR4PUSD.com.  That exists still.  I still have people

20  email at that address.

21  Q.   At one point, you had your Poway Unified email address on

22  your Facebook page, correct?

23  A.   I did.

24  Q.   And did anyone respond to that email address?

25  A.   I get a ton of emails at that email address.  I don't know

1    how many of them came at it through my Facebook page.

2           My Facebook page also linked to my campaign website,

3    and still does.  And when my website was hacked, I directed it

4    to that hacked site.  I didn't rebuild it right away, and I

5    directed it to the Facebook page.

6    Q.  Is it still true that the only people who are blocked on

7    your Facebook page, setting aside the filter issue --

8    A.  Mm-hmm.

9    Q.  -- only people who are blocked are my clients and

10   Ms. Garnier's father?

11   A.  Yes.

12          MR. BRIGGS:  Your Honor, I have no further questions.

13          THE COURT:  All right.

14          MR. SHINOFF:  Thank you.

15   CROSS EXAMINATION

16   BY MR. SHINOFF:

17   Q.  Good afternoon, Ms. O'Connor-Ratcliff.

18   A.  Good afternoon.

19   Q.  Would you just briefly share with us your educational

20   background, please?

21   A.  I grew up in Poway Unified.  I went there from preschool

22   through high school graduation.  Went to Stafford University,

23   and then Hastings Law School.

24   Q.  And after graduating from Hastings Law School, were you

25   admitted to the Bar?

1   A.   Yes.

2   Q.   And did you practice law?

3   A.   I did.

4   Q.   Just briefly, share with us.

5   A.   Three years at the California Legislative Council Bureau in

6   Sacramento.  And then in Los Angeles for a litigation -- small

7   litigation firm, insurance litigation firm.

8   Q.   And do you currently teach?

9   A.   Yes.  I teach business law at the University of San Diego.

10  Q.   And how long have you been doing that?

11  A.   Eight years.  That's a part-time.  I don't teach every

12  semester, but usually one class a semester with some -- some

13  non-teaching times, usually, when I'm running for re-election.

14  Q.   You filed your papers to run for office sometime in the

15  Summer of 2014; is that true?

16  A.   That's true.

17  Q.   And I think, if I understood you correctly, you used a

18  couple of different medium to share information; one was

19  Facebook, true?

20  A.   True.

21  Q.   Okay.  And you -- I think you described it as your campaign

22  page.  Was that true?

23  A.   Yes.  I had a personal page before that -- well, and

24  continue to have a personal page.

25  Q.   Why do you refer to it as a campaign page?

1   A.   That's what I built it for.

2   Q.   Okay.

3   A.   And it's a little bit -- it doesn't run the same way.  It

4   doesn't have the same rules as a personal Facebook page,

5   either.

6   Q.   Okay.  Your personal Facebook page, is it fair to say

7   that's about contact and sharing with family and friends?

8   A.   Yes.

9   Q.   And pictures of kids and relatives?

10  A.   Absolutely.

11  Q.   The newsletter that you referred to, when did you begin

12  publishing your newsletter?

13  A.   During my campaign in 2014, in mid Summer 2000 -- actually,

14  probably late Spring, 2014.

15  Q.   And one of your passions, as a Trustee, is a focus on

16  special education?

17  A.   That's correct.

18  Q.   You also talked about having a website.  Was that website

19  created in or around the same time you ran for office?

20  A.   Yes.

21  Q.   And if I were to want to access your campaign page, how

22  would I go about searching for it?

23  A.   You mean the web page or the Facebook page?

24  Q.   Facebook page.

25  A.   I believe it comes up if you put Michelle O'Connor-Ratcliff

1  in, but MOR4PUSD, as in my initials, Michelle

2  O'Connor-Ratcliff, MOR4PUSD, which is on all of my campaign

3  literature and signs.  It's easy to find.

4  Q.  The reference for MOR4PUSD, is that something that's also

5  contained within your email address, or not?

6  A.  Yes.

7  Q.  Okay.  And I think you said you received tons of emails?

8  A.  Yes.

9  Q.  Okay.  And have you received emails --

10 A.  I believe Mr. Briggs' question, though, was regarding my

11 Poway USD email address.

12 Q.  Yes.  I apologize.  Thank you for clarifying that.

13 A.  Yes.

14 Q.  So my reference is your Poway Unified School District

15 account.

16      Each Trustee is afforded an email account?

17 A.  Correct.

18 Q.  Okay.  And is that posted somewhere?  If I went on a Poway

19 Unified website, would I see your email address --

20 A.  Yes.

21 Q.  -- posted?

22 A.  Yes.

23 Q.  And you indicated that you get tons of email.  Are you

24 referring to your Poway account?

25 A.  Yes, I am.

1    Q.  And the receipt of emails, has that changed at all since

2    you have gone from general representation to the Trustee area

3    of representation?

4    A.  I still get emails from all over the District, but it's

5    fair to say that when I'm slammed with emails, when there's a

6    big issue that comes up, I -- I can't possibly respond to 200

7    emails, for instance, before this Thursday's Board meeting.

8    Q.  Okay.

9    A.  I will definitely focus on the ones who are actually my

10   constituents.

11   Q.  Have you ever gone to the effort of counting the number of

12   emails that you have received from Dr. and Mrs. Garnier?

13   A.  Yes.

14   Q.  And how many emails have you received?

15   A.  780.

16        THE COURT:  I'm sorry.  How many?

17        THE WITNESS:  780.  I have never deleted any, so I put

18   them in a folder --

19   BY MR. SHINOFF:

20   Q.  Okay.

21   A.  -- labeled with their last name, and that's -- I didn't

22   have to count each one, I just ask at the top of the folder how

23   many -- how many emails are in here.  780.

24   Q.  If we could focus in on your Facebook page, your political

25   campaign Facebook page.

1          At some point in time, I think you were describing it,

2    your intention, at least, was to use it as a bulletin board; is

3    that fair enough?

4    A.   Yes.  I wanted to use it in the same way -- posting things

5    I was working on, and things that were going on in the

6    District.  The same way I did on my website.  Post an event,

7    then post the same one in the newsletter, and the same one on

8    the Facebook page.  Yes.

9    Q.   Was the purpose of your Facebook page to engage with

10   constituents, or was it more about pushing out information?

11   A.   Always pushing out information.  I was trying to figure out

12   the best way to do that.  I was learning how to do that on

13   Facebook.  And it took a while.

14   Q.   Now, Mr. Briggs had asked you whether you post anything

15   about etiquette -- your expectations in terms of etiquette, and

16   I think you indicated that you have none.

17   A.   No, I don't.

18   Q.   Okay.  As a Facebook user, are you aware of standards

19   that -- or community standards that are defined by Facebook?

20   A.   Yes, very much so.

21   Q.   Okay.  And can you share with us what your understanding is

22   of them?

23   A.   Well, after the Garniers had been spamming my page for

24   quite a while, I was concerned.

25          I looked up all of Facebook's community standards,

1  their definitions of spamming, what's allowed and what's not.

2        What they were doing on my page clearly fell within

3  the definition of spamming, so I reported it to Facebook on two

4  separate occasions.

5        Facebook did tell me they were looking into it, and

6  their response also suggested that I block them.

7  Q.  Okay.  In terms of --

8  A.  I didn't do that right away, though --

9  Q.  Okay.

10 A.  -- I was looking for a better way.

11 Q.  In terms of community standards and definitions from

12 Facebook, are you familiar with a standard that indicates that

13 a user is not to post, share, engage with content at very high

14 frequencies?

15 A.  Yes.

16 Q.  Are you familiar with a specification in terms of Facebook

17 community standards that SPAM creates a negative user

18 experience and detracts from people's ability to engage

19 authentically?

20 A.  Yes.  I think no one said it better than Facebook itself.

21 They know what SPAM does to a user's experience.

22 Q.  Was it a concern of yours that Dr. and Mrs. Garnier were

23 posting comments frequently?

24 A.  Yes.

25 Q.  Was it a concern of yours that they were spamming the

1  message that you were attempting to send out?

2  A.  They were spamming in something unrelated.  They claim that

3  everything was related to Poway Unified, but that is as broad

4  an umbrella as possible.  And it wasn't always about Poway

5  Unified anyway.  That's untrue.

6  Q.  Was your concern at all the content of their comments?

7  A.  When they post the same thing over a period of a few days

8  42 times, it's not about the content.

9  Q.  Okay.  Did you ever have occasion where they posted

10  comments in excess of 200 times?

11  A.  That was my Twitter feed.  Yes.  When they discovered that

12  I actually have a Twitter feed -- because I had that under a

13  different handle while I was trying to learn how to use

14  Twitter -- but very shortly after I changed it to @MOR4PUSD,

15  Mr. -- Dr. Garnier found it, and I believe he posted the same

16  exact thing on every tweet I had ever made, even before I was

17  posting about Poway Unified.

18        And that was 226 tweets, I believe, all at the same

19  time, within a span of five or ten minutes.  I don't even know

20  how he did it.

21  Q.  Does the date of October 16, 2017, where there were 226

22  tweets by Dr. Garnier, sound familiar?

23  A.  Yes.  And that's when I emailed Twitter to complain about

24  Dr. Garnier.

25  Q.  Are you aware as to whether Twitter has similar community

1  standards as it relates to SPAM?

2  A.   They do.  They phrase it slightly differently, but they

3  describe it in the same way.  That very frequent, repetitive --

4  repetitive commenting on multiple posts at the same time, which

5  is exactly what they did.

6          MR. BRIGGS:  I'll move to strike as hearsay.

7          THE COURT:  No.  Overruled.

8  BY MR. SHINOFF:

9  Q.   I don't want to repeat what Mr. Briggs has already covered,

10 but just briefly.

11          You've received emails over the years from Dr. and

12 Mrs. Garnier where they're expressed their opinions, true?

13 A.   Correct.

14 Q.   You have been present when Dr. and Mrs. Garnier may have

15 spoken to the Board of Trustees in open session?

16 A.   Correct.

17 Q.   Now, did you -- it sounds as though you did -- did you

18 serve in the capacity of Board President on a couple different

19 occasions?

20 A.   Yes.

21 Q.   And as Board President, is one of your responsibilities to

22 officiate over the -- over how the meeting is proceeding?

23 A.   Yes.

24 Q.   Okay.  So, for example, are there time limitations on

25 public comments?

1    A.   Yes.

2    Q.   And can you explain that for the Court, please?

3    A.   Sure.   That has evolved a little bit over the time -- but

4    any changes the Board needs to vote on and agree as a body that

5    they're going to change -- but that has always been three

6    minutes per person.

7              What has varied is, if there are two sides to an

8    issue, if we allow a certain number of three-minute comments on

9    each side, to give equal weight to each side.   So that has

10   changed.   We don't do that anymore.   We just take the first --

11   we allow as many comments as can be read in 15 minutes on the

12   same topic.

13   Q.   So the manner in which you limit it is the total amount of

14   time that can be taken during the Board meeting; is that true?

15   A.   Per topic.   So on different topics, it could be 15 minutes

16   on unlimited numbers of topics.

17   Q.   And do you have a time within which you're supposed to

18   finish your meetings by before there's a vote to extend the

19   time of the Board meeting?

20   A.   Given that our last meeting went until after midnight

21   without extending the time, yes, I did look for that.   It is

22   10:00 p.m. that the Board should be taking a vote on whether to

23   continue or adjourn.   I only looked that up because we went

24   until after midnight, and I didn't want to do that again.

25   Q.   When the Board is conducting its business, it's conducting

1   its business before the public; is that a fair statement?

2   A.   Yes.   That's required under the law.

3   Q.   Okay.   It's not a collaborative give and take?

4   A.   Between the public and the Board?

5   Q.   Yes.

6   A.   No, no.   It's the Board that has to do the discussion and

7   come to decisions.   The public is allowed to give input before

8   we begin discussing with each other.

9   Q.   Let me draw your attention, if I may, to Exhibit U.

10  Specifically, I would like to draw your attention to page 10.

11  Do you see that?

12  A.   Yes.

13  Q.   So if I understand it, you post this item at the top of the

14  page on page 10 of Exhibit U, and then you add two photographs;

15  is that true?

16  A.   That's true.

17  Q.   And then underneath that you see the two-hour link to the

18  YouTube that was posted by Kim Garnier.

19  A.   Yes.

20  Q.   And do you see -- if you could just peruse through this

21  exhibit.   I think you can see -- and tell me if I'm wrong --

22  that you see the same thing on page 11, page 12, page 13,

23  page 14, page 15, page 16, 17, 18, 19, 20, 21, 22, 23, 24, 25.

24  A.   I believe Mr. Garnier's posts might have started changing

25  on page 19.

1  Q.  And then --

2  A.  But the same thing is above it.  I'm sorry, yes, it's still

3  there.

4  Q.  And then, on page 25, you begin to see posts from you at

5  the top of the page, and then comments from Dr. Garnier.  Do

6  you see that?

7  A.  Yes.

8  Q.  So we see that continuing on Exhibit U, 25, 26, 27, 28, 29,

9  30, 31, 32, 33, 34, 35.

10        And I will represent to you, Ms. Ratcliff -- and

11  please feel free to check on me -- but it continues all the way

12  to page 130.

13  A.  I believe that one that Dr. Garnier read out loud to the

14  Court is on various comments under various posts 42 times.

15        THE COURT:  I'm sorry.  How many times?

16        THE WITNESS:  42.

17  BY MR. SHINOFF:

18  Q.  Was the issue the content of the comments or was the issue

19  the repetition?

20  A.  Repetition, clearly.

21  Q.  The first thing you did in order to block the repeated

22  comments, was that the application of the filter, or was it use

23  of a feature where you had to block?

24  A.  No.  I attempted to -- well, I complained to Facebook, and

25  nothing happened immediately, so I went looking in my Google

1   search for how do you stop all comments, and that's where I

2   found the suggestion of putting in the top 50 most commonly

3   used words in the English language as a filter.

4   Q.   Okay.

5   A.   So I tried that first.

6   Q.   And I'm not sure that I understood your explanation.  I

7   think I understood Mr. Briggs' explanation.

8           But this feature of hiding a comment, what were you

9   attempting to do after repeated comments from Mr. Garnier?

10  A.   I was trying to eliminate the visual clutter and the

11  difficulty that other people had seeing my post, seeing the

12  message that I was trying to push out.

13  Q.   Have Dr. and Mrs. Garnier been blocked from your personal

14  Facebook account?

15  A.   No.

16  Q.   No?

17  A.   No.  I use a pseudonym there.

18  Q.   And what was your reason for blocking them from your

19  campaign Facebook account?

20  A.   Spamming.

21          THE COURT:  Can I ask you a question, ma'am?

22          THE WITNESS:  Yes.

23          THE COURT:  This 42 times, this comment, was that on

24  Twitter or was that on Facebook?

25          THE WITNESS:  On Facebook.

1        THE COURT:  Okay.  When that comment first showed up

2   on your page -- I think I heard somebody say that you can

3   delete or hide a comment.  Am I right?

4        THE WITNESS:  Yes.

5        THE COURT:  Okay.  When that comment first appeared on

6   your page, did you delete it?

7        THE WITNESS:  No.  I've never deleted anything except

8   the one from my mother when I had to tell her, "Not here, mom."

9        THE COURT:  That's not nice.  Did you hide it?

10        THE WITNESS:  No, I deleted hers.

11        THE COURT:  No, not your mother.

12        THE WITNESS:  Oh, okay.  No, I did not hide it,

13   either.

14        THE COURT:  Okay.  So the first time it appeared, you

15   didn't delete it, you didn't hide it.

16        THE WITNESS:  Correct.

17        THE COURT:  What about the second time?

18        THE WITNESS:  They generally would post them on the

19   most recent post, and then go back and just keep posting it on

20   every post down the line until their finger got tired or

21   something.

22        So the latest one would be usually when they posted

23   all of them.  The most recent --

24        So I'm pulling this out of the air.  They see my post

25   from October 17th, and they put a comment under it, and then

1  they go and put the same exact comment on October 17th, on my

2  post from October 16th, and on October 15th, and 14th, and

3  13th, and all the way -- every post that I had made.  So they

4  would do it all at the same time.  So they all appeared at

5  once --

6          THE COURT:  I see.  Okay.

7          THE WITNESS:  -- on multiple posts on the same day.

8          THE COURT:  Got it.

9  BY MR. SHINOFF:

10 Q.  I heard earlier today there was a feature on Facebook where

11 it could be chronicled by relevancy.  Can it also be chronicled

12 by timing --

13 A.  Yes.

14 Q.  -- like most recent?

15 A.  Yes.  And that is entirely the user's preference.

16 Q.  Okay.

17 A.  That could change for every person who looks at the page.

18 Q.  And when did you -- and did you do that, as well?

19 A.  My preference isn't -- my preference doesn't tie anyone

20 else to my preference.  They get to pick.  When they look at my

21 page, they get to choose how it appears to them.

22 Q.  I see.

23 A.  I have my preferences so that any page I look at, I see it

24 in chronological order, but that's not necessarily everyone

25 else's choice.

1  Q.  Okay.  And when was it that you first became active on

2  Facebook?

3  A.  I probably started my personal Facebook page maybe about

4  2005.

5  Q.  Okay.  And Twitter.  When did you start to use Twitter?

6  A.  I wanted to be sure I knew how to do it before my 2018

7  campaign, so I started using it in 2017, and, again, under a

8  pseudonym because I didn't want anyone following me.

9       So I did change it over -- I thought I was getting the

10 hang of it, so I changed it over to my MOR4PUSD campaign handle

11 in 2017.

12 Q.  And did you have a Twitter handle between 2014 and 2017?

13 A.  No, I -- I had a Twitter handle -- my pseudonym Twitter

14 handle, probably -- I probably started using that in early

15 2017, but I don't know the exact date.  I'd have to look.

16      I've never deleted a tweet, either, though, so I could

17 look back at all of my tweets and tell you when I did my first

18 one, I guess, but I don't know offhand.  I would say early

19 2017, though.

20 Q.  Okay.  Did you also receive notification from Facebook in

21 June of 2020 about the -- that Facebook would no longer show

22 your elected office information?

23 A.  I did not receive that because I had never changed it from

24 the 2018 campaign.  I left it as "political candidate".  So I

25 haven't changed it since then, but I did see news stories on

1    it.  It was kind of a big deal --

2    Q.  Okay.

3    A.  -- and was related to a lot of changes they were trying to

4    make.

5    Q.  Thank you.

6              MR. SHINOFF:  No further questions, Your Honor.

7              THE COURT:  Mr. Briggs?

8              MR. BRIGGS:  I do, Your Honor.

9              Your Honor, I think before I neglected to move

10   Exhibit 19 into evidence.  I'd like to do that now.

11             THE COURT:  Any objection?

12             MR. SHINOFF:  No objection.

13             (Plaintiffs' Exhibit 19 received in evidence)

14   REDIRECT EXAMINATION

15   BY MR. BRIGGS:

16   Q.  Did I hear you say that you always intended your Facebook

17   page to be a bulletin board that was a one-way form of

18   transmission?

19   A.  That was my intent.

20   Q.  You never used it to interact the public, it's always been

21   just to give them information; is that correct?

22   A.  No.  That's how I hoped to do it, but I didn't know how to

23   do it.  And it's still not a feature of Facebook.  You have to

24   use these little workarounds, so I've been learning how to do

25   that.

1   Q.  Well, do you -- has it been your -- was it ever your

2   practice to respond to people --

3   A.  Mm-hmm.

4   Q.  -- or did you just --

5   A.  Yes.

6   Q.  Well, under what circumstances would you respond?

7   A.  A question that I was interested in answering.

8   Q.  Did you ever respond when people gave you positive

9   feedback?

10  A.  I haven't looked back at that, but I would assume I would

11  smile or give it a thumbs up or something.

12  Q.  So when people said things you liked, you would go to their

13  comment and give it a thumbs up; is that correct?

14  A.  Sometimes, early on.

15  Q.  So you would react and let them know that you liked when

16  they were giving you positive feedback, correct?

17  A.  Correct, yeah.

18  Q.  Do you remember the last time you did that?

19  A.  No, I don't.

20  Q.  I'm going to show you Exhibit 17.  Do you have that on the

21  screen in front of you?

22          Exhibit 17 is a series of screen shots, two per page.

23          That looks like your Facebook account, yes?

24  A.  It does.

25  Q.  If I go to the top of the second page -- I'll make this

1    bigger for you -- do you see that you -- you're one of the

2    persons who liked a comment by April Barker.  Do you see that?

3    A.   Mm-hmm.

4    Q.   Yes?

5    A.   Yes.

6    Q.   Okay.  And if we go to the top of the third page -- sorry,

7    that's the bottom of the second page.

8         On the bottom of the second page, you again gave a

9    thumbs up to Meg Goffredo when she said something you liked,

10   correct?

11   A.   Yes.  She's a family friend.

12   Q.   Okay.  And then, when we get to the top of the third page,

13   you again give a thumbs up to Gioia Bowser when she said,

14   "Thank you for the kind words?"

15   A.   Yes.

16   Q.   Who is Ms. Bowser?

17   A.   She was the mother of the young lady who spoke at our

18   District Board meeting -- or at our State of the District

19   breakfast.

20   Q.   She's a constituent?

21   A.   I actually don't know.  No, I believe she's not.  Her child

22   went to Twin Peaks.

23   Q.   She's just a member of the public?

24   A.   Yes.

25   Q.   Okay.  Why did you go and give a thumbs up to people who

1   were commenting on your Facebook page?

2   A.   It was nice of them to say something nice.

3   Q.   Okay.  And now, if we go back to the first page -- sorry, I

4   think it's the second page.  At the bottom, you actually

5   responded to Ms. Bowser, correct?

6   A.   Yes.

7   Q.   Okay.  And this was back in November of 2018, right?

8   A.   Looks -- well, I can't tell if that's the date that's

9   attached to this one or not.

10  Q.   Let's see if we can find a better image.  November 2018?

11  A.   Yes.

12  Q.   Now does that look right to you?

13  A.   Yes.

14  Q.   Okay.  So in November of 2018, you don't have a problem

15  giving people a thumbs up when they say something you agree

16  with, correct?

17  A.   No.

18  Q.   No, I'm wrong, or no, you don't have a problem?

19  A.   No, I did not have a problem with that.

20  Q.   And in November of 2018, you didn't have a problem going in

21  and posting your own comment to somebody's comment, correct?

22  A.   No.

23  Q.   No, I'm wrong, or no, you didn't have a problem?

24  A.   No, I don't have a problem with that.

25  Q.   Okay.

1   A.   Double negatives are tough.

2   Q.   I'd like you to take a look at Exhibit U.

3   A.   Is that in my book here?

4   Q.   That's on your lap, yes.

5        And if you would turn to page 11.  Actually, turn to

6   page 10.  Do you have U10 in front of you?

7   A.   I do.

8   Q.   Okay.  And that's the one where you posted at the top,

9   looks like a couple pictures from an auditorium, maybe a band

10  is playing?

11  A.   Yes.

12  Q.   Okay.  And then, when you get to the video posted by Kim

13  Garnier, do you notice the font is a little lighter --

14  A.   I do.

15  Q.   -- compared to the dark text at the top?

16  A.   Mm-hmm.

17  Q.   That's a yes?

18  A.   Yes.

19  Q.   And you notice that the video font is lighter than the dark

20  text at the bottom by Connie Mitchell.  Do you see that?

21  A.   I do.

22  Q.   Isn't that because the video post has been hidden?

23  A.   I believe that happens after they're blocked.

24  Q.   Okay.  But can you see -- underneath the image in Kim

25  Garnier's comment, can you see the word "unhide"?

1    A.   Yes.

2    Q.   Okay.  So that post is actually hidden --

3    A.   Okay.

4    Q.   -- from anyone seeing it, correct?

5    A.   Yes, I think -- well, not anyone.

6    Q.   Well, you could see it because you were the one who hid it,

7    right?

8    A.   And I believe any friend of Kim Garnier or Christopher

9    Garnier could still see it.

10   Q.   But you don't care whether their friends see their posts,

11   do you?

12   A.   No.

13   Q.   Okay.  So --

14   A.   If it's cluttering up my page, that's what I care about.

15   Q.   And so Exhibit U is from your Facebook page, right?

16   A.   Yes.

17   Q.   So if we turn the page and look at U11, once again, the

18   video link Ms. Garnier posted is lighter colored because it's

19   been hidden, correct?

20   A.   I'm certain that that happened once I blocked them, all of

21   their posts, going back forever, turned that way automatically.

22   Q.   Okay.  And so when you look at all of the pages, if you go

23   through this entire U exhibit, the posts by the Garniers are

24   actually a lighter color because they've been hidden, right?

25   A.   Because I blocked them, and Facebook automatically did that

1  for everything they've ever posted once I blocked them.

2  Q.  It hid them when you blocked them or when you put --

3          (Talking over each other)

4  BY MR. BRIGGS:

5  Q.  It hid them when you blocked them or when you put in those

6  word filters?

7  A.  They did not disappear off of my page.  I could still go

8  back and find every single one of these on my page.  So it just

9  hid them, they didn't disappear.

10  Q.  But the public could no longer see them, correct?

11  A.  That's correct.

12  Q.  Okay.  And that's a function of the word filter --

13  A.  No, that's a function of blocking.

14  Q.  So what did the word filters accomplish for you with

15  respect to the Garniers?

16  A.  If you look forward towards my -- towards my later posts,

17  my most recent ones, I think you said you could see comments.

18  I'm shocked by that because I haven't seen comments.

19  Q.  I could see that there are comments is what I asked you

20  about.

21  A.  Yeah.  I have not seen them, so that surprises me.

22          I've learned how it works better, and Facebook has

23  changed the way it works.  It doesn't just gray them out, it

24  doesn't put them in at all.  It gives three dots.

25  Q.  But you understand that once a comment is hidden, that

1   other viewers on your Facebook page cannot see them, right?

2   A.   That's true.

3   Q.   And so they wouldn't be bothered by what you call clutter,

4   correct?

5   A.   Not after they were blocked, no.

6   Q.   And the only reason you blocked my clients is because of

7   the repetition, right?

8   A.   That's correct.

9   Q.   They never threatened you or your family, did they?

10  A.   No.

11  Q.   Did they ever use profanity?

12  A.   The Garniers?  No, they did not.

13  Q.   Okay.  They never said anything salacious or nasty about

14  you, correct?

15  A.   Not on my page, no.

16  Q.   Okay.  I think you mentioned earlier that there were 780

17  emails from my clients; is that right?

18  A.   That's correct.

19  Q.   When did the first email arrive?

20  A.   I don't know.  I'd have to go back and look in my folder.

21  Q.   When is the last time you received an email from them?

22  A.   It's been a little while, but I believe I got a little poke

23  email maybe a month ago reminding me that we were coming to

24  court, and they were going to win.

25  Q.   Okay.  Did you get emails from them during your first term?

1    A.   Yes.

2    Q.   You did.  And was it toward the beginning of the first term

3    or the end?

4    A.   I think I was getting emails from them the entirety that

5    I've been in office.  Less frequently lately.

6    Q.   Did you -- the reason I'm asking is because I don't recall

7    seeing those emails in the Rule 26 disclosures that I would

8    have received from your counsel.

9    A.   Mm-hmm.

10   Q.   So I'm trying to find out when those emails would have

11   arrived.  If you had them from the beginning, seems like we

12   would have received them.

13   A.   You'd have to be more specific with that question.  I don't

14   know what Rule 26 is.

15   Q.   Did you give any of those emails to your counsel?

16   A.   The emails were all available via public records.

17   Q.   Did you give any of the 780 emails to your counsel in this

18   case?

19   A.   I don't recall.  I don't know.  If you don't have them, I

20   probably didn't.

21   Q.   Okay.  You mentioned 200 tweets on the same day.

22   A.   226, yes.

23   Q.   226.  Did you keep those tweets?

24   A.   Unfortunately, Twitter doesn't work the way Facebook does.

25   When I blocked Dr. Garnier, they all disappear.  I can't pull

1   them back, I can't get a screen shot.  As all of these are

2   screen shots after I blocked them, Facebook just grays them

3   out, Twitter deletes them entirely.

4   Q.  And were those 220 some tweets when you were running for

5   re-election in 2018?

6   A.  2017.

7   Q.  What part of 2017?

8   A.  October.

9   Q.  That's when those tweets happened?

10  A.  No.  The tweets had been happening for quite some time.

11  Q.  When was the date of the 220 some tweets?

12  A.  I believe October 16th, 2017.

13  Q.  Okay.

14  A.  It was a tweet -- it was a response to -- it was a comment

15  after every tweet I had ever made since I opened my Twitter

16  account.  226 tweets.

17          THE COURT:  Mr. Briggs, how much longer do you have?

18          MR. BRIGGS:  I think I'm about done with this witness.

19          THE COURT:  Okay.

20          MR. BRIGGS:  Actually.  I was just going to look at my

21  notes.  I think I'm done.

22          THE COURT:  All right.  Can I ask a question?

23          MR. BRIGGS:  Yeah, you may.

24          THE COURT:  Ma'am, other than from plaintiffs in this

25  action, have you ever received any negative comments on your

1   Facebook account.

2          THE WITNESS:  Yes.

3          THE COURT:  How about your Twitter account?

4          THE WITNESS:  Yes.

5          THE COURT:  Did you block those people?

6          THE WITNESS:  No.

7          THE COURT:  Mr. Briggs?

8   BY MR. BRIGGS:

9   Q.  Let me ask you once again.  I'm sorry if this is

10  repetitive.  When did you first apply that word filter that

11  auto hid --

12  A.  I'm not sure.  And I tried to look back and see if Facebook

13  would give me the date, and I don't know.  But I've been

14  tinkering with it since the day I started it, because it wasn't

15  working very well from the very beginning.  And now, I think

16  Facebook has changed how they do it, so it works great now.

17  Q.  Well, if the filter works really well now --

18  A.  Mm-hmm.

19  Q.  -- why don't you unblock my clients and let the filter do

20  its job?

21  A.  The filter might do its job, but if I ever decide I want to

22  use this page in a different way, they would be allowed to SPAM

23  again.

24  Q.  When you say "in a different way", do you mean as a public

25  official or as a private person?

1  A.  Either way.  I think you made the point with Mr. Zane that

2  rebuilding the following would take some time.

3  Q.  Well, I'm -- I want to know whether, as a public official.

4  A.  Yes.

5  Q.  Not interested in what you do as a private person.

6          As a public official, why don't you unblock my clients

7  and just let the filter do its thing, and then, if you decide

8  to go back to strictly private life, then it's nobody's

9  business what you do with your Facebook page.

10 A.  It means that I can't change the way I use my page.  If I

11 decided I wanted to use it to have some back and forth with my

12 constituents at any point in the future, tomorrow maybe, your

13 clients would be spamming again, ruining that for everyone.

14 Q.  How do you know that?

15 A.  It's their history.  That's what they've done all along.

16 Q.  But why, if you decided you wanted to do back and forth, do

17 you think it would be okay to do back and forth with me, but

18 not with my clients?

19 A.  It would be fine to do back and forth with your clients if

20 they weren't spamming.

21 Q.  How do you know what they're going to do in the future?

22 That's my question.

23          THE COURT:  All right, Mr. Briggs.

24          THE WITNESS:  Sir, I can only look at what they've

25 done in the past.

1          THE COURT:  I'm sorry.

2          MR. SHINOFF:  I'm going to object.  It's

3   argumentative.

4          THE COURT:  Yeah, I think so.  I agree.

5          Anything else, Mr. Briggs?

6          MR. BRIGGS:  No, Your Honor.

7          THE COURT:  All right.  Now is a good time --

8          By the way, Mr. Shinoff --

9          MR. SHINOFF:  No further questions.

10         THE COURT:  All right.

11         (Witness excused)

12         THE COURT:  We're going to break for the evening.

13  I'll be back tomorrow morning at 9:30.

14         Just so that you know, we will be done with this case

15  tomorrow.

16         MR. SHINOFF:  Yes.

17         THE COURT:  Right?  Great.  See you tomorrow.

18         MR. BRIGGS:  30 seconds?  Because we might be done.

19         We're prepared to rest, and I --

20         THE COURT:  Now?

21         MR. BRIGGS:  Yes.

22         THE COURT:  Okay.  You've rested.

23         MR. BRIGGS:  And I spoke to my colleague.  I think

24  he's not calling more witnesses --

25         MR. SHINOFF:  Right.

1          MR. BRIGGS:  -- which means we don't want to come back

2     and take you -- take your time tomorrow if we're not needed,

3     other than an argument.

4          And I was going to propose that we get our transcripts

5     and just submit closing briefs and not take your time tomorrow.

6          MR. SHINOFF:  I would actually -- I think there's a

7     lot of wisdom to that, Your Honor.

8          THE COURT:  Wisdom for it?

9          MR. SHINOFF:  I think Mr. Briggs is making a wise

10    recommendation.

11         THE COURT:  Well, look.  I really have to run.

12         But I have a question.  So -- and it's a question

13    that, frankly, I don't know the answer to.

14         So I've read the *Trump* case, and I've read the

15    *Governor Evans* case, as well.

16         MR. SHINOFF:  Yes.

17         THE COURT:  Now, in those cases, you have an executive

18    who has an account, whether it's a Facebook, or a Twitter

19    account, or whatever.  And they put something out there for the

20    public.  Right?  But the public has no other way to respond to

21    whatever it is that they've put out there than to, in fact, use

22    that same account for back and forth.  Right?

23         Now, I've been listening to the testimony this

24    afternoon.  I'm not saying that it's controlling, I'm just

25    simply asking the question.

1    But does it make a difference, the fact that, for

2 example, there's an email account that's available?  Does it

3 make a difference that these folks can come into a Board

4 meeting, a public Board meeting, and express the very same

5 views and things that they could do on Facebook or Twitter, or

6 not?

7    Because, as I said, I see a distinction.  I see a

8 difference between an executive who doesn't have an open forum,

9 if you will, for people to express their views and opinions and

10 so on versus these folks and other folks like them who do have

11 other forums for people to be able to express their opinions.

12    I raise that for you because, fine, the case is

13 concluded, we're done.  But I would like to have briefing from

14 you on -- and discuss that issue, if you don't mind.  I think

15 it's important.  Right?

16    MR. SHINOFF:  Your Honor, may we -- I don't want to

17 create work for Mr. Briggs, but may we show up at

18 9:30 tomorrow, just Mr. Briggs and myself, just to get the

19 Court's timeline and everything?  Because I know you have this

20 ceremony to show up for.

21    THE COURT:  Sure.  Tomorrow morning at 9:30 a.m.

22    By the way, I think both of you have done a wonderful

23 job representing your clients.  Thank you.

24    (Proceedings adjourned at 4:21 p.m.)

25    -o0o-

1          C E R T I F I C A T I O N

2

3          I hereby certify that I am a duly appointed,

4   qualified and acting official Court Reporter for the United

5   States District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with rules and requirements of the United States Judicial

10  Conference.

11  Dated:  October 4, 2020, at San Diego, California.

12

13

14

15

16                    /s/ Ellen L. Simone

17                    _____
                       Ellen L. Simone, RMR, CRR
18                     Official Court Reporter

19

20

21

22

23

24

25