1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

11  CHRISTOPHER GARNIER; and              Case No.:  3:17-cv-02215-BEN-JLB
12  KIMBERLY GARNIER,
13              Plaintiffs,               **FINDINGS OF FACT AND**
                                          **CONCLUSIONS OF LAW**
14          v.

15  MICHELLE O'CONNOR-RATCLIFF;
16  and THOMAS JOSEPH ZANE,
17              Defendants.

18        Plaintiffs Dr. Christopher Garnier and Ms. Kimberly Garnier (collectively,

19  "Plaintiffs") are parents of children in the Poway Unified School District ("PUSD").

20  Defendants Ms. Michelle O'Connor-Ratcliff and Mr. Thomas Joseph Zane (collectively,

21  "Defendants") are members of the PUSD Board of Trustees.  Plaintiffs allege Defendants

22  blocked them from commenting on their Facebook and Twitter pages, depriving them of

23  their federal constitutional rights in violation of 42 U.S.C. § 1983.  Compl., ECF No. 1.

24  Plaintiffs also allege violation of their state constitutional rights.  *Id*.

25        This case is one of a growing number applying the First Amendment to the

26  activities of elected officials on social media platforms.  *See, e.g.*, *Knight First*

27  *Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (finding

28  President Donald Trump's Twitter account to be a designated public forum and that

blocking users was unconstitutional viewpoint discrimination); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) (holding that a public official who used a Facebook page as a tool of her office exercised state action when blocking a constituent); *Robinson v. Hunt Cty., Texas*, 921 F.3d 440 (5th Cir. 2019) (finding that a government official's act of blocking a constituent from an official government social media page was unconstitutional viewpoint discrimination); *Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020) (granting plaintiffs' motion for a preliminary injunction and ordering defendant county sheriff to unblock plaintiffs on his official Facebook page by finding the relevant page was a public forum); *Campbell v. Reisch*, 367 F. Supp. 3d 987 (W.D. Mo. 2019) (denying motion to dismiss and finding that defendant state legislator was acting under color of law when she blocked plaintiff from her official Twitter account); *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018) (denying plaintiffs' motion for a preliminary injunction prohibiting defendant state governor from blocking plaintiffs on Facebook by finding the relevant page was not a public forum).

The Court conducted a two-day bench trial on Plaintiffs' claims on September 21 and 22, 2020. The following is a brief procedural background of this case, along with the Court's findings of fact and conclusions of law from that trial. *See* Fed. R. Civ. P. 52(a). As explained below, the Court finds in favor of Plaintiffs' on their Section 1983 claim. Because Plaintiff did not offer evidence or argue the state law claim, the Court declines to find Defendants' conduct violated the California Constitution.

## I. PROCEDURAL BACKGROUND

On October 30, 2017, Plaintiffs filed suit alleging one claim for violation of federal constitutional rights and one claim for violation of state constitutional rights, seeking general and punitive damages as well as injunctive and declaratory relief.[1] Compl., ECF No. 1, 5. Prior to the case's transfer to this Court, Defendants moved for summary

---

[1] Plaintiffs initially also named PUSD in this lawsuit but voluntarily dismissed the district on January 26, 2018. ECF No. 9.

judgment on all claims.  Mot., ECF No. 34.  On September 26, 2019, Judge Thomas J. Whelan issued an order granting Defendants' motion with respect to Plaintiffs' damages claim reasoning that damages were barred by qualified immunity.  Order, ECF No. 42, 24.  Judge Whelan denied Defendants' motion with respect to Plaintiffs' requests for injunctive and declaratory relief.  *Id*.

Following transfer, the case proceeded to a bench trial.  At the beginning of trial, the Court informed the Parties that it had reviewed Judge Whelan's order and that it adopted the rulings set forth in the order.  Trial Tr., ECF No. 80, 5:21-24.  To formalize those rulings, the Court finds Defendants: (1) are entitled to qualified immunity for Plaintiffs' damages claims; (2) acted under color of state law in blocking Plaintiffs from their social media pages; and (3) created designated public forums on their social media pages.  The reasoning for these determinations is set forth in Judge Whelan's order, which the Court adopts for these findings of fact and conclusions of law except for the ruling on standing.  *See* Order, ECF No. 42.

The exception for the standing ruling is necessary because the evidence presented at trial indicated that Zane may have "unblocked" Kimberly Garnier before trial.  "The Supreme Court has noted that the doctrine of mootness requires that the 'requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'"  *McKercher v. Morrison*, Case No. 18-cv-1054-JTM-BLM, 2019 WL 1098935, at * 2 (S.D. Cal. Mar. 8, 2019) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n.22 (1997)).  Because the evidence received at trial regarding standing differed in some respects from the Parties' claims in their briefing on the motion for summary judgment, the Court also makes findings of fact and conclusions of law with respect to each Plaintiff's standing as to each Defendant's alleged actions.

Aside from the continuing analysis of standing, the remaining issue for trial was whether Plaintiffs' comments and replies disrupted Defendants' original posts on their social media pages, "because if [Plaintiffs'] comments did not disrupt the original posts,

then it is reasonable to infer that [Defendants'] claimed justification for blocking [Plaintiffs] was a pretext and that they actually blocked [Plaintiffs] because of the content of their comments." Trial Tr., ECF No. 80, 6:4-11.

Plaintiffs claim that: (1) Defendants blocked them from posting on their social media pages; (2) Plaintiffs' comments and replies prior to blocking did not disrupt Defendants' original posts; and (3) the blocking was impermissibly content-based. *See generally* Pls.' Br., ECF No. 85. Defendants argue that: (1) any blocking left open alternative channels of communication; (2) the blocking was content-neutral and narrowly tailored; and (3) as officials of the legislative branch, their social media accounts should be treated differently from those of executive branch officials. *See generally* Defs.' Br., ECF No. 84.

## II.   FINDINGS OF FACT

Following the testimony and exhibits received at trial, the Court makes the following findings of fact.

### A.   Parties and Pages

Plaintiffs Christopher Garnier and Kimberly Garnier are parents of children who are students in PUSD. Trial Tr., ECF No. 80, 87:20-23. Defendants Michelle O'Connor-Ratcliff and T.J. Zane are members of PUSD's Board of Trustees. *Id*. at 112:7; 153:1. Both Defendants were first elected in 2014, and both still serve on PUSD's Board of Trustees. *Id*. at 114:11; 153:5.

Zane has a Facebook account and maintains at least two pages. *Id*. at 112-115. He has a personal profile page that he uses for family and friends as well as a public page he uses for campaigning and issues related to PUSD. *Id*. at 113:25-114:20. Zane created the public page in 2014. *Id*. at 114:3-6. Zane is the only administrator of the public page. *Id*. at 114:12-25. Zane also has a Twitter account that he rarely uses but has interacted with Christopher Garnier on Twitter, which eventually led to an in-person meeting between the two. *Id*. at 138:8-10. Zane testified that Plaintiffs also posted on his personal and business Facebook pages, after which he blocked them from posting there.

*Id.* at 137:12-13.  Zane's decision to block Plaintiffs on his personal and business Facebook pages is not at issue here.

Like Zane, O'Connor-Ratcliff has a Facebook account.  *Id.* at 153:13.  She has both a personal page that she uses for family and friends as well as a public page she uses for campaigning and issues related to PUSD.  *Id.*  O'Connor-Ratcliff created her public page sometime before 2017.  *Id.*  Since 2017, O'Connor-Ratcliff has also used a Twitter account for PUSD and campaign purposes.  *Id.* at 184:6-8.

O'Connor-Ratcliff and Zane successfully created and published original social media content on Facebook and Twitter – known as "posts" and "tweets," respectively – related to PUSD on their public Facebook pages Twitter feeds.  *See, e.g.*, Pls.' Ex. 4, 1; Ex. 5, 1-25; Ex. 6, 1-88; Ex. 7, 1; Defs.' Ex. "U," 25-130.  Neither O'Connor-Ratcliff nor Zane established rules of etiquette or decorum regulating how the public interacted with their social media accounts.  Trial Tr., ECF No. 80, 115:6-9; 154:21-23.

Defendants testified that they intended their Facebook and Twitter pages to be used in a "bulletin board" manner—providing one-way communication from themselves to their constituents.  *See, e.g.*, *id.* at 130:10-16, 131:6-19, 133:11-12, 147:13-15, 148:7, 168:15-16, 174:1-8, 185:16-19.  However, at least through 2017, both also used Facebook for interactive purposes by replying to comments on their posts from other constituents about PUSD issues.  *See generally* Pls.' Exs. 3-4.  There is no evidence O'Connor-Ratcliff used Twitter for similar interactions because her Twitter feed shows only posts, not comments and replies to others.  Pls.' Ex. 5.  Zane used Twitter to interact—indeed, even with Christopher Garnier.  He has not blocked Plaintiffs on Twitter.

## B.    PUSD Boarding Meetings in the Physical World

At public meetings of PUSD's Board of Trustees, members of the public can express their views to board members.  Trial Tr., ECF No. 80, 178:3-24.  Public comments may be made on any topic of the speaker's choosing but do not allow for a response from members of the Board of Trustees.  *Id.* at 21:20; 179:1-8.  Public

comments are also limited to three minutes per speaker.  *Id*. at 178:7-12.  There are several members of the public who appear at each meeting and often press the same points.  *Id*. at 113:6-16.  PUSD does not have a policy prohibiting members of the public from appearing at subsequent meetings and repeatedly addressing the same issues to the Board.  *Id*. at 133:22.  Both Defendants testified that they do not leave the room during the public comment time, even when the comments they are hearing are repetitive.  *Id*. at 154:4-20.

### C.    Other Alternate Avenues of Communication

Both Defendants testified that receiving feedback from constituents is an important part of their duties as Trustees.  In addition to the public comment portions of Board meetings discussed above, both Defendants maintain email addresses provided by PUSD that they use to conduct official business.  The PUSD Board of Trustees also has a policy for the public to make a complaint about a Trustee.  *Id*. at 58:6.

Both Defendants testified that the public frequently uses in-person comments and their PUSD email addresses to contact them.  *Id*. at 134:16-18; 168:25.  O'Connor-Ratcliff testified Plaintiffs emailed her PUSD email address 780 times.  *Id*. at 173:15.  Plaintiffs testified that email messages sent to Defendants went unanswered or the recipient refused to talk or meet.  *See, e.g.*, *id*. at 21:15-22:11, 89:21-90:5.  Christopher Garnier also submitted complaints about both Defendants pursuant to the Board of Trustees' policy but received no response.  *Id*. at 58:2-24.

However, Defendants never attempted to prevent Plaintiffs from speaking during the public comment period of a Board meeting and never attempted to prevent Plaintiffs from sending emails to their PUSD email addresses.  Moreover, Zane has even met with Christopher Garnier in-person on at least two occasions.  *Id*. at 138:6-7.

### D.    Facebook Page and Twitter Account Functionality

The crux of this case focuses on the alleged disruption of Defendants' Facebook pages and Twitter feeds.  To analyze whether and how disruption on those platforms can

occur, an understanding of how the platforms display content is required.[2]

On both Defendants' public Facebook pages, Defendants, respectively, are the only people who can create original "posts." *Id*. at 115:17. Nonetheless, members of the public are generally allowed to interact with the content Defendants post through "comments" and "reactions" on the Defendants' original posts. When accessing Defendants' Facebook pages, Facebook automatically truncates lengthy posts, requiring a viewer interested in reading the full post to click a "See More" button beneath the truncated post. *See, e.g.*, Trial Tr., ECF No. 80, 29:5-19,1 93:11-95:2; Pls.' Ex. 3, 3 and 19; and Defs.' Ex. U, 150. For viewers who have not clicked "See More" on the post, Facebook shows only the beginning of the post and only the most recent or most relevant comments.

An illustration may be beneficial to the reader. The picture below depicts a post made by O'Connor-Ratcliff on August 28, 2017. O'Connor-Ratcliff's post is long enough that a viewer is required to click "See More" to read her entire post.

---

[2] The Court notes its findings of fact here are limited by the evidence received at trial. Other cases examining social media blocking have attempted to make similar descriptions of social media platforms' functionality based on the evidence submitted in those cases, *see, e.g.*, *Morgan*, 298 F. Supp. 3d at 1007, but the Court is hesitant to adopt anything outside of the record in this case because the functionality of these platforms constantly changes, making adoption inappropriate for judicial notice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24  Pls.' Ex. 3, 3.  If a Facebook user wishes to skip past this post, she need only scroll past

25  the truncated post, which takes a brief amount of time.  Indeed, as shown above,

26  O'Connor-Ratcliff's next post (dated August 26, 2017) is also visible on this screenshot.

27       Lengthy comments are treated similarly to lengthy posts.  On Facebook, comments

28  in response to a post appear below the post.  *See, e.g.*, Pls.' Ex. 3, 4-6; Pls.' Ex. 6, 6 and

10.  There is no limit on the number of comments that can be made within a specific period of time, and the evidence produced at trial indicates such comments can be quite lengthy.  *See generally*, Defs.' Ex. U.  To read a lengthy comment, the viewer must click "See More" on the truncated beginning of a comment.  Pls. Ex. 3, 75.  The individual viewer selects whether they will see the most recent or most relevant comments.  Trial Tr., ECF No. 80, 183:10-13.

The picture below depicts a Facebook post shared by O'Connor-Ratcliff on August 10, 2016.  There are thirteen reactions to the post using the "thumbs-up" symbol from other members of the public.  The picture displays the beginning of a lengthy comment on the post made by a non-party to this action.  A Facebook user must click "See More" to show any text beyond the truncated beginning of the comment.  In this instance, O'Connor-Ratcliff also replied to the comment.



Pls.' Ex. 6, 6. Again, if a Facebook user wishes to skip past this comment, she need only

9

1    scroll past the truncated comment, which takes a small amount of time.

2        When a video is linked in a comment to a Post, the video does not play

3    automatically when a Facebook user reads the comment.  Instead, the user must click a

4    link to watch the video or can scroll past the comment containing the video link almost

5    instantaneously.  Trial Tr., ECF No. 80, 108:20-109:12.  The picture below depicts a

6    Facebook post made by O'Connor-Ratcliff on May 24, 2015.  Below the post, Kimberly

7    Garnier posted a comment containing video link.  Christopher Garnier also posted a

8    comment containing a link.



28   Defs.' Ex. U, 10.  Plaintiffs' comments are light in color because O'Connor-Ratcliff

"hid" those comments on her page, discussed further below.  Scrolling past these video link comments is quick and straightforward.

Zane testified that because of this truncation as well as Facebook's other features designed to streamline a page's appearance, even repeated comments only had "a net effect of slightly pushing down anything that I would have put up there."  Trial Tr., ECF No. 80, 133:15-17.  Scrolling past even numerous, repeated comments or links to videos would take minimal time due to Facebook's truncation of comments.  *Id*. at 94:22.  As quickly as the user can click his finger, he can disregard the truncated comments.  *Id*. at 109:9-10.

Any Facebook user may comment on a post on a public page such as those used by Defendants.  *Id*. at 115:20.  The comment does not necessarily relate to the original post. *Id*. at 81:14-20.  When a person comments, the page administrator for that page may leave a comment visible to other Facebook users.  *Id*. at 120:4-19.  The page administrator can also delete a comment, removing it entirely from appearing beneath the post, or "hide" the comment.  *Id*.  The "hide" feature allows a page administrator to make comments on posts invisible to other viewers.  *Id*.  The only people who can view a comment that has been hidden are the page administrator and the person who posted the hidden comment.  *Id*.  Another Facebook user viewing a post would not see any hidden comments.  *Id*. at 121:1-5.

In addition to deleting or hiding individual comments, Facebook also allows page administrators to block people from posting on their page.  While users generally may respond to a post with a comment—whether germane or not to the post—or by making a non-verbal reaction, such as by "liking" a post or give a "thumbs up" emoticon, a blocked user cannot comment or make a non-verbal reaction.  *See, e.g.*, Trial Tr., ECF No. 80, ECF No. 80, 186:8-188:2; Pls.' Ex. 3, 2 (showing "thumbs up" and smiley-face emoticons to the left of "16" reactions).  Instead, a blocked user can only view the public Facebook page.  *Id*.

On Twitter, the equivalent of an original post is called a "tweet."  A Twitter user's

tweets are displayed on a "feed," similar to how a Facebook user's posts are displayed on her page.  The pictures below depict the top of O'Connor-Ratcliff's Twitter feed as of October 26, 2017.  As can be seen, when viewing a user's feed, replies to the user's tweets are not visible.  Instead, a user must click on a specific tweet to view replies to that tweet.  Thus, a user's ability to "disrupt" another user's Twitter feed—the page she wishes to display to other users—is minimal because replies are only visible when clicking on a particular tweet.



Pls.' Ex. 5, 1-2.

On Twitter, a user may also block another user.  Blocking prevents the blocked user from seeing the blocker's Twitter feed and replying to the blocker's tweets.  In other words, the blocked user cannot see any of the content posted by the blocker while logged into his Twitter account or interact with the blocker on the site.

### E.      Plaintiffs' Interactions with Defendants' Pages and Accounts

Christopher Garnier began posting on Defendants' Facebook pages when he believed they were not satisfactorily responding to his emails and other communications. Trial Tr., ECF No. 80, 37:14-18.  None of Plaintiffs' comments used profanity or threatened physical harm, and almost all related to PUSD.  *Id*. at 39:1-9.  Plaintiffs' comments were not commercial in nature.  *Id*. at 39:11.

However, Plaintiffs acknowledged their posts were often repetitious.  *Id*. at 41:4; 100-103.  On Facebook, Christopher Garnier made the same comment on forty-two posts made by O'Connor-Ratcliff.  *Id*. at 180:16.  On another occasion, Christopher Garnier posted the same reply to every tweet O'Connor-Ratcliff posted within approximately ten minutes. *Id*. at 176:18.  This involved repeating the same reply 226 times.  *Id*.  As discussed above, these replies would only be visible by (1) visiting Christopher Garnier's Twitter feed or (2) clicking on a tweet on O'Connor-Ratcliff's feed to which Christopher Garnier replied.  For example, looking at O'Connor-Ratcliff's Twitter feed, the following tweet appears from October 13, 2017.



Pls.' Ex. 5, 3.  A user can see that there is one reply to this tweet, indicated by the "1"

next to the cartoon dialogue icon, but cannot see that reply on O'Connor-Ratcliff's feed.

Moreover, not all of Plaintiffs' comments were the same.  O'Connor-Ratcliff's documentary evidence shows Christopher Garnier posting more than 20 unique comments and Kimberly Garnier posting more than 15 unique comments in response to O'Connor-Ratcliff's original Facebook posts.  *See* Defs.' Ex. U, 25-130.  Plaintiffs testified they repeated comments because they wanted to reach other Facebook users who might only look at one particular post made by Defendants.  Trial Tr., ECF No. 80, 107:2-7.  By repeating their message on each post, Plaintiffs reasoned, they would raise the issues that mattered to them involving PUSD to a broader audience.  *Id*. at 102:17-103:11.

Assessing the full scope of these comments' disruption is difficult because Zane deleted some of Plaintiffs' comments on his Facebook page while O'Connor-Ratcliff "hid" or deleted others.  In addition, the Parties' exhibits generally show the pages as they appeared in 2017 when the suit was filed.  More recent screenshots were not submitted in evidence.  Nonetheless, Zane testified that deleting comments was not onerous and that he did so to ensure his Facebook page had a "streamlined" appearance.  *Id*. at 133:13-21.  On some of O'Connor-Ratcliff's Facebook posts, she "hid" Plaintiffs' comments and still replied to comments made by other members of the public.  *See, e.g.,* Defs.' Ex. "U," 26, 28, 30 and 32; *and* Trial Tr., ECF No. 80 189:24-190:12.

## F.    Use of Word Filters

In general, Facebook allows a page administrator to block a particular user from commenting on his page but does not allow a page administrator to entirely block comments from all other Facebook users.  Though not addressed extensively at trial, the reasoning for Facebook's policy is intuitive: Facebook is a social media platform, not a website designed for the one-way presentation of information to a reader.  It seeks interaction between users, not just dissemination of content to a recipient.

However, after this suit was filed, Facebook created a new feature that allows a page administrator to use word filters.  Word filters are designed to allow a page

15

administrator to moderate potentially offensive content on their page.  If a page administrator adds a word to the filter, a comment including that word will not appear as a comment on any post.  Trial Tr., ECF No. 80, 116:1-15.

Zane began using word filters on his page in December 2018.  Zane testified that his intent is not to limit only potentially offensive content.  *Id*.  Instead, he seeks to preclude *all* comments on his public page.  *Id*.  To accomplish this intent, he added more than 2,000 words to his word filter.  *Id*.  The words include basic words likely to appear in any comment, such as "he, she, it, [and] that," to ensure all comments are filtered out from his page.  *Id*.  O'Connor-Ratcliff has also adopted word filters, though uses a much smaller set of words.  *Id*. at 160:24-25.  Her intent, likewise, is now to eliminate all comments and use her public Facebook page as a "bulletin board."  *Id*. at 168:16.

### G.    Blocking

Christopher Garnier testified that in October 2017, he was blocked from posting on Zane's public Facebook page and remains so blocked today.  *Id*. at 45:4; 56:1-2.  Zane denies this, stating he never blocked Christopher Garnier on his public Facebook page – only on his personal and business pages.  *Id*. at 117:7.  Zane also testified that he has deleted specific comments and used word filters, discussed above, attempting to prevent all Facebook users from commenting on his posts.  *Id*. at 117:8-20.  He stated that as Facebook's features have evolved, his use of the platform evolved as well.  He now tries to prevent any comments on his page by using an extensive word filter instead of deleting individual comments.  *Id*. at 117:19-25.  The Parties did not address whether blocking an individual from one page automatically blocks that same person from other pages run by the same page administrator, but this could likely be the case here.

Christopher Garnier and Zane offered directly conflicting testimony.  While dated, the documentary evidence supports the conclusion that Zane blocked Christopher Garnier from his public Facebook page.  Christopher Garnier appears unable to comment on any post made by Zane on his page, *see* Pls.' Ex. 15, which is consistent with what a blocked user would experience on a Facebook page.  Accordingly, the Court finds that although

Zane may not have acted with the intent to block Christopher Garnier, the result of his action is that he has blocked and continues to block Christopher Garnier on Facebook.

With respect to Kimberly Garnier, the evidence is different. Kimberly Garnier testified that at the time she filed suit, Zane blocked her from posting on his Facebook page. Trial Tr., ECF No. 80, 88:17-18. Kimberly Garnier testified, however, that only days before trial Zane appeared to unblock her from his Facebook page. *Id*. at 92:10-11. As discussed above, Zane denies he blocked anyone from his public Facebook page. *Id*. at 117:7. Where there is no dispute, the Court readily finds Zane is not currently blocking Kimberly Garnier on Facebook.

Plaintiffs do not allege Zane has ever blocked either of them on Twitter. As such, the Court makes no finding in this regard.

The evidence regarding O'Connor-Ratcliff is much clearer. O'Connor-Ratcliff reported Plaintiffs' comments on her page to Facebook on two occasions. *Id*. at 175:2-4. A representative from Facebook informed O'Connor-Ratcliff that they were looking into the matter, but Facebook did not end up taking any action against Plaintiffs. The representative also recommended O'Connor-Ratcliff block Plaintiffs on the platform, which she did. *Id*. at 175:5-6. O'Connor-Ratcliff has also blocked Christopher Garnier on Twitter. *Id*. at 193:25. She has not unblocked either Christopher Garnier or Kimberly Garnier on those platforms. *Id*. at 45:11; 155:11.

## H. Rationale

Zane testified the content of Christopher Garnier's posts were "not particularly" of any concern to him. *Id*. at 132:25; 133:1-7. Instead, Zane's issue with Plaintiffs' posts on his social media page was the alleged disruption and "spamming" nature of the comments, which went against Zane's intent to have the page "just be very streamlined" in a "bulletin board nature." *Id*. at 133:11-12. Zane stated he never understood Christopher Garnier's decision to repeat comments beneath each post Zane made. *Id*. at 137:23-25. He testified that a comment repeated below each post "wasn't what I wanted for the page, so that's why I chose the settings that I did." *Id*. at 138:1-2.

1   Likewise, O'Connor-Ratcliff testified her reason for blocking Plaintiffs on her
2   Facebook page and Christopher Garnier on Twitter was the repetition, not content, of his
3   posts.  *Id.* at 180:20.  She testified that she has received negative comments from other
4   members of the public on her Facebook page but has not blocked them.  *Id.* at 194:23-
5   195:6.  The record also reflects O'Connor-Ratcliff frequently responded to positive
6   comments on her page with "thumbs-up" reactions and responses such as "Thank you for
7   the kind words," *id.* at 186:8-188:22, but does not show evidence that Plaintiffs were
8   blocked due to the content (vice repetition) of their comments.

9   ## III.   CONCLUSIONS OF LAW

10   Plaintiffs' federal claim arises out of 42 U.S.C. § 1983, pursuant to which "[e]very
11   person who, under color of any statute, ordinance, regulation, custom, or usage, of any
12   State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the
13   deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
14   shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.  To state a
15   claim under Section 1983, a plaintiff must allege: (1) the violation of a right secured by
16   the Constitution and laws of the United States; and (2) that the alleged deprivation was
17   committed by a person acting under color of state law.  *Id.*; *see also West v. Atkins*, 487
18   U.S. 42, 48 (1988); *Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020).  "Section 1983 'is not
19   itself a source of substantive rights,' but merely provides 'a method for vindicating
20   federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

21   As discussed below, this Court concludes that Plaintiffs have demonstrated the
22   requisite elements for a Section 1983 claim, namely: (1) state action, as was determined
23   prior to trial, *see* Order, ECF No. 42; and (2) deprivation of a constitutional right.  Before
24   turning to the claim, however, the Court briefly addresses standing.

25   ### A.   Plaintiffs have Standing for their claims

26   While the Parties' briefs assume Defendants blocked Plaintiffs on Facebook and
27   O'Connor-Ratcliff blocked Christopher Garnier on Twitter, the evidence presented at
28   trial requires the Court to closely examine this issue.

The jurisdiction of federal courts is limited by Article III, § 2, of the Constitution to "Cases" or "Controversies. *Arizonans*, 520 U.S. at 64. This requires a litigant to show "an invasion of a legally protected interest" that is "concrete and particularized," as well as "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations omitted). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint was filed.'" *Arizonans*, 520 U.S. at 67 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). However, "[i]t is undisputed that as a general rule voluntary cessation of challenged conduct moots a case . . . only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Carlson v. United Academics – AAUP/AFT/APEA AFL-CIO*, 265 F.3d 778, 786 (9th Cir. 2001) (internal quotations omitted).

Here, Plaintiffs seek declaratory and injunctive relief against Defendants. Compl., ECF No. 1. An injunction issued by this Court would require Defendants to unblock Plaintiffs on Facebook and would require O'Connor-Ratcliff to unblock Christopher Garnier on Twitter. However, there is evidence that Zane unblocked Kimberly Garnier on Facebook shortly before trial. Accordingly, the general rule would suggest that Kimberly Garnier's claims for injunctive and declaratory relief against Zane are moot. *See Arizonans*, 520 U.S. at 67; *see also Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 622 (S.D.N.Y. 2020) (finding plaintiff's claim for declaratory and injunctive relief mooted because defendant state senator unblocked plaintiff) *and McKercher*, 2019 WL 1098935, at *3 (dismissing claims as moot where defendant added plaintiff on Facebook as a friend during the pendency of litigation, allowing plaintiff to post on defendant's Facebook page). Nonetheless, because Zane unblocked Kimberly Garnier only days before trial, the Court finds it is not absolutely clear that Zane could not block Kimberly Garnier again. *See Carlson*, 265 F.3d at 786. Accordingly, the Court concludes Kimberly Garnier has standing for her claims against Zane.

As discussed above, the Court finds that both Defendants blocked and continue to

3:17-cv-02215-BEN-JLB

block Christopher Garnier on Facebook, that O'Connor-Ratcliff blocked and continues to block Christopher Garnier on Twitter, and that O'Connor-Ratcliff blocked and continues to block Kimberly Garnier on Facebook.  These claims therefore involve an actual controversy and the Court's analysis on these alleged Section 1983 violations proceeds below.

### B.     Defendants' Conduct Constitutes State Action

First, although not alleged in the complaint, Plaintiffs have filed suit against Defendants on the basis that their actions qualify as state action.  Judge Whelan's order on Defendants' motion for summary judgment already concluded that Defendants acted under color of state law, satisfying the first element for a Section 1983 action.  *See generally* ECF No. 42.  Despite Judge Whelan's ruling, Defendants noted at the beginning of trial that this case involved a question of "whether there was state action." Trial Tr., ECF No. 80, 13:8-12.  Although recognizing that Judge Whelan had found state action when denying their motion for summary judgment, they intended to present evidence on that issue to preserve the record for appeal.  *Id.*  At the conclusion of trial, the Court stated that it recognized a difference between this case and the *Knight* and *Morgan* cases, both of which involved an executive, because unlike the legislators here who have regular meetings at which the public can appear and provide comment, the executives in *Knight* and *Morgan* lacked such a forum.  *Id.* at 199:7-11.  The Court noted that in this case, Plaintiffs could come into a Board meeting and "express the very same views . . . that they could . . . on Facebook or Twitter."  *Id.* at 199:1-6.  As a result, the Court asked the Parties to address whether the fact that Defendants' actions were taken outside of a meeting could preclude those actions from being considered state action sufficient to allow a Section 1983 action to proceed.

Plaintiffs argue that Defendants' status as legislators vice executive branch officials does not change the analysis of whether Defendants acted under color of state law in blocking Plaintiffs.  Pls.' Br., ECF No. 86, 9-11.  Plaintiffs urge the Court to adopt a "totality of the circumstances" test for determining state action, citing the Fourth

1  Circuit's decision in *Davison*. *Id*. (citing 912 F.3d 666).  Defendants argue extensively

2  that they did not act under color of state law because they are members of the legislative

3  branch and cannot take official action outside of a meeting of their legislative body.

4  Defs.' Br., ECF No. 84, 13-15 (citing Cal. Gov't Code § 54950 *et seq*.).  On these

5  grounds, they attempt to distinguish other cases that have found similar conduct to violate

6  the First Amendment. *Id*. at 14.

7  As stated above, the Court adopts the reasoning and conclusions articulated by

8  Judge Whelan in his order on Defendants' motion for summary judgment that "[t]he

9  content of [Defendants'] posts, considered in totality, went beyond their policy

10  preferences or information about their campaigns for reelection."   ECF No. 42 at 14:2-4.

11  Because Defendants "could not have used their social media pages in the way they did

12  but for their positions on PUSD's Board, their blocking of [Plaintiffs] satisfies the state-

13  action requirement for a section 1983 claim." *Id.* at 14.  Further, "the content of many of

14  their posts was possible because they were 'clothed with the authority of state law.'" *Id*.

15  (citing *Davison*, 912 F.3d at 679).  Finally, other recent cases addressing blocking on

16  social media have found legislators to be acting under color of state law in making

17  blocking decisions. *See, e.g.*, *Davison*, 912 F.3d at 680 (county board chair); *Campbell*,

18  367 F. Supp. 3d at 994 (state representative); *and Felts v. Reed*, Case No. 20-cv-821-

19  JAR, 2020 WL 7041809, at *6 (E.D. Mo. Dec. 1, 2020) (municipal alderman).  For these

20  reasons, the Court concludes Defendants acted under color of state law despite

21  Defendants' positions as legislators, not executives.

22  **C.    Deprivation of a Constitutional Right Under the First Amendment**

23  Second, Plaintiffs argue that they suffered a deprivation of a constitutional right in

24  the form of a violation of their First Amendment rights to free speech.  First Amendment

25  cases involving social media address many issues.  Some of these issues have already

26  been addressed by Judge Whelan's order on Defendants' motion for summary judgment,

27  including but not limited to his conclusions that: (1) Plaintiffs have standing to bring their

28  claims; (2) Defendants are entitled to qualified immunity; and (3) Defendants' accounts

are designated public forums.  ECF No. 42.  As noted, the Court adopts those conclusions here.[3]  Other potentially relevant issues, such as whether a plaintiff can require a defendant to listen to their speech—she cannot, *see Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984) (a plaintiff has "no constitutional right to force the government to listen to their views")—are addressed by other cases but have not been raised on the facts here.[4]

Instead, this dispute addresses an apparent issue of first impression in the digital domain: whether Plaintiffs' repetitive comments and replies on Defendants' social media pages actually disrupted Defendants' original posts, making Defendants' blocking a reasonable time, place, or manner restriction on Plaintiffs' speech.  As outlined below, the Court concludes that while the blocking was content-neutral, Defendants' continued blocking constitutes a burden on speech that is no longer narrowly tailored to serve a substantial government interest.

### 1.    *Defendants' Blocking was a Content-Neutral Rule of Decorum*

Having concluded Defendants' pages are public forums and that they acted under color of state law in maintaining those pages, the Court turns to whether the blocking at

---

[3]    Whether Defendants' accounts remain a public forum today is a close question.  It is undisputed that the government may close a designated public forum.  *See DiLoreto v. Unified Sch. Dist. Bd. Of Educ.*, 196 F.3d 958, 970 (9th Cir. 1999) ("The government has an inherent right to control its property, which includes the right to close a previously open forum.").  Since the Complaint was filed, Facebook introduced the word filter feature and Defendants have started using word filters extensively to attempt to block all comments.  It may be that by doing so Defendants closed the public forums on their public Facebook pages.  However, the Parties did not brief and the Court is not aware of any authority holding that a social media public forum is closed when broad word filters are used.  These are simply uncharted seas with plenty of icebergs.  To proceed circumspectly, the Court does not make that holding here, but notes the difficulty of applying First Amendment analysis to technology platforms that change rapidly during a single case.

[4]    Plaintiffs' also briefly touch on the issue of "hiding" and deleting comments, but do not argue these actions constituted a violation of Section 1983.  Accordingly, those actions are not analyzed in these conclusions of law.

issue here was content-based or content-neutral because "[v]iewpoint discrimination is prohibited in all forums." *Faison*, 440 F. Supp. 3d at 1135 (citing *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992)).  Thus, if Defendants' blocking was content-based, it would be subject to strict scrutiny.  Alternatively, if Defendants' blocking was content-neutral, the Court would analyze whether the blocking constituted "reasonable restrictions on the time, place, or manner of protected speech" under the framework set forth by the Supreme Court in *Ward v. Rock Against Racism*.  491 U.S. 781, 791 (1989).

"Viewpoint discrimination is apparent . . . if a government official's decision to take a challenged action was 'impermissibly motivated by a desire to suppress a particular point of view.'" *Davison*, 912 F.3d at 687 (quoting *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788, 812–13 (1985)).  By contrast, a regulation on speech is "content-neutral" if it is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791.  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id*.

Plaintiffs argue Defendants' blocking was content-based because their social media comments "were addressing what even Defendants acknowledged to be serious, persistent, legitimate PUSD issues."  Pls.' Br., ECF No. 86, 4.  Defendants' counter that they blocked Plaintiffs "because of the 'manner' [i.e., the repetition] of the posting and not because of the content of the posts."  Defs.' Br., ECF No. 84, 4.

The evidence presented at trial favors Defendants.  To begin with, it is undisputed that Defendants' did not adopt formal rules of decorum or etiquette for their social media pages.  Trial Tr., ECF No. 80, 115:6-9; 154:21-23.  However, to survive a challenge that their decision to block Plaintiffs' was content-based (and thus subject to strict scrutiny – *see Boos v. Barry*, 485 U.S. 312, 321 (1988), Defendants' necessarily argue that the blocking was to enforce an unwritten rule of decorum prohibiting repetitious speech on their social media pages.

In Defendants' favor, there is ample testimony that once Facebook introduced the word filter feature, Defendants intended their pages to be "bulletin boards" and tried to block *all* comments on their pages.  Plaintiffs' repetitive posting was also clearly established by the evidence at trial.  Christopher Garnier sent 226 tweets to O'Connor-Ratcliff in the span of ten minutes on October 17, 2017, sending each tweet as a reply to every tweet she ever posted.  On Facebook, Plaintiffs repeatedly posted comments – though not all were identical – to both Defendants' pages.  This evidence distinguishes the case at bar from others addressing First Amendment challenges to social media blocking, which did not involve repeated comments and acknowledged the blocking in those cases was content-based.  *Cf. Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 553-54 (S.D.N.Y. 2018) ("Defendants do 'not contest Plaintiffs' allegation that the Individual Plaintiffs were blocked from the President's Twitter account because the Individual Plaintiffs posted tweets that criticized the President or his policies'") *and Davison*, 912 F.3d at 687 (defendant county board chair blocked plaintiff "because she viewed the allegations [in his Facebook comments] as 'slanderous'").

However, O'Connor-Ratcliff's testimony also describes interacting with constituents on Facebook who had nice things to say by either replying to their comments or responding through an emoticon.  The documentary evidence further indicates that while Zane may have intended his page to be a "bulletin board" and only deleted Plaintiffs' comments because "that's not what I wanted for my page," other positive comments remained on his page when the suit was originally filed.  For example, Zane made an original post on June 29, 2017, on which it appears the official PUSD Facebook account made a comment.  Pls.' Ex. 6, 5-6.  That positive comment was still visible on the date the screenshot was taken, September 8, 2017.  *Id.*  Thus, at least when the suit was filed, there is strong evidence these pages were not "bulletin boards."[5]

---

[5]     As discussed above in note 3, the Court declines to hold that Defendants' later use of extensive word filters here effectively closed the public forum.  If the public forum was now closed, it would moot

On this record, the evidence shows that Defendants' blocked Plaintiffs due to the repetitive manner of their posts, vice the negative content of those posts.  Accordingly, the Court concludes Defendants' blocking was content-neutral.

One final note on content-neutrality is appropriate.  Both parties argue that Facebook and Twitter's community standards support their claims.  Defendants assert that Plaintiffs' comments violated those community standards by "engag[ing] with content at very high frequencies."  Defs.' Br., ECF No. 84, 8.  Plaintiffs respond that O'Connor-Ratcliff attempted to bring these posts to Facebook's attention, but that Facebook took no action against them.  Pls.' Br., ECF No. 86, 11, n. 14.  Plaintiffs argue Facebook's inaction confirms Plaintiffs' posts did not violate Facebook's community standards, and therefore, the comments should be considered protected speech.  *Id.* Notably missing from these arguments, however, is citation to authority approving the use of Facebook or Twitter's community standards in analyzing whether the First Amendment is infringed.  The Court declines the invitation to do so here.  The First Amendment is interpreted by the courts, not tech companies.  *Cf. Prager Univ. v. Google, LLC*, 951 F.3d 991, 999 (9th Cir. 2020) (state action doctrine precluded First Amendment scrutiny of YouTube's content moderation policy pursuant to its terms of service and community guidelines).

### 2.    *Defendants' blocking is no longer narrowly tailored*

Having found the blocking to be content-neutral, the Court next turns to whether Defendants' blocking and use of word filters are narrowly tailored.  Plaintiffs argue Defendants' blocking was not narrowly tailored because their comments did not "disrupt, disturb, or otherwise impede" Defendants' social media pages.  Pls.' Br., ECF No. 86, 13-14 (*citing White v. City of Norwalk*, 900 F.2d 1421, 1424 (9th Cir. 1990)).  Defendants argue that because they intended to use their pages in a "bulletin board type

---

Plaintiffs' claims.  *See Karras v. Gore*, Case No. 14-CV-2564-BEN-KSC, 2015 WL 74143, at *3-4 (S.D. Cal. Jan. 6, 2015) (denying as moot the plaintiff's request for an injunction allowing him to post on the defendant's public Facebook page where the defendant had already closed the page).

manner," the use of expansive word filters to attempt to block all comments supports the conclusion that Defendants' blocking was narrowly tailored.  Defs.' Br., ECF No. 84, 11. While the Court concludes Defendants' blocking was initially narrowly tailored, the fact that blocking has gone on for nearly three years requires the Court to reach a different conclusion now.

To be "narrowly tailored," a regulation "need not be the least restrictive or least intrusive means" of serving "the government's legitimate, content-neutral interests." *Ward*, 491 U.S. at 798.  "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).  However, "this standard does not mean that a time, place, or manner regulation may burden substantially more speech that is necessary to further the government's legitimate interests."  *Id*.

In the physical world, the Ninth Circuit has held that a city council may remove a person from a meeting without offending the First Amendment "when someone making a proscribed remark is acting in a way that actually disturbs or impedes the meeting." *White v. City of Norwalk*, 900 F.2d 1421, 1424 (9th Cir. 1990).  The city ordinance at issue there provided that an offending individual must first be provided a warning before persistent disrupting action could result in ejection from the meeting and a misdemeanor citation.  *Id*.  The court elaborated that "the nature of a [c]ouncil meeting means that a speaker can become 'disruptive' in ways that would not meet the test of an actual breach of the peace."  *Id*.  "A speaker may disrupt a [c]ouncil meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies."  *Id*. at 1426.  While "the point at which speech becomes unduly repetitious or largely irrelevant is not mathematically determinable," the test is whether the city council "is prevented from accomplishing business in a reasonably efficient manner."  *Id*.  The court also emphasized that "such conduct might interfere with the rights of other speakers."  *Id*.

In *Norse v. City of Santa Cruz*, the Ninth Circuit addressed another case involving

26

an individual who was ejected from a city council meeting for giving a silent Nazi salute to the city council mocking a decision the council had made. 629 F.3d 966, 969-70 (9th Cir. 2010). Though the text of the ordinance does not appear in the court's opinion, it is clear from the opinion that the plaintiff never received an indefinite ban from city council meetings. Indeed, he sought leave to amend his complaint two years after it was initially filed to add another ejection for a subsequent alleged disruption. *Id*. at 970. Addressing the plaintiff's disruption, the Ninth Circuit explained that *White* stands for the proposition that "[a]ctual disruption means actual disruption." 629 F.3d 966, 976 (9th Cir. 2010) (en banc). "It does not mean constructive disruption, technical disruption, virtual disruption, *nunc pro tunc* disruption, or imaginary disruption." *Id*. The Court remanded for trial the issue of whether the plaintiff's actions constituted an actual disruption. *Id*. at 978.

While, "as a general matter, social media is entitled to the same First Amendment protections as other forms of media," *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735-36 (2019), the Court notes that applying the First Amendment to social media is a relatively new task. Accordingly, it "proceed[s] circumspectly, taking one step at a time." *Id*. at 1744 (Alito, J., concurring). Thus, the Court applies the narrow tailoring test articulated in *Ward*, while acknowledging the "actual disruption" standard in *White* and *Norse*, which have not been applied outside the context of a city council meeting.

On Facebook, Plaintiffs' repeatedly posted the same or similar comments at high frequency during a short period of time. Trial Tr., ECF No. 80, 68:13-15. While Plaintiffs' comments on posts appeared beneath Defendants' original content, Facebook truncated long posts, and comments such that only an interested reader would see the entirety of a lengthy comment, blocking promoted the legitimate interest of facilitating discussion on these social media pages and did not burden substantially more speech than necessary because it immediately responded to high frequency posting during a short period of time. *See Ward*, 491 U.S. at 799. Alternatively, applying the "unduly repetitious or largely irrelevant" threshold the Ninth Circuit articulated in *White*, Plaintiffs' comments surely also met this standard. 900 F.2d at 1426. In other words, at

the time Defendants' blocked Plaintiffs, Plaintiffs' repetitive comments on Defendants' Facebook posts were narrowly-tailored grounds for ejection from the forum.

On Twitter, the reasonableness of O'Connor-Ratcliff's initial decision to block Christopher Garnier is even more apparent.  The testimony received shows that Christopher Garnier "tweeted at" O'Connor-Ratcliff 226 times in less than ten minutes. Trial Tr., ECF No. 80, 180:16.  While the Court concurs with Christopher Garnier that it "is a beautiful thing [to be] able to engage [] elected officials' social media pages," *id*. at 76:19-20, this repetitive posting is far from "the banter" he asserts it is, *id*. at 76:24. Instead, O'Connor-Ratcliff's blocking of Christopher Garnier was narrowly tailored because it constituted a very limited blocking induced only by an excessive "Tweet storm."  While this conclusion differs from other social media cases, it does so because those cases did not address repetitive posts.   Alternatively applying *White*'s "actual disruption" standard, Christopher Garnier's tweets once again crossed the line into "unduly repetitious or largely irrelevant."  900 F.2d at 1426.  Accordingly, the Court finds O'Connor-Ratcliff initially ejecting Christopher Garnier from her Twitter forum for narrowly tailored reasons.

The issue then becomes whether Defendants' continued blocking, which has now gone on for more than three years, continues to "'promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (quoting *Albertini*, 472 U.S. at 689)).  Here, the Court concludes the blocking has run its course – for now.

In *White* and *Norse*, the respective city councils both eventually allowed the plaintiffs into subsequent meetings.  Not so here.  Defendants continue to block Plaintiffs more than three years after initially doing so.  While blocking was initially permissible, its continuation applies a regulation on speech substantially more broadly than necessary to achieve the government interest.  *See Ward*, 491 U.S. at 800.  Requiring Defendants to unblock Plaintiffs' following a three-year ban is also consistent with the Ninth Circuit's holding in *White*, which held the city ordinance at issue to be valid because it could be

applied in a permissible manner.  *See* 900 F.2d at 1426.  Accordingly, the Court finds Defendants' blocking is no longer narrowly tailored.

However, the Court's conclusion is not free reign for Plaintiffs' to repeatedly post on Defendants' social media pages again.  As noted above, the Court finds Defendants' *initial* blocking decision responded to repetitive and largely unreasonable behavior, and was therefore narrowly tailored to serve a substantial government interest.  *See Ward*, 491 U.S. at 799.  Only the fact that the blocking has gone on for three years requires the Court to intervene here.  Plaintiffs should not interpret these conclusions of law as an invitation to flaunt and mock the First Amendment's important protections.

### 3.      *Substantial Government Interest*

Having found the blocking is no longer narrowly tailored, Plaintiffs are entitled to the injunctive relief they request.  Nonetheless, the Court turns to whether Defendants' blocking furthered a significant government interest because of the important consequences the Court's ruling may have here.

It is undeniable that Defendants, by creating and maintaining public Facebook pages and Twitter accounts, serve a substantial government interest.  They have leveraged technology to provide new ways for their constituents to gain awareness of their activities and initiatives as elected officials.  In short, they have used their pages to facilitate transparency in government.  This is one of the most "significant government interests" the Court could imagine.  Ensuring those platforms are not cluttered with repetitive posts monopolizing the pixels on the screen is important, and their role as "moderator[s] involves a great deal of discretion."  *White*, 900 F.2d at 1426.  It is a challenging role, but one that public officials should not be scared away from as they seek to increase the public's access to themselves and their offices.

For these reasons, the Court notes that Defendants could adopt content-neutral rules of decorum for their pages to further the substantial government interest of promoting online interaction with constituents through social media.  For example, those rules could contain reasonable restrictions prohibiting the repeated posting of comments

and include sanctions such as blocking for a limited period of time.  Though the Court cannot decide a precise time limit that might be reasonable, blocking for one month may pass muster given the ease at which a page administrator can block and unblock a user from a particular page.  Blocking for three years, on the other hand, cannot.

### 4.  *Alternative Channels of Communication Exist*

Again, while the foregoing is sufficient to grant Plaintiffs their requested injunctive relief, the Court briefly addresses the final factor in the *Ward* analysis.  491 U.S. at 802. Defendants argue that their decision to block Plaintiffs on social media left open "ample alternative channels for communication."  Defs.' Br., ECF No. 84, 12.

Ample alternative channels for communication exist when a regulation "does not attempt to ban any particular manner or type of expression at a given place or time." *Ward*, 491 U.S. at 802.  "An alternative is not ample if the speaker is not permitted to reach the intended audience."  *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (internal quotation marks omitted).

Plaintiffs do not argue that ample alternatives are lacking, and the evidence confirms this is a wise concession.  Whether Plaintiffs' intended audience for their comments and replies was Defendants themselves or other constituents within PUSD, Plaintiffs are able to communicate their concerns through Board meetings, emails, and their own social media accounts.  Accordingly, the Court finds Defendants' blocking does not offend the third step of the *Ward* analysis.

### 5.  *Prior Restraint*

Based on the foregoing, the Court need not reach the thorny question of whether an expansive use of word filters designed to block every comment constitutes an impermissible prior restraint on protected speech or whether it closes the public forum. "A prior restraint is an administrative or judicial order that forbids certain communications issued before those communications occur."  *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014) (citing *Alexander v. United States*, 509 U.S. 544, 549-50 (1993)).  "Any prior restraint on

expression comes to [the Court] with a heavy presumption against its constitutional validity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976) (internal quotations omitted). As discussed above, "social media is entitled to the same First Amendment protections as other forms of media," *Packingham*, 137 S.Ct. at 1735-36 (2019), but the Court again "proceed[s] circumspectly, taking one step at a time." *Id*. at 1744 (Alito, J., concurring). That caution counsels the Court against making a finding regarding word filters here, when the Court can decide the issue on narrower grounds.

## IV.   CONCLUSION

The Court is aware of the consequences of its ruling today, but it is bound to follow the law as it has been interpreted by the Supreme Court and Ninth Circuit Court of Appeals. It may be that, faced with the choice between unblocking Plaintiffs and closing their public pages entirely, Defendants choose the latter. That would be a sad conclusion. The actions of a few repetitive actors should not deprive so many of this important civic tool, and the Court hopes that Defendants do not choose this course of action.

The Court finds that based on the record and the applicable law, Plaintiffs have proven Defendants violated 42 U.S.C. § 1983 by depriving Plaintiffs of their right to free speech while acting under color of state law. Specifically, the violation began at some time late in 2017 when the blocking of Plaintiffs had continued for too long a time and continues to the present. The Court does not find Defendants' conduct violated the California Constitution. Plaintiffs are entitled to declaratory and injunctive relief on their Section 1983 claim. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Date: January 14, 2021

**HON. ROGER T. BENITEZ**
United States District Judge

31

3:17-cv-02215-BEN-JLB